## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JACQUELYN CHESSON, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-01-315 |
| | § | |
| DARRELL HALL, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Plaintiffs, a group of 315 home buyers, sued defendants Darrel Hall and entities he controls that build and sell houses and develop subdivisions.  The claims arose from plaintiffs' purchase of new and previously-owned single-family homes in newly-developed subdivisions.  Plaintiffs generally alleged that the houses were incompletely or poorly constructed, had water and septic systems that functioned poorly, and were in subdivisions with drainage problems and unpaved roads.  Plaintiffs asserted causes of action under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 *et seq.*, and state-law causes of action for breach of contract, negligent construction, breach of the implied warranty of habitability, and breach of the implied warranty of good workmanship.  (Docket Entry No. 37).  Because plaintiffs had stopped making any monthly payments on the houses but had continued to live in them, defendants counterclaimed for breach of contract and trespass to try title.

On March 14, 2004, this court dismissed plaintiffs' RICO claims and the state-law claims for fraud and fraudulent inducement. (Docket Entry No. 73). After supplementing the record based on depositions of certain plaintiffs, defendants moved for summary judgment on the remaining claims. Defendants argue that those plaintiffs who signed contracts for deed cannot recover for breach of those contracts; that none of the plaintiffs can recover damages for the condition of the properties because they signed contracts with "as is" provisions; that plaintiffs have failed to raise a fact issue as to the breach of the warranty of habitability; and that plaintiffs cannot recover damages in excess of the amount they owe for the fair market value of the rent that they have failed to pay for years. (Docket Entry No. 86). Plaintiffs challenge the enforceability of the "as is" clauses and assert that defendants breached the contracts first, excusing their obligation to pay. Plaintiffs move to strike defendants' motion for summary judgment as to the breach of the implied warranty of habitability claims and argue that there are disputed material issues of fact as to the remaining claims. (Docket Entry No. 91).

Based on the pleadings; the motions, responses, replies; the parties' submissions and arguments; and the applicable law, this court denies plaintiffs' motion to strike and grants defendants' motion for summary judgment in part, denying it only as to certain claims and certain plaintiffs. The ruling and reasons are explained in detail below.

A status conference is set for **September 7, 2005** at **10:00 a.m.** At that conference, the parties should be prepared to discuss the implications of this opinion for

the remaining claims of one of the sixteen plaintiffs and for the claims of the remaining plaintiffs.

## I.    Background

In June 2000, plaintiffs, a group of forty home owners in the Trails End I and II, 59 Estates, Shannon Estates, Cedar Estates, Huntsville West Estates, and Five Oaks Estates subdivisions developed by defendants, filed this suit in federal court, alleging that defendants violated RICO by fraudulently promising to deliver complete homes with approved water systems and failing to do so.  Defendants Darrell Hall and Sue Hall are named individually and as d/b/a Darrell Hall Land Sales.  Both Hall and his wife, Sue, allegedly sold the properties to plaintiffs either directly or through one of their business entities.  5G Exchange, Inc. owns real estate and is controlled by Hall.  TJR Partnership, Ltd. is a limited partnership in the business of building and selling single family homes. TJR is operated by its general partner, 5H Exchange Management, Inc. and its limited partner, Darrell Hall, who serves as president of  5H Exchange.[1]

On October 2, 2000, some, but not all, of the same home buyers filed suit in state court against most of the same defendants earlier sued in federal court.  Plaintiffs asserted state-law claims for fraud, fraudulent inducement, breach of contract, and breach of the implied warranties.  Defendants removed the state-court action to federal court, where it was consolidated with this suit.  In January 2001, the consolidated action was transferred to the Southern District of Texas, with a pending motion to remand the state-law claims.

---

[1]  Plaintiffs allege that "TJR, 5G Exchange and/or others" owned the real estate.  In most cases plaintiffs contracted with TJR, and in some cases with 5G, Inc. and the Halls.

This court granted the motion to remand.  (Docket Entry No. 17).  The parties then agreed to abate the state court action and litigate all the claims in federal court.  In July 2002, plaintiffs filed a first amended complaint and added new plaintiffs.  In March 2003, plaintiffs filed a second amended complaint to add additional plaintiffs and assert the state-law claims previously remanded.  (Docket Entry Nos. 20, 37).

In August 2003, defendants moved for summary judgment on the basis that plaintiffs had agreed to buy the property "as is" and breached the contracts by failing to make monthly payments.  This court granted the summary judgment motion as to the RICO and state-law fraud claims, but found the record available at that time inadequate to dismiss the claims for breach of contract, negligence, and breach of the implied warranties of workmanship and habitability.  Based on the close relationship of the factual and legal bases for the federal and state law causes of action, and the procedural history of the case, this court retained jurisdiction rather than have plaintiffs refile yet again in state court.  (Docket Entry No. 73).[2]

Since the March 2004 ruling, the parties have identified sixteen "trial" plaintiffs to serve as "bellwether" or "test" cases and have conducted additional discovery. Defendants filed a motion for leave to file a second summary judgment motion on the basis that the recent discovery allowed them to supplement the record to cure the previous deficiencies necessary to show entitlement to summary judgment.  This court granted the

---

[2]  *See Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir.1992) ("[T]he amount of judicial resources that the case has consumed is most important for our analysis as an indication of the familiarity of the forum with the case and its ability to resolve the dispute efficiently.").

motion.  The record now consists of the deposition testimony of the sixteen plaintiffs and copies of the individual contracts they signed, as well as information as to when they stopped making any payments toward the purchase price of the houses.

Plaintiffs generally alleged defects with the construction, electrical wiring, plumbing, air conditioning units, and foundations in the houses.  They alleged that these problems resulted in additional difficulties, including power surges, high electrical bills, plumbing leaks, flooding, and mold contamination.  Plaintiffs also alleged that defendants did not complete the houses or make repairs as promised.  A second category of complaints concern the effects of the subdivision conditions on the individual houses. Plaintiffs alleged that defendants did not provide paved roads or approved water systems in the subdivisions where the houses were built.  Some of the plaintiffs alleged that the water within their houses was an odd color and smell, during certain periods, not drinkable.

Defendants generally respond that they offered to make repairs for construction problems that plaintiffs brought to their attention after they inspected the houses.  As to the road systems, defendants point to the fact that the plaintiffs were aware that the roads were not paved when they purchased the houses and that the contracts did not contain any promises that the roads would be paved in the future.  As to the septic and water systems, defendants argue that the systems were installed as promised and function properly.

Defendants primarily rely on the terms of the plaintiffs' contracts.  Defendants argue that all of the plaintiffs who purchased existing homes, and most of the plaintiffs

who purchased new homes, had an opportunity to inspect the homes before signing the contracts, and that the contracts have enforceable "as is" clauses that preclude recovery on the negligence and implied warranty causes of action.  Defendants also argue that plaintiffs cannot recover for breach of contract, because plaintiffs have failed to make payments under their contracts.  Finally, as to the implied warranty of habitability, defendants argue that none of the plaintiffs can recover because the alleged latent defects were not so severe as to make the houses unsuitable for habitation.  Defendants have moved for summary judgment as to all of the claims asserted by the sixteen plaintiffs.  Defendants also argue that summary judgment is appropriate against all nontrial plaintiffs who also stopped making monthly payments and failed to produce evidence in response to the motion for summary judgment.  (Docket Entry No. 95, p. 9).

### A.    The Plaintiffs' Contracts

Ten of the plaintiffs – Tommy Breedlove, Johnny Hensley, Harold Dodson, Roger Fountain, Timothy Lockhart, Jesse Salazar, Carla Shumate, Marion Standley, Belinda Stokes, and Darlene Trapp, – entered into contracts to purchase new houses built and sold by defendants.  The new houses were sold in different stages of construction – 100% completed, 95% completed, or "completed shell."  The new houses were to be "painted outside" by plaintiffs within six months of possession.  Five of the plaintiffs – Rhonda Carson, Jacquelyn Chesson, Sandra Eaton, George Glover, and Richard Johnson – entered into contracts to purchase existing houses that defendants had built but that had been previously owned.  One plaintiff – Tommy Breedlove – purchased a new home that

no one has lived in; Breedlove bought the house, located on three acres, as an investment. One plaintiff – Jim Farnkoff – purchased lots from defendants, but defendants did not build his home.

The summary judgment evidence shows that all the plaintiffs signed an earnest money contract, made a down payment, and all but one signed a contract for deed or a deed of trust before moving onto the property.[3] Hall or one of his employees showed the property to the plaintiffs. After viewing the lots and houses, the plaintiffs returned to the sales office and executed an earnest money contract. Hall or his wife, Sue Hall, filled in the payment terms, the description of the lot, the house, and any additional items to be included or repairs to be made. The total purchase price of the properties ranged from $26,900.00 to $107,000.00; the monthly installment payments ranged from $207.62 to $1,139.00.

All sixteen plaintiffs signed the same form of standard earnest money contract. The contracts stated  in part as follows:

> Purchaser agrees not to take permanent possession until down payment is completed and all closing papers signed.
>
> . . .
>
> Water, septic tanks, telephones, and electricity will be the responsibility of the purchaser. Purchaser shall have until midnight of the seventh calendar day following the date of

---

[3] Johnny Hensley, Harold Dodson, Roger Fountain, Timothy Lockhart, Jesse Salazar, Carla Shumate, Marion Standley, Belinda Stokes, Darlene Trapp, Tommy Breedlove, and George Clover signed contracts for deed. Rhonda Carson, Sandra Eaton, and Richard Johnson signed deeds of trust. One plaintiff – Jacquelyn Chesson – did not execute any contract other than an earnest money contract. (Docket Entry Nos. 91, 95).

this contract to revoke contract and demand his earnest money refunded.

The herein described premises may be subject to flooding. PURCHASER has examined all information to his/her satisfaction and either examined the property personally or been given the opportunity to inspect the property and has found it to be suitable his needs and purposes. PURCHASER hereby releases and agrees to hold SELLER harmless from liability arising out of any lease or any claim based on the present condition of the premises and any future condition not caused by the acts of seller. . . .

It is further understood and agreed that there is herein contained all the terms and conditions of the agreement, and that no verbal statement of any person or persons whomsoever not herein incorporated shall be binding upon either party or upon the SELLER, his agent or representatives, and that no warranties of representation of any kind have been made by either party other than as herein incorporated.

(Docket Entry No. 95, Ex. 2).

After paying the down payment sums set out in the earnest money contracts, the plaintiffs signed a second contract, either a contract for deed or a deed of trust, for the property. The second contract set out the installment payment terms and the consequences of default and contained "as is" provisions.

Three of the plaintiffs who purchased previously-owned existing homes – Rhonda Carson, Sandra Eaton, and Richard Johnson signed deeds of trust with vendor's liens that contained the following "as is" provisions:

The conveyance of this property is made without any warranty, express or implied, as to the condition of the property, in that all or part of the property herein may be subject to flooding, and the conveyance of the property

> described herein made by Grantor and accepted by Grantee "AS IS, WHERE IS AND WITH ALL FAULTS."
>
> [N]o warranties, either express or implied, are or shall be made to merchantability, fitness for purpose, workmanship or quality, and the conveyance of the property is made "AS IS AND WHERE IS."

(Docket Entry No. 95, Ex. 2).  The default provisions in the real estate lien notes stated as follows:

> If Maker defaults in the payment of this note or in the performance of any obligation in any instrument securing or collateral to it, and the default continues after Payee gives Maker notice of the default and the time with which it must be cured, as may be required by law or by written agreement, then Payee may declare the unpaid principal balance and earned interest on this note immediately due.  Upon default, Maker and each surety, endorser, and guarantor waive all demands for payment, presentations for payment, notices of intention to accelerate maturity, notices of acceleration of maturity, protests, and notices of protest, to the extent permitted by law.

(*Id.*).

The remaining plaintiff who purchased an existing house – George Glover – and those who purchased new houses – Tommy Breedlove, Timothy Lockhart, Johnny Hensley, Harold Dodson, Darlene Trapp, Marion Standley, Belinda Stokes, Roger

Fountain, Carla Shumate, and Jesse Salazar – signed contracts for deed.[4]  The contracts

for deed stated in part as follow:

> Purchaser understands and acknowledges that Purchaser does not acquire legal title by this contract and that purchaser will not acquire legal title until Seller's deed is delivered.
>
> The herein described premises may be subject to flooding. PURCHASER has examined the property either on the ground or to PURCHASER'S complete satisfaction and knows its condition.  PURCHASER acknowledges that no warranty or representations of any kind have been made by any party or individual other than is herein incorporated, and such property is sold "AS IS," "WHERE IS," and WITH ALL FAULTS.  In purchasing the property, PURCHASER relies only on PURCHASER'S examination and judgment, not on the representation of any other person as to value, future value, condition, size, age, use, or any other matter. PURCHASER acknowledges that in selling the property SELLER makes no warranties other than title.  PURCHASER hereby releases and agrees to hold SELLER harmless from liability arising out of any lease or any claim based on the present condition of the premises and any future condition not caused by the acts of the SELLER.
>
> It is further understood and agreed that there is herein contained all the terms and conditions of this agreement, and that no verbal statement of any person or persons whomsoever, not herein incorporated, shall be binding upon either party or upon the SELLER, his agent or representatives, and that no warranties or representation of any kind have been made by either party other than as herein incorporated.

---

[4] Jim Farnkoff, who purchased land only, signed three contracts for deed for undeveloped lots. The contracts for deed stated that "[a]t anytime during the terms of this contract, at SELLER'S option, SELLER may tender his General or Special Warranty Deed to PURCHASER, reserving a Vendors Lien in the Deed for the then remaining balance due on the contract and PURCHASER agrees to execute a Vendors Lien note secured by a Deed of Trust on the same terms and conditions as herein contained . . ."  The following plaintiffs who signed contracts for deed later signed deeds of trust: Harold Dodson (June 25, 2000);  Jim Farnkoff (June 29, 2001); and Darlene Trapp (November 13, 2001).

(Docket Entry No. 95, Ex. 3).[5]

> The contracts for deed contained the following forfeiture provisions:
>
> This contract is accepted by the PURCHASER . . . with the express understanding that time is of the essence in its performance and that in the event of any violation of the above terms and conditions by PURCHASER, or default in making one or more of said payments, or on breach of any of the terms and conditions of this contract by the PURCHASER, then SELLER, at his option, may declare the entire unpaid principal amount immediately due and owing and in the event PURCHASER shall fail to pay in full the said entire unpaid principal amount. . . within ten (10) days following notice . . . all right, title and interest of said PURCHASER, his heirs and assigns, in said property shall then and there at the option of SELLER be forfeited and shall revert to SELLER, its successors or assigns, together with all sums theretofore paid by PURCHASER. . . . In the event that the said property reverts to SELLER or his assigns under the terms of this paragraph, PURCHASER shall within 30 days of PURCHASER'S violation, default or breach of this agreement, remove all personal property from the premises. All such property remaining after such thirtieth day shall at SELLER'S option, become the property of SELLER or may be removed by SELLER at PURCHASER'S expense. . . . If the property is used as PURCHASER'S residence, the grace period for default is determined by § 5.061 of the Texas Property Code or its successor. . .
> . . .
>
> No delay by SELLER in enforcing any part of this contract shall be deemed a waiver of any of SELLER'S rights or remedies.  If SELLER accepts any payment after its due date, the acceptance shall not be construed as a waiver of any other

---

[5]  The contracts for deed used for property in the Trails End subdivision stated that "ALL ROADS INSIDE THIS DEVELOPMENT, TRAILS END, ARE PRIVATE ROADS AND SAN JACINTO COUNTY WILL NOT NOW OR EVER BE RESPONSIBLE FOR THE MAINTENANCE OF THESE ROADS."  (Docket Entry No. 95, Farnkoff Deposition, Ex. 2).

> due date, shall not change any other due date, and shall not
> waive any of SELLER'S rights or remedies.

(*Id.,* ¶ 9).  Section 5.064 of the Texas Property Code provides as follows:

> A seller may enforce the remedy of rescission or of forfeiture
> and acceleration against a purchaser in default under an
> executory contract for conveyance of real property only if:
>
> > (1) the seller notifies the purchaser of:
> >
> > > (A) the seller's intent to enforce a remedy under
> > > this section; and
> > >
> > > (B) the purchaser's right to cure the default
> > > within the 30-day period described by Section
> > > 5.065;
> >
> > (2) the purchaser fails to cure the default within the
> > 30-day period.

TEX. PROP. CODE § 5.064.  Section 5.065 states that:

> Notwithstanding an agreement to the contrary, a purchaser in
> default under an executory contract for the conveyance of real
> property may avoid the enforcement of a remedy described by
> Section 5.064 by complying with the terms of the contract on
> or before the 30th day after the date notice is given under that
> section.

TEX. PROP. CODE § 5.065.

It is undisputed that all the plaintiffs stopped making monthly payments as
required under the contracts; that defendants sent the plaintiffs default notices; and that
plaintiffs failed to cure the defaults.  The deposition testimony shows that some plaintiffs
lived in the houses for several years before they stopped making monthly payments; some
plaintiffs never made any monthly payments.  Most plaintiffs stopped making payments

in 2000 or 2001.  No plaintiff who purchased a home has made a payment since 2002.

Jim Farnkoff, who purchased land only, made his last payment in May 2003.  The

following plaintiffs continued to live in the houses without making any payments:

Chesson, Eaton, Carson, Glover, Dodson, Hensley, Fountain, Shumate, Salazar, and

Trapp.  Stokes's home was destroyed by fire in 2001.  As noted, Breedlove never lived in

the house he purchased from defendants; he stopped making payments in 1998.  Plaintiffs

Standley, Lockhart, and Johnson have moved out of the houses.  Standley lived in the

house from 2001 to 2003 and made no monthly payments; Lockhart did not make any

payments from 2001 to 2004; Johnson made monthly payments from April 2002 to

October 2002 and moved out of the house in January 2003.  (Docket Entry No. 95, Ex. 1).

### B.    Defendants' Developments and the Water Issue

Plaintiffs' houses are in subdivisions outside city limits in different counties.  The

subdivisions were developed at different times. Some plaintiffs live in "first generation"

subdivisions, located in Grimes, Leon, and Madison Counties and developed around

1996.  Other plaintiffs live in "second generation" subdivisions, located in Liberty and

San Jacinto Counties and developed around 1999.  The houses include new and existing

homes that are set on blocks or piers.  The roads in the subdivisions are not paved and

defendants did not install culverts or other drainage improvements.  The subdivisions do

not have access to city utilities.  The houses rely on individual septic systems for waste

disposal.  In some of the first generation subdivisions – River Oaks, Sunshine Acres, and

Shannon Estates subdivisions – defendants operated registered "public water systems"

and offered metered water service to residents.  In these subdivisions, residents paid monthly water bills based on established per gallon rates.  (Docket Entry No. 95, Stokes Deposition, Ex. 2; Breedlove Deposition, Ex. 2).  The second generation subdivisions relied on non-public water systems.  In some of the second generation subdivisions – the Five Oaks Estates and Trails End subdivisions – defendants offered some home buyers a service connection to a "community" water well for an annual maintenance fee.  It appears that residents in the Highway 59 Estates subdivision relied on individual and privately maintained water wells that were installed by defendants.  (Docket Entry No. 95, Trapp Deposition, Ex. 1).

Plaintiffs alleged that after the contracts were signed, problems with the construction of their homes and the utilities in the subdivisions became apparent and they demanded repairs and improvements. Plaintiffs alleged that although defendants originally agreed to make repairs or improvements, they did not follow through. (Docket Entry No. 1, ¶ 15).  The recurrent problems led some residents in the first generation subdivisions to file complaints alleging inadequate construction and utilities with the Attorney General of Texas.  Some residents claimed that they had no potable water or working septic system.  On April 27, 2000, the Attorney General and the Texas Commission Environmental Quality ("TCEQ") sued defendants, alleging violations of the Texas Health and Safety Code and the Texas Water Code.  (*Texas v. Hall, et. al*, No. GV-000697).  In September 2000, a state court enjoined defendants from operating the water systems in the first generation subdivisions and placed the systems in receivership.  The

appointed receiver hired MSEC Water Resources, Inc. to operate the systems, collect the monthly payments, and make any necessary repairs.  The residents were informed of the receivership and instructed to contact MSEC for customer service needs.

In 2001, the Trails End I and II subdivisions were added to the receivership after some residents reported that defendants had dumped or buried hazardous materials and construction debris on their property.[6]  The record contains the deposition transcript of Kristie Lemmons, a TCEQ environmental investigator, who investigated the complaints. Lemmons testified that plaintiffs' counsel in this case, Damon Capps, originally contacted her about unauthorized dumping in the subdivision and gave her Chesson's name and phone number.[7]  (Docket Entry No. 68, Ex. B, pp. 18–20).  On May 8, 2000, Lemmons performed a Compliance Evaluation Investigation "CEI" in the Trails End I subdivision and created a compliance report based on information provided by the residents and her visual inspection of the properties.  At the time of the inspection, most of the houses were complete. (*Id.,* p. 38)  Lemmons testified that there were some piles of wiring, sheetrock, insulation, tar, scrap wood and metal, and other construction debris next to some of the houses. Chesson, Hensley, and one other resident accompanied Lemmons during the May 8, 2000 inspection.   They identified areas of their property where defendants had

---

[6]  The Trails End I and II subdivisions are located adjacent to each other in San Jacinto County.

[7]  Several plaintiffs testified about  meetings held for homeowners from the different subdivisions  to discuss the conditions of the properties and this lawsuit. Chesson was identified as the person who organized the meetings and provided information about this suit.  Plaintiffs have moved to strike the testimony as inadmissible hearsay and unfairly prejudicial.  (Docket Entry No. 91).  Defendants do not argue, as plaintiffs assert, that Chesson recruited homeowners to join this suit.  The motion to strike is moot.

allegedly buried construction debris and hazardous materials.  (*Id.,* pp. 33–36).  Hensley pointed out an area on his property where the ground had subsided, water had collected, and grass would not grow.  Hensley did not see defendants bury any waste or debris.  He reported that one of Hall's employees had told him that waste had been buried in the subdivision during the construction of the houses.  Chesson showed Lemmons dead pine trees around the perimeter of her house and a bare area of land approximately ten feet away from the trees with no grass or other vegetation.  The CEI report indicated "an area where waste was" on Chesson's property, but Lemmons provided no detail.

In September 2000, Lemmons received complaints about similar unauthorized dumping and burying of materials in the Trails End II subdivision.  Lemmons received a complaint from Shirley Brandon, who did not live in the subdivision, that defendants had buried "insulation, paint cans, and other building materials."  (*Id.*, p. 67).  During her deposition, Lemmons stated that she had relied on statements from Brandon and Chesson that defendants had buried waste in the Trails End II subdivision in completing her compliance report.

Based on the May 8, 2000 and September 12, 2000 inspections Lemmons determined that defendants had violated the Texas Administration Code and the Texas Water Code for failing to dispose of municipal solid waste at an authorized facility and for storing, processing, or disposing of construction debris without a permit.  No soil tests were performed.  Lemmons testified that the subsided, bare areas of land could be attributed to something other than waste, but "usually [] when the soil has been disturbed

like that and there's not any vegetation, there's got to be, you know, something that would make the soil subside and the vegetation [not] grow."  (*Id.,* p. 34).  Lemmons explained that the piles of construction debris could potentially contaminate surface water and "filter down into the groundwater."  "It's possible as waste decomposes, it could contaminate runoff or groundwater."  (*Id.,* pp. 51–53).  She stated that she did not know when the residents had moved into the houses or how long the various piles of construction debris had been on the property.  (*Id.,* pp. 110, 112).  Based on the reported violations, the Trails End subdivisions were added to the enforcement suit that had been filed as a result of complaints about the first generation subdivisions.  The Highway 59 Estates subdivision was also added to the enforcement suit sometime in 2001 after a complaint about an allegedly contaminated well in the subdivision.  The TCEQ Municipal Solid Waste Division did not conduct a separate investigation and violation notices were not sent to the residents of the subdivisions.  (*Id.,* p. 63).

On April 29, 2002, defendants entered into an agreed judgment with the TCEQ that included the second generation subdivisions.  (Docket Entry No. 91, Ex. D).  The judgment required defendants to make specific improvements to the preexisting water systems in the first generation subdivisions and then sell the systems to an approved operator.  As to the second generation subdivisions, the Halls were ordered to excavate and remove all solid waste, including construction debris, from each of the subdivisions. The judgment provided for notice to residents and the TCEQ before any excavation and an opportunity to videotape and collect samples.  (*Id*., p. 29).  The judgment also required

defendants to create new public water systems in the second generation subdivisions and obtain TCEQ certification.[8]  (*Id.,* pp. 8–9).  Under the agreement, the court ordered the receiver to remain in place to oversee the installation of new wells and the approved public water systems.  During construction of the new systems, the receiver was to continue using the fund already established.  (*Id.,*  pp. 13, 26–28).  Finally, the judgment set a ninety day-deadline for defendants to apply for a Certificate of Convenience of Necessity ("CCN") to establish a service area for continuous metered water service at reasonable rates.  (*Id.,* p. 12). A CCN was established and a tariff was enacted for the existing public water systems in the Shannon Estates, River Oaks, and Sunshine Acres subdivisions and the new public water systems in the Highway 59 Estates, Five Oaks, and Trails End subdivisions.  It is unclear when the new systems in the second generation subdivisions were completed.  The record shows that new utility rates went into effect on May 24, 2002.

In response to defendants' motion for summary judgment, the plaintiffs who contracted for a community water well connection in the Five Oaks Estates and Trails End subdivisions submitted affidavits dated January 2005 stating that "[t]he water service was taken over by the State of Texas and will be more than the $280.00 per year as promised."  (Docket Entry No. 91, Ex. A).  Plaintiffs attached a December 6, 2004 letter

---

[8]  Under federal and state law, the number of people served determines whether a water system is "public." A private person or entity may be a "public water system." The Safe Drinking Water Act defines a public water system as a system that provides water to the public "for human consumption through pipes or other constructed conveyances if the system has at least 15 service connections or regularly serves at least 25 individuals."  42 U.S.C.A. § 30(f)(4)(A). Public water systems must comply with monthly water quality reporting and metering requirements.

from the receiver informing the Five Oaks Estates residents that the new water system had been constructed and new tariff rates were required for water service in the subdivisions.[9]  The letter stated in part as follows:

> On February 21, 2001, I advised you that the water system providing you water service had been placed into receivership by the [TCEQ]. Once the system became subject to the receivership, the water system became subject to rules and regulations of TCEQ.  These rules and regulations require that payment be made to the water system in an amount sufficient to allow its operation on a continuous and adequate basis.
>
> A new plant facility and distribution system has now been constructed in your subdivision.  All customers are currently connected to the new system.   As a result, TCEQ has authorized the collection of the approved tariff for each connection.  This became effective November 1, 2004.
>
> I am advised that many of you are concerned about a representation that apparently was made by Mr. Darrel Hall when you purchased your property. TCEQ and this receivership is not bound by that agreement.

(Docket Entry No. 91, Ex. D, p. 34).  The plaintiffs who contracted for community water well access assert breach of contract claims based on the higher water rates. As described below, during their depositions some plaintiffs described isolated incidents of sickness before 2001 that were allegedly caused by the water.   After 2001, the plaintiffs'

---

[9]  The following  plaintiffs contracted for community water well access in the Trails End subdivisions   for an annual maintenance fee of $280.00: Harold Dodson, Johnny Hensley, Marion Standley, and  Jacquelyn Chesson. Timothy Lockhart and George Clover contracted for water well access in the Five Oaks Estates subdivision . The only water bill submitted was addressed to George Clover for  $91.61.  (Docket Entry No. 91, Ex. D, p. 33).

complaints are largely limited to weak water pressure and odors in the water supplied to the houses.

### C.     The Evidence as to the Sixteen Plaintiffs

The depositions and affidavits of the plaintiffs provide the summary judgment evidence as to the inspections they made of the properties before entering into the contracts with defendants; the communications they had with defendants; and the experiences they had with the properties after entering into the contracts.[10]

*1.     Jim Farnkoff* – Farnkoff owns a trucking company.  He is the only plaintiff who purchased land, but no house, from defendants.  In December 1999, Farnkoff signed a contract for deed for an undeveloped piece of land in the Trails End subdivision after inspecting the property several times.  He later bought two adjacent lots. When Farnkoff purchased the first lot, he did not intend to live on the property and the land did not contain a water well or a septic tank.  (Docket Entry No. 95, Farnkoff Deposition, Ex. 2).  When Farnkoff bought the other lots, he contracted for community water well access for $280.00 a year.   After making various improvements to the land, Farnkoff moved a manufactured home onto the lot in the summer of 2000.   In his deposition, Farnkoff testified that his home and the area within his fence are very habitable, but that defendants did not provide the kind of subdivision they promised.  Farnkoff seeks damages for the condition of the subdivision, which he describes as a "ghetto."   He testified that the

---

[10]  One plaintiff designated as a trial plaintiff – Ron LeBlanc – did not show up for his scheduled deposition and plaintiff's counsel has been unable to produce LeBlanc.  Due to LeBlanc's default, this court dismisses his claims against all defendants with prejudice.

houses are not properly maintained and there are houses, such as older model mobile homes, that violate deed restrictions; the roads do not comply with county standards because they are not paved; the ditches are of different depths and overgrown with weeds; and trash and junk litter the property.  (*Id.*, pp. 59–65, 75).  Farnkoff claims that he was told that nice homes would be built in the subdivision, the dirt roads would be paved, and the property would be supplied with drinkable well water.  (*Id.,* pp. 57–58).  Farnkoff claims that he developed a skin rash in the summer of 2000 from drinking the well water. A doctor attributed the skin rash to a parasite but did not link the parasite to a water source.  Farnkoff felt better when he started using bottled water.  (*Id.,* pp. 85–87).  He seeks improvements to the neighborhood or a return of his investment.  (*Id.,* pp. 82–83). Farnkoff made monthly payments from June 2001 to May 2003.

The following ten plaintiffs signed contracts for deed for new houses.

2. *Belinda Stokes* – Stokes represents the estate of her husband, Thomas Renshaw. In August 1995, Renshaw signed an earnest money contract in the Shannon Place Estates subdivision and in February 1996, signed a contract for deed for a "shell home [with] rough wiring and plumbing packages."  (Docket Entry No. 95, Stokes Deposition, Ex. 2). Renshaw lived in a tent on the property while Hall constructed the house.  (*Id.,* Ex. 1, p. 18).  Renshaw and Stokes moved into the house around March 1996 and made monthly payments under the contract for deed until January 2001.  Some time in April 2001, the house was destroyed by a fire caused by a pan of grease left on the stove top.  (*Id.*, Ex. 1, pp. 23–24).  Stokes testified that Renshaw inspected the house after it was complete and

he noticed that the floors and the walls were bowing in different sections.  Defendants repaired the floors and the walls before Renshaw and Stokes moved in.  Stokes claims that despite these repairs, the house had structural defects.  She testified that beginning in 1997 the floors "bowed" in areas and the front door would "swell," making it difficult to shut.  The roof "sagged" in areas and began leaking in the kitchen around 1998.  Stokes testified that these problems were reported to Hall but did not otherwise explain defendants' response.  She and Renshaw did not repair the problems themselves or hire anyone to repair the problems.  (*Id.,* pp. 27–30).  Stokes also claims that the water supplied to the house was not drinkable.  (*Id.*, pp. 33–34).

3.    *Tommy Breedlove* – Breedlove frequently purchased houses and leased them to tenants for a profit.  He currently works as a cab driver, driving a cab that he leases.  (Docket Entry No. 95, Breedlove Deposition, pp. 29, 36, 61).  Breedlove is the only plaintiff who purchased property from defendants, but never lived there.  In June 1996, Breedlove and another individual, James Egbuna, who is not a plaintiff in this case, purchased a lot with a completed "shell" home in the Shannon Place Estates subdivision from Hall.  The contract provided for a one-time "water hookup" fee of $400.00 and water for $25.00 a month.  Breedlove bought the property as an investment and stated in his deposition that he considered the price a good deal compared to Houston prices.  "[W]e liked that particular location, and we went for it.  It was an investment."  (*Id*., Ex. 1, p. 25).  Egbuna later decided that he no longer wanted to be involved and Breedlove signed the contract for deed on June 28, 1997.  Before Breedlove signed the contract, he

inspected the home.  The inside was "trashed out" but Breedlove agreed to clean it up. (*Id.,* Ex. 1, pp. 22–23).  The house has not been lived in, leased, or sold.  He fenced in the three-acre lot and keeps a horse and a dog on the property.   Breedlove stopped making payments in 1998.   The record contains a May 7, 1998, default notice addressed to Breedlove and a cancellation of contract notice dated June 15, 1998.  (*Id*., Ex. 1, pp. 33–35; Ex. 2).  Breedlove paid $29,000.00 for the house.  He seeks damages for lost market value and pain and suffering.  He testified that "a $26,000.00 house in the country, undeveloped property, not even a paved road to get to the access to that house, it sounded very strong to me that it could have valued [$58,000.00] if [defendants] had completed it." (*Id.,* p. 66).  Breedlove did not explain what he meant by "completed."  According to the Madison County Appraisal Office, the appraisal value of the house in 1999 was $29,680.00 and in 2000, had increased to $30,30.000.  (*Id.,* Ex. 8).

*4.*     *Darlene Trapp* – Until 2002, Trapp worked for Hall selling houses in the various subdivisions, then worked for a construction company.  Trapp's husband was a superintendent of a construction company. (Docket Entry No. 95, Trapp Deposition, pp. 7, 52).  In January 1998, Trapp signed an earnest money contract for a new house with rough wiring and a complete septic system in the Highway 59 Estates subdivision.  (*Id*., Exs. 2–3).  The contract for deed provides for "bathroom fixtures, insulation, sheetrock which was hung, taped, floated and texture, 50 gallon hot water heater and complete septic system." (*Id.,* pp. 30–35). While the house was being constructed, Trapp made home videotapes of the construction work.  She and her husband inspected the house

several times before they signed the contract for deed in June 1998 and moved in.  The record contains copies of notices that Trapp sent to Hall during the construction of the house in May 1998 describing problems with the location of her water well, electrical wiring, and air conditioner leaks.  (*Id.,* p. 65, Exs 3–9).  In 2002, Trapp stopped making monthly payments.  She claims that her house was built with the wrong type and size of lumber; that the rooms in the home were not the right size or the right shape; and there are two-inch gaps around every window.  (*Id.,* pp. 28–30).

Trapp also claims that some time in 2000, the water made one of her children sick.  (*Id.,* pp. 26, 31).  Trapp stated in an affidavit that defendants provided a chlorine filter for the water well after she reported her concern about the water.  She also stated that "[j]ust recently we have been advised that our well cannot be used but that we must pay for water from a water supply company as the State of Texas has taken over the water service to our subdivision."  (Docket Entry No. 92, Ex. 11).  Trapp repaired the air conditioning unit and kitchen plumbing and installed pine paneling over cracked sheet rock.  She testified that she did not know how much money she has spent to repair the house.  Trapp did not submit evidence of repair costs or medical bills and stated that the amount of damages is up to her attorney. Trapp explained that she would like some money back; she wants "out of her contract"; and wants the defaulted house payments "off her credit."  (*Id.,* pp. 32, 36–37).

5.    *Carla Shumate* – Shumate is a restaurant manger.  (Docket Entry No. 95, Shumate Deposition, Ex. 1, pp. 9–10).  In March 1999, Shumate signed an earnest money contract

with Hall in the Peaceful Place subdivision.  In May 1999, she signed a contract for deed with TJR Partnership for a "95% complete" home and in June 1999, signed a contract for deed for the same property with the addition of "one truckers pad."  (*Id*., Exs. 2–4).  She and her husband lived in a residence in the same subdivision rent-free during the construction of the new house and inspected it several times before signing the contract for deed.  (*Id.,* Ex. 1, pp. 49–50).  In her deposition, Shumate identified several problems with the house.  The interior doors are poorly secured and the sheetrock is not properly installed; the kitchen plumbing leaks; the house needs additional foundation support; and the kitchen accessories and utility room are too small.  When Shumate moved in, defendants provided a larger water heater as she requested at no extra charge.  However, defendants did not move the water heater and her utility room is too small for the water heater and the washer and dryer.

Shumate testified that she was shown a model home that had eight-foot kitchen cabinets, closet accessories, and baseboards and that her home did not have these amenities.  She testified that before she moved in, she pointed out that the kitchen cabinets were too small and that Hall orally promised to take care of it but did not deliver larger cabinets.  (*Id.,* pp. 60–64, 72–73).  Shumate testified that before she moved in, defendants completed some repair work on the foundation as requested.  After Shumate moved in, a contractor inspected the house and told Shumate that it needed an extra row of support "pillars."  She testified that after the contractor inspected the house, Hall sent two men to repair the foundation.  It is unclear from her testimony what foundation

repairs were made by defendants at that time and what repairs are needed today.  Shumate has not paid anyone to repair the foundation.  (*Id.,* pp. 60–62, 82).  Shumate testified that in 1999, she sent written notice to defendants about plumbing leaks in the kitchen but they did not offer any repairs.  She fixed the leaks herself in 2000.  (*Id.,* p. 68).

The septic system works, but Shumate claims several problems.  First, because of the way the septic system is set up, the ground thirty feet behind her house stays saturated with discharge water.  Second, defendants did not adequately cover the lids of the septic tanks.  (*Id.,* pp. 51–55, 106).  Defendants made some repairs to the septic system after Shumate moved in so that the water does not collect underneath the house as it previously did.  Shumate testified that, a few years ago, the water was shut off for several days.  She has not experienced any other interruptions in service, but testified that she believes that the water is not properly chlorinated and the water pressure is weak.  Shumate's children were sick on several occasions shortly after they moved into the house, and she felt that it was because of the water, although she has no medical or other basis for that conclusion.  (*Id.,* pp. 80–84, 95, 103).

Finally, Shumate complains about the roads.  She testified that Hall installed some culverts and had the roads graded so that the school bus will drive down the road to her house and her children do not have to walk seven-tenths of a mile to meet the bus.  However, when it rains, the school bus will not drive on the unpaved roads and the ditches in front of the home fill with water.  (*Id.*, p. 85–87).

In 2001, Shumate stopped making payments.  Shumate did not submit receipts or repair estimates and testified that she has spent between $5,000.00 and $10,000.00 in repairs.  Although her house has gone up in value every year according to her tax records, she testified that if she had not made the various repairs, it would lose its market value.  (*Id.*, p. 97–98).  She stated that she wanted the title to her house clear and free and did not want defendants to make repairs because she was tired of dealing with Hall's employees.  (*Id.*, p. 114–15).

6.     *Timothy Lockhart* – Lockhart worked as an electrical contractor.  On September 11, 1999, Lockhart signed an earnest money contract with TJR Partnership for "land only" in the Five Oaks Estates subdivision.  (Docket Entry No. 95, Lockhart Deposition, Ex. 2).  On January 6, 2000, Lockhart signed a contract for deed with "TJR Partnership, Ltd./Darrell Hall" for the land.   The contract stated that the purchaser would pay "$280.00 per year water maintenance fee if water is provided to this location."  (*Id.,* Ex. 3).  Lockhart testified that he did not have a copy of the contract for his house that he signed in May 1999.  (*Id.,* Ex. 1, pp. 48–49, 56).

In March 1999, Lockhart was living in California.  He traveled to Texas to inspect the house, which was still under construction.  It did not yet have windows, toilets, electricity, or running water.  Lockhart stated that he inspected the house several times during the construction process when he traveled through the area.  In May 1999, after returning from California with all his belongings, Lockhart moved into the house, which was still unfinished and without running water.  Lockhart used plywood as makeshift

windows and defendants supplied a portable toilet for Lockhart to use.  At that time, Hall was installing the septic system and the County could not supply water to his home until the septic system installation had been approved.  The septic system was installed two weeks after Lockhart moved in. The water and septic systems functioned properly.  (*Id.,* pp. 22–24).  Lockhart testified that his house  was "livable," but never totally completed and poorly constructed.  He also testified that Hall and his associates probably made more repairs to his house than they did for his neighbors.  The extent of repairs requested or made is unclear.

Lockhart stated that he performed a lot of the work that needed to be done because he knew how to make the necessary repairs and improvements.  Lockhart seeks damages for the work he did, including labor costs.  He prepared a "Record of Expenses" that itemizes the type and cost of work he performed.  (*Id.,* pp. 47–51).   The list includes landscaping items, such as grass seed and rose bushes; exterior paint; new light fixtures and kitchen appliances; and the construction costs for closets, gates, a driveway, and a workshop. (Ex. 4).  In February 2001, Lockhart stopped making monthly payments and in 2004, he moved out of the house.

7.    *Johnny Hensley* – Hensley worked in the construction industry installing heating and air conditioner units.  (Docket Entry No. 95, Hensley Deposition*,* Ex. 1, pp. 11–12).  On July 17, 1999, Hensley signed an earnest money contract with TJR Partnership for a "100% complete" house in the Trails End subdivision with a septic system, central air conditioning, driveway material, skirting, and shutters.  On December 8, 1999, he signed

a contract for deed with a provision for a community water well connection for a charge of $280.00 per year.  (*Id*., Exs. 2–3).  Hensley moved into the house before it was completed and before he signed the contract for deed.  He had ample opportunity to inspect the house before he signed the contract. Hensley explained that he inspected the roof of the house and crawled underneath the house to inspect the foundation before he signed the contract for deed.  When he moved in, defendants were installing water wells; he testified that they left debris on his property.  (*Id.,* Ex. 1, pp. 28–29, 68).

Defendants built the house as Hensley had requested, but the inside of the house was not completed on time.  Hensley waited three months for carpet and tile in the bathroom.  Although defendants eventually installed the carpet and tile as promised, they did not paint the outside of the house or finish the driveway.  (*Id.,* p. 59). He testified that the walls are uneven, the floor is buckled in places, and the air conditioning unit is undersized.  (*Id.,* pp. 53–56).  Hensley stated that he did not notify Hall or his employees about these defects or ask for repairs because he "can't even get them to finish the house."  He also stated that no one would accept his phone calls. (*Id*., p. 42–43.)  Hensley made three $759.34 monthly payments, but stopped making any payments under the contract for deed in April 2000.  He has lived in the home for the last five years and testified that he intends to continue living in the house without making any payments until Hall provides a "100 percent home."  (*Id*., pp. 34–35,  Ex. 7).

8.   *Harold Dodson* – Dodson worked in the construction industry and previously worked as a boilermaker.  (Docket Entry No. 95, Dodson Deposition, pp. 9–10). On June

23, 2000, Dodson signed a contract for deed with TJR Partnership for a "shell" house with "plumbing, septic, and AC and Heat" in the Trails End subdivision. On June 25, 2000, Dodson signed a warranty deed with vendor's lien and deed of trust with TRJ Partnership for the same property.  When Dodson inspected the house for the first time in June 2000, home buyers were picketing in front of Hall's office.  Dodson noticed several structural defects with the house, including gaps around the doors and windows and gaps between the sheet rock and the baseboards.  (*Id*., Ex. 1, pp. 31–32).  Before he signed the contract for deed, Dodson asked Hall's employees to repair the sheet rock, which they did.  Defendants also repaired the air conditioning unit, at Dodson's request.  Dodson claims that the repairs to the air conditioning unit and the sheetrock were not made as they should have been.  As a result, he bought air conditioning window units to use instead of the central air conditioning unit.  (*Id*., Ex. 1, pp. 26–29).  Dodson made monthly payments until July 2002, and has lived in the house without making a payment for the past three years.  In December 2003, he filed for bankruptcy.  (*Id.,* p. 11).

9.      *Marion Standley* – Standley has a degree in construction management from Texas A & M University and works as a construction manager.  He previously worked as a construction inspector.  (Docket Entry No. 95, Standley Deposition, Ex. 1, pp. 11–13, 30–31).  In September 1999, Standley signed an earnest money contract with TJR Partnership for a new house.  He moved into the house in November 1999.  In December 1999, Standley signed a contract for deed for a "100% complete home" in the Trials End subdivision. The contract called for a community water well connection for $280.00 a

year.  Standley described the construction of the house as a "rush deal." (*Id*., Ex. 1, pp. 68–69).

After Standley moved in and before he signed the contract for deed, he told defendants that the kitchen linoleum was improperly installed, making the kitchen floor higher than the carpeted areas.  Defendants made the requested repair.  Standley testified that after the repairs, the floor was even for about a month and then began to buckle.  (*Id.,* p. 54).  Standley also testified that defendants made some initial repairs to the plumbing as requested but did not perform the repairs adequately.  (*Id.,* p. 37).

Standley made no monthly payments.  He lived in the house without making payments until 2003.  Standley testified that the house had electrical, plumbing, and structural defects and identified the following problems:  the bathtubs did not drain properly; the toilets backed up frequently; the sanitary sewer system was not vented properly; faulty wiring caused the lights to flicker; the doors did not close properly; the exterior siding separated from the plywood and "blister[ed] up" in areas; the attic had no vents; and there were no back steps.  He is seeking $14,000 in damages for air conditioning system repairs, the installation of a venting system in the attic, the removal of construction debris, and costs for back steps that he added to the house.  (*Id.,* pp. 70–71).

10.	*Roger Fountain* – Fountain previously worked as a police officer and then worked for himself as a truck driver.  (Docket Entry No. 95, Fountain Deposition, Ex. 1, p. 4, 11–13).  Fountain signed one lease for commercial property and two contracts for deeds,

one for residential use and one as an investment.  In January 2000 Fountain signed a contract for deed with TJR Partnership for a 95% complete house in the Country Towns Estates subdivision, which he used as his residence.  Fountain signed the contract after inspecting the house. (*Id*., Ex. 1, p. 30).  Fountain moved into the new house in May of 2000.  He claims that the roads in the subdivision  were in poor condition and the foundation in his home was defective.  (*Id*., pp. 43–47).  After living in the new house for approximately eighteen months, Fountain noticed foundation movement. Fountain explained that he repaired the doors after the house "settled" to some extent and then the siding began to peel.  In addition, the toilet "fell through" the bathroom floor and the air conditioning unit stopped running.  Although the septic system worked, it produced strong odors.  Fountain testified that he informed the sales person about the foundation and plumbing problems.  He stated that Hall was never available and that "it is either too hot, too cold, too wet, too dry or they are too busy to fix anything," so Fountain "gave up" and made certain repairs himself, including the installation of roof vents, which were missing, and repairs to the air conditioning unit.  He made monthly payments until July 2002.  (*Id*., p. 36).  Fountain lived in the house without further payments.

Fountain attempted to sell the house he purchased for investment after making several repairs.  Although a buyer was interested in the house, because Fountain did not hold legal title to the house under the contract for deed, he was unable to sell the house to the buyer.  Fountain testified that he bought the house in order to resell it and that he did not know that he could not sell the property under the contract for deed.  He claims

damages for the improvements, the down payment, and monthly payments, and lost profits.

The third contract Fountain entered into with Hall was a lease for existing commercial property in Bebidas, Texas.  In July 2001, Fountain opened a restaurant on the property.  The business was successful but the building was old and collapsing. (*Id.*, pp. 22–24).  Fountain testified that in October 2001, Hall orally agreed to build a new building on the property and accepted $550.00 as a down payment.  In December 2001, Fountain closed the restaurant because of problems with the old building.  (*Id.*, pp. 80–81).  Hall returned the down payment and did not construct a new building.  Fountain claims that he was unable to lease commercial space to continue his business and seeks lost profits as damages.

11.    *Jesse Salazar* – Salazar managed a wrecker and towing business.  He previously owned an electronic repair shop and worked as a truck driver. (Docket Entry No. 95, Salazar Deposition, Ex. 1, pp. 9–10).  Salazar read about the house in a magazine and thought the deal "was too good be true."  He saw the same advertisement two years later and decided to come to Texas to look at the property.  (*Id.*, Ex. 1, pp. 20–21).  On February 21, 1999, Salazar signed an earnest money contract with Hall for a "95% complete" house in the Huntsville West Estates subdivision.  As described on the contract, Salazar originally decided to buy a completed house.  After he signed the first earnest money contract, he returned to the subdivision, inspected the house and noticed problems.  He executed an earnest money contract that stated: "customer wants to switch

from TR 73 Huntsville West 22 to TR 72 Huntsville West 22 with 1200 S.F. House 95% completed.   Everything except floor coverings and Heat & Air.   New price on house subject to Darrell Hall Approval."   When the earnest money contract was signed, Salazar had already paid $300.00 for the "TR 73" property.   On May 30, 1999, Salazar signed a contract for deed for a "95% complete" house with "everything except floor coverings and heat and air."   (*Id.,* Exs. 2–3).

Salazar testified that when he signed the contract for deed, defendants had not begun construction of the house.   In June, Hall called Salazar and told him the house was complete.   Salazar stated that his father builds custom homes and that he did not believe that it was possible for the house to be completed so soon.   Salazar explained that he inspected the house in July 1999 when the house was "finished" and it looked like a "shanty shack."   Salazar testified that he told Hall that the siding, framing, and rafter bracing were inadequate and asked for repair; he and his family rented a hotel room for a year waiting for the repairs to be made.   (*Id.,* pp. 22–27, 29).   Salazar testified that he moved into the house in June 2000 after Hall told him that he would not make any repairs to the house; after he moved in and made three or four payments, Hall attempted to evict him because the house was ready for several months before Salazar began to make the payments.   (*Id.,* p. 34).   Defendants attempted to evict Salazar, but Salazar had declared bankruptcy and that prevented the eviction.   (*Id,.* pp. 33–35, 53).   According to defendants' records, Salazar made monthly payments from July 1999 to October 2000, and has continued to live in the home without making any payments for almost five years.

Salazar seeks damages for $50,000.00 for mental anguish and for physical suffering, including headaches, loss of sleep, and upset stomach; $65,000.00 for reimbursement of the hotel expenses; and $79,000.00 for repairs that need to be made to the house. (*Id.,* pp. 44, 47–48).

The five remaining plaintiffs signed contracts to purchase previously-owned homes. All the plaintiffs inspected the homes, which were then vacant, before signing the earnest money contracts and the contracts for deed or deeds of trust. Plaintiffs observed various problems, including broken or missing windows and doors, holes in the roof or floors, and graffiti on the outside of the houses.

12.   *Jacquelyn Chesson* – Chesson previously worked for a construction company performing refurbishing and remodeling work. (Docket Entry No. 95, Chesson Deposition, Ex. 1, pp. 14–15, 17). On February 28, 2000, Chesson signed an earnest money contract with TJR Partnership to purchase a previously-owned home in the Trails End subdivision. Chesson did not sign a second contract. When Chesson inspected the house, she saw that the floor had collapsed in places, the walls were cracked, and the windows were not securely installed. As described in the contract, Chesson agreed to clean and refurbish the home "in trade" for a $1,100.00 credit on the down payment. In March 2000, Chesson moved into the house without paying the remainder of the down payment. On March 21, 2000, defendants sent Chesson a cancellation notice for failure to make the required installment on the down payment and for moving onto the property without permission. (*Id.,* Ex. 3). Chesson testified that defendants orally promised to

repair the house when she signed the earnest money contract; that she spent $3,600.00 on repairs when she first moved in; and that she has since made repairs on a regular basis. (*Id*., Ex. 1, pp. 59–62, 70).  She has not made any payments other than $2,200.00 of the down payment, but has continued to live at the house since March 2000.

13.    *George Glover* – Glover is self-employed as a truck driver and previously worked as a mechanic.   (Docket Entry No. 95, Glover Deposition, Ex. 1*,* pp. 9–11).   On November 12, 2000, Glover signed a contract for deed with TJR Partnership for a previously-owned house in the Five Oaks Estates subdivision .  The contract provided for new exterior paint and repairs to the master bedroom.  Glover inspected the house several times before he signed the contract.  At the time of inspection, there was damage and a strong odor throughout the house.  "[I]t looked like the walls had been rotting. . . ." (*Id*., Ex. 1, pp. 24–26).  Glover stated in his deposition that he requested that defendants repair the damaged walls before he signed the contract for deed.  Defendants painted the damaged walls, but Glover was under the impression that they were going to replace the damaged sheetrock and parts of the floor.  (*Id.,* p. 34).

        In his deposition, Glover identified multiple defects with his home and the subdivision.  He complained that the property frequently floods and the house is not protected by a moisture barrier and as a result is contaminated with mold; due to faulty wiring, the lights flicker when the air conditioner turns on; the septic tanks smell; there was construction debris left on the property; and a pond behind the house attracts mosquitos.  Glover made monthly payments of $1,139.18 from December 2000 to June

2001.  He has lived in the house since November 2000, without making any payments since June 2001. Glover testified that after defendants first sent notice of his default, he made an arrangement with an employee in the sales office to make partial payments in exchange for some repairs.  Glover did not identify which repairs he asked for and claims that defendants failed to follow through with the oral agreement and did not offer any repairs. (*Id.,* pp. 17–18).

On December 3, 2003 and January 19, 2004, Glover's house was inspected for mold.  After the inspections, Glover scraped and repainted the walls to remove the mold several times.  (*Id*., pp. 29–31, 40–42, 48).  Glover stated that Hall would hang up on him when he called to discuss repairing the mold contamination. (*Id.,* p. 38).  He claims that because of the mold contamination, the house is "worthless."  He seeks $38,779.18. in damage to personal property, including mold damage to such items as family photographs that he values as a $10,000 loss.  (*Id.,* pp. 78–79, Ex. 10).

14.    *Sandra Eaton* –  Eaton worked as a secretary for a construction company and in the contracts department for a timeshare resort.  (Docket Entry No. 95, Eaton Deposition, Ex. 1, pp. 10–11).  On July 27, 2001, Eaton signed an earnest money contract with 5G Inc. for a previously-owned home in the Highway 59 Estates subdivision with a septic system.  Eaton inspected the house before she signed the earnest money contract. When Eaton inspected the house, she noticed that the floors were uneven and the siding was buckling (*Id.,* Ex. 1 pp. 33, 51–52).  The earnest money contract listed several repairs that defendants were to make including kitchen cabinets that "needed to be replaced," a new

bathroom sink and vanity, and "partial vinyl repair" in the kitchen/utility area. The contract stated that the "owners will have cabinets hung, if they are brought out to them, to save time." (Docket Entry No. 95, Eaton Deposition, Ex. 5).

On January 21, 2002, Eaton signed a deed of trust, made a down payment of $1,900.00, and moved into her house. She has not made any of the $701.26 monthly payments under the deed of trust, but has continued to live at the house. Eaton alleges that defendants did not replace the kitchen cabinets or bathroom sinks or repair the vinyl as listed in the earnest money contract. Eaton complains that defendants generally failed to complete the inside of the house and identified missing baseboards, closet accessories, and outlet and light-switch covers. Eaton acknowledged that her contract did not provide for these items but stated that "[w]e were told the house would be 100 percent complete. And to me a 100 percent complete home would have all these things." (*Id.,* p. 46).

Eaton also described the following problems: her water heater produces scalding water one moment and freezing water the next; the bathtubs drain slowly; mold grows on the bathroom wall; the sheetrock is "wavy and bowed" in places; and the ceiling is starting to sag in the master bedroom. Eaton claims that her house has an uneven foundation and as a result, there is a gap between the front door and the floor. (*Id.,* pp. 21–22). Eaton explained that defendants made one attempt to level the house, but only made it worse, and after that, they did not return her phone calls about repairs. Eaton testified that except for the sagging ceiling and the cracks in the wall, she was aware of each of the structural problems and missing items before signing the contracts. (*Id.,* pp.

43, 58–59).  She also stated that occasionally the water supplied to her house smells like bleach and the septic tanks produce strong odors.  Eaton receives water reports from Wagner Water Services that the water is safe to drink,  but she uses bottled water.  (*Id.,* pp. 66–67).

Eaton paid $74.00 to repair a faulty electrical plug.  She seeks damages for the loss in market value of the house.  She bought the home for a purchase price of $69,500.00 and testified that it is currently appraised at $52, 500.00.  She stated that she would like defendants to build her a new house because she did not think that her home could be repaired to "100 percent complete."  (*Id.,* pp. 62, 66–68).

15.   *Rhonda Carson* – Carson works for a mortgage company and previously worked as an apartment leasing agent for fourteen years.  Her husband works in the construction industry.  (Docket Entry No. 95, Carson Deposition, Ex. 1 pp. 10–11, 14).  On January 26, 2002, Carson signed an earnest money contract with 5G Inc., for a previously-owned home in the Trails End subdivision "as is, where is, except A/C and Heat, electrical, and plumbing is to be functional and seller is to replace window and front door."   In September 2002, Carson signed a deed of trust. Carson and her husband inspected the house before signing the contracts.  (*Id.,* p. 29).  Although the house was "run down," it had potential and they liked its location.  (*Id.,* Ex. 1, pp. 32–34).

In August 2002, Carson moved in and made one $788.00 monthly payment.  (*Id.*, pp. 36–38).  She testified that she stopped making payments because her house is located on the lot in a way that does not comply with county subdivision  regulations.  As

described in the deed restriction, county regulations require that no building "shall be located closer than thirty (30) feet from the front property line and shall be no closer than twenty (20) feet from the side lot lines and no closer than twenty (20) feet from the rear property line."  Hall had the property resurveyed, and the result showed that the lot did have sufficient space between the house and the adjacent lot.  Carson stated in her deposition that Hall did not record the adjustment of her property lines with the County.  (*Id.,* pp. 43, 57–59, Ex. 9).  Carson also testified that her septic tank was never cleaned or drained, the plumbing leaks, and the electrical wiring is defective.  Although defendants made some repairs that she requested before she signed the deed of trust, the house still needs repair.  Defendants repaired a plumbing leak in the bathroom and replaced the sprinkler heads in the septic system.  Carson stated that after she identified the problem with the property line, defendants were no longer willing to make repairs as they had been.  (*Id.* p. 48–50).

Carson submitted a plumbing repair estimate for $7,040.00, an electrical repair estimate for $1,000.00, and an estimate for $30,630.00 to move the house to comply with the county subdivision  requirement.  (*Id.,* Exs. 8–10). The plumbing estimate contains the costs to repipe the entire house with copper water pipes and install new faucets and a new electric water heater.  The electrical repair estimate dated January 2003 lists repairs to the track lighting and hot water heater connection; the other items are unreadable.  Carson likes her home and does not want to move, but she wants her house to be relocated on the lot and repaired.  Carson acknowledged that as long as the new property

lines are recorded with the County, her home does not need to be moved.  (*Id.,* pp. 58, 63).

16.   *Richard Johnson* – Johnson worked for Hall as a carpenter before he purchased an existing house in Trails End subdivision.  On April 26, 2002, Johnson signed an earnest money contract with Hall after inspecting the house.  In June 2002, he moved into the house.  On October 26, 2002, he signed a deed of trust.  (Docket Entry No. 95, Johnson Deposition, Ex. 3).  When Johnson inspected the house, he noticed a hole in the roof and damaged shingles.  The floor in the bathroom was damaged.  (*Id.*, Ex. 1, pp. 46–47).  He informed Hall of the damaged floor and offered to make the repairs himself if Hall would provide the materials.  Hall agreed to provide the materials.  Johnson removed the floor and discovered black mold.  Johnson testified that he raised the mold issue with Hall, who offered to place Johnson and his family in a different house.  Johnson testified that he did not pursue this offer because Hall's employees forced him to sign the deed of trust for the mold contaminated home and would not allow him to move in to a different house.  (*Id.,* pp. 60–61).  Johnson made five monthly payments of $978.12.  In January 2003, he moved out of the house, leaving most of the household items behind.  Johnson claims that the mold made his children sick.  (*Id.*, Ex. 1, pp. 32–36).  The record contains a February 27, 2003 letter from a doctor, which stated as follows:

> [Johnson's three children] have been treated repeatedly for allergic rhinitis, upper respiratory infections, as well as wheezing.  Because of the frequency of their illnesses it must be assumed that an inhaled irritant such as mold, could be the underlying cause of these children's health problems.

(Ex. B).   Johnson submitted an estimate from Barica Inc. Contractors dated April 15, 2003 and signed by Jack Carnes.   The letter states "[f]rom being in the home building business for some (42) years it is my estimate that it will be best to demolish the present house and build a new home." Johnson seeks personal injury damages for his children's health problems, consequential damages for household items left behind, and loss in market value.   Johnson stated that except for the mold contamination, the house was "really nice" and he would live in the house today except for the mold. (*Id.,* p. 16).

### D.    The Summary Judgment Issues

The parties dispute whether, as a matter of Texas law, plaintiffs may recover for breach of contract.   Defendants make three primary arguments. First, defendants assert that those plaintiffs who executed a contract for deed have no legal interest or title under the contracts that survives their failure to make payments, and no claim for breach of contract or other cause of action arising out of the condition of the property.   Second, defendants argue that because plaintiffs agreed to buy the property "as is" and had reasonable opportunities to inspect, they cannot recover damages for breach of contract, negligence, or for breach of the warranty of workmanship.   Defendants argue that even if the disclaimers do not preclude claims for breach of the implied warranty of habitability, plaintiffs have failed to meet the legal requirements to assert such claims.   Defendants also argue that they are entitled to summary judgment as to the plaintiffs who contracted to purchase previously-owned houses because the implied warranty applies only in the sale of a new home.   Finally, defendants argue that any recovery that plaintiffs could

achieve would be precluded by the counterclaims for the fair market rental value of the houses for the periods in which the plaintiffs have lived in the houses without making any payments. Defendants have submitted payment records that show the number of payments made by the plaintiffs as compared to the amounts due under the contracts. (Docket Entry No. 95, p. 3).

Plaintiffs assert that they have equitable title to the properties and argue that there are disputed fact issues as to which party breached the contracts first. Plaintiffs assert that defendants materially breached the contracts by delivering houses and subdivisions that were not in the promised condition, excusing their obligation to make the monthly payments.  Plaintiffs argue that the "as is" clauses are unenforceable because of lack of sophistication; the boilerplate nature of the clauses; and the absence of a meaningful opportunity to inspect the houses before signing the contracts.  Plaintiffs also argue that the "as is" clauses do not preclude recovery because they seek damages for latent defects and for defendants' failure to make repairs as promised after the contracts were signed. (Docket Entry No. 91, p. 14).  Plaintiffs also assert that there are disputed fact issues material to deciding whether defendants breached the implied warranty of habitability.

Each argument and response is examined below.

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56. Under FED. R. CIV. P. 56(c), the moving party bears the initial burden of "informing the

district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). If the burden of proof at trial lies with the nonmoving party, the movant may either: (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense; or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate the evidence in the record insufficiently supports an essential element or claim. *Celotex*, 477 U.S. at 330. The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chemical Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Texas*

*Reg'l Narcotics Trafficking Task Force,* 379 F.3d 293, 305 (5th Cir. 2004). The nonmovant must do more than show that there is some metaphysical doubt as to the material facts. *Armstrong v. Am. Home Shield Corp.,* 333 F.3d 566, 568 (5th Cir. 2003).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

## III.   The Breach of Contract Claims

### A.   The Contracts for Deed

Defendants argue that the ten plaintiffs who signed contracts for deed have no rights in the property because plaintiffs did not hold legal title and the contracts provided for forfeiture if the plaintiffs defaulted in their payments.[11]  Plaintiffs assert that there are

---

[11]   Chesson cannot sustain any breach of contract claim against defendants. After signing an earnest money contract, Chesson moved into the house without signing a second contract. (Docket Entry No. 95, Chesson Depo., Ex. 3). The earnest money contract was an option contract for the sale of land that gave Chesson the right to choose to purchase the property within the time and the terms specified but did not obligate her to do so. *Chambers County v. TSP Dev., Ltd.*, 63 S.W.3d 835, 838 (Tex.App.–Houston [14th Dist.] 2001, pet. denied). A contract for the sale of real estate is an agreement that binds the purchaser to buy and the seller to sell in accordance with the terms of the contract. *Seelbach v. Clubb*, 7 S.W.3d 749, 756 (Tex.App.–Texarkana 1999, pet. denied) (when the seller's only contractual remedy is retention of the earnest money, the agreement is an option to purchase). Chesson did not comply with terms of the earnest money contract and she did not sign a contract for the sale of the property. As a result, defendants did not assume any contractual liability with respect to the property described in the earnest money contract. *See Chambers*

triable issues of fact as to whether defendants materially breached the contracts first by delivering defectively constructed houses, excusing plaintiffs' default and precluding forfeiture.  Plaintiffs assert that they obtained equitable title in the houses when they signed the contracts for deed, entitling them to recover for breach of contract and to obtain extracontractual remedies even after defaulting under the payment obligation and, in most cases,  remaining in the homes.

A contract for deed is an executory contract to purchase real property.  *Brown v. De La Cruz*, 156 S.W.3d 560 (Tex. 2004).  Under Texas law, the only rights a purchaser under a contract for deed possesses are conditioned on the purchaser's fulfillment of the contractual obligation to pay in full.  *Johnson v. Wood*, 157 S.W.2d 146 (Tex. Comm'n App. 1941, opinion adopted); *see* TEX. PROP. CODE § 5.061.  Under a contract for deed, the buyer agrees to purchase real property over a period of time through installment payments; the seller agrees to deliver title to the property once the purchase price is paid in full.  The purchase price is typically paid over a number of years.  The buyer is entitled to immediate possession of the property, but the seller retains legal title. *Graves v. Diehl*, 958 S.W.2d 468, 470 (Tex.App.–Houston [14th Dist.] 1997, no pet.); *Gibson v. Bostick Roofing and Sheet Metal Co.*, 148 S.W.3d 482, 491 (Tex.App.–El Paso 2004, no pet.).  If the contract is paid in full, the seller delivers a warranty deed to the property, and the purchaser then receives legal title.  Until the purchase price is paid in full, the buyer's legal interest is limited to the equitable right to perform under the contract by making the

---

*County*, 63 S.W.3d at 837 (holding that plaintiff did not have standing with respect to property when the plaintiff had only signed an earnest money option contract).

installment payments.  *Club Corp. of Am. v. Concerned Property Owners for April Sound*, 881 S.W.2d 620 (Tex.App.–Beaumont 1994, writ denied); *In re Waldrom*, 65 B.R. 169, 173 (Bankr. N.D. Tex. 1986).

Plaintiffs argue that they received equitable title when they signed the contracts for deed, relying on *Leeson v. City of Houston*, 243 S.W. 485 (Tex. Comm'n App. 1922, judgment adopted).  Texas case law does not support the plaintiffs' argument that they have equitable title to the houses.  The few cases that have considered this question support the conclusion that under *Johnson*, which was decided and was adopted by the Texas Supreme Court 20 years after *Leeson*, a contract for deed does not convey legal or equitable title to the purchaser until the purchase price is fully paid.  *Graves*, 958 S.W.2d at 470; *Club Corp. of Am.,* 881 S.W.2d at 626 ("A contract for deed is executory under the laws of the State of Texas [and] a purchaser under a contract for deed possesses only an equitable right under the contract instead of an equitable title."); *White v. Hughs,* 867 S.W.2d 846, 849 (Tex.App.–Texarkana 1993, no writ);  *Mora v. City of Mission*, 2005 WL 1693685 (Tex.App.–Corpus Christi);  *Cullins v. Foster,* 2005 WL 1771508 (Tex.App.–Houston [14th Dist.], 2005); *Caperton Realty Services, Inc. v. Shamblin*, 2001 WL 605193 (Tex. App.–Dallas).

Defendants are correct that plaintiffs are not entitled to demand conveyance of legal title until they have completed performed the payment obligation.  Defendants are also correct that provisions in contracts of deed authorizing the termination of the contracts and retention of payments made are enforceable.  *See* Tex. Prop. Code § 5.064;

*see also Grant v. Sherwood Shores, Inc.*, 477 S.W.2d 667, 672 (Tex. Civ. App.–Austin 1972, no writ); *Dixon v. Brooks*, 604 S.W.2d 330, 334 (Tex. Civ. App.–Houston [14th Dist.] 1980, writ ref'd n.r.e.).[12]  Although defendants retained legal title to the properties, this court cannot conclude that, as a matter of law, plaintiffs have forfeited all rights under the contracts for deed.  Defendants do not cite a Texas case in which a court has ruled that a buyer cannot assert a right to recover damages if the seller has failed to provide property as promised under the contract of deed.  The Texas cases that recognize the absence of the purchaser's legal or equitable title under a contract of deed hold that a purchaser may not sue the seller for trespass.  These cases, however, recognize that a purchaser under a contract for deed has an equitable right – not an equitable title – to specific performance of the contract, although the purchaser cannot demand conveyance of the legal title until he has completely performed the payment obligation.  *See, e.g.*, *Graves*, 958 S.W.2d at 470–71; *Club Corp. of Am.*, 881 S.W.2d at 626.

The right of a seller to terminate a contract for deed if the buyer fails to make the required installment payments, retain the purchase money, and obtain possession,  applies "in the absence of any showing that [the seller] was in default under the contracts." *Grant v. Sherwood Shores, Inc.*, 477 S.W.2d at 672.  A contract for deed is subject to the

---

[12]  Texas is not alone in recognizing the validity of forfeiture provisions in contracts for deed. *See Lambert v. Bongard*, 648 N.W.2d 712 (Minn. Ct. App. 2002); *Black v. Robinson*, 2002 WL 1585853 (Iowa Ct. App. 2002) (real estate contract was forfeited when purchaser failed to remedy the defaults identified in the notice of forfeiture, including making contract and tax payments); RESTATEMENT (THIRD) OF PROPERTY § 3.4 ("[W]hen the contract for deed is enforced as written, the vendor is able to avoid the equity of redemption, foreclosure, and other traditional debtor protections that are part and parcel of mortgage law. . . On one hand, [statutes that regulate contracts for deed], temper the harshness of forfeiture.  On the other, they tend to put a legislative imprimatur on the forfeiture concept.").

usual rules applicable to contracts, making reciprocal promises in a contract mutually dependent, such that a breach of one will excuse performance of the other. *See Morgan v. Singley,* 560 S.W.2d 746, 749 (Tex. Civ. App.–Texarkana, 1977) ("It is of course the general rule that the unjustified refusal or failure to pay the agreed installments would constitute a breach of contract. [But] reciprocal promises in a contract are presumed . . . to be mutually dependent rather than independent . . ."). "In Texas, the general rule is that reciprocal promises in a contract, absent intentions to the contrary, are presumed to be mutually dependent and the breach of one will excuse the performance of the other." *See D.E.W., Inc. v. Depco Forms, Inc.*, 827 S.W.2d 379, 382 (Tex.App.–San Antonio 1992, no writ); *Dobbins v. Redden* 785 S.W.2d 377, 378 (Tex. 1990) ("It is a well established rule that 'a party to a contract who is himself in default cannot maintain a suit for its breach.'") (quoting *Gulf Pipe Line Co. v. Nearen*, 138 S.W.2d 1065, 1068 (Tex.1940)); *Graco Robotics, Inc.*, 914 S.W.2d 633, 641 (Tex.App.–Texarkana 1995, writ dism'd) (a party that fails to perform its obligation may not enforce the remaining terms of the contract).

The case of *Caperton Realty Services, Inc. v. Shamblin* is instructive. The plaintiff had purchased a house under a contract for deed, which required her to make monthly payments and required the seller to maintain its existing insurance policy on the house. Fire destroyed the property and the buyer withheld payments under the contract for deed until the seller provided proof of the insurance. The seller cancelled the purchaser's interest under the contract and in the property and retained the sums previously paid. The

purchaser then discovered that the seller did not have the house insured as required. The court rejected the argument that the seller was justified in rescinding the contract for deed, finding that the buyer was excused from making the payments. The court further found that the buyer was entitled to contract damages for the breach of the promise to provide insurance; the damages were the amount necessary to put the plaintiff in a financial position equal to that which she would have had if both sides had performed the contract. 2001 WL 605193 *1–2. If defendants materially breached the contracts by delivering houses that did not comply with the contracts for deed, plaintiffs are entitled to damages. Defendants are not entitled to a finding that plaintiffs can recover no damages under the contracts for deed. If defendants materially breached the contracts, plaintiffs should be entitled to damages. As defendants assert, however, they are entitled to the fair market rental value of the properties for the period plaintiffs have lived in the houses for free. *See G.E., Inc. v. Buford*, 105 S.W.3d 667 (Tex.App.–Austin 2003, pet. denied); *Winters v. Arm Refining Co.* 830 S.W.2d 732 (Tex.App.–Corpus Christi 2003, writ denied).

### B.    The Deeds of Trust

Three of the plaintiffs – Eaton, Carson, and Johnson – signed deeds of trust with vendor's liens for previously-owned homes. A vendor's lien secures unpaid purchase money and allows the vendor to foreclose on the property if the buyer defaults. *See Walton v. First Nat'l Bank of Trenton*, 956 S.W.2d 647, 651 (Tex.App.–Texarkana 1997, pet. denied). Texas courts have recognized that the property interest of a buyer under a contract for deed is generally the same as that under a deed with a retained vendor's lien.

*See Ward v. Malone,* 115 S.W.3d 267, 269 (Tex.App–Corpus Christi 2003, pet. denied) ("The legal effect of the contract [for deed] is the same as that of a deed with a retained vendor's lien.") (citing *Bucher v. Employers Cas. Co.*, 409 S.W.2d 583, 584–85 (Tex.Civ.App.–Fort Worth 1966, no writ)).   Under a deed of trust with a retained vendor's lien, the seller retains a superior title interest in the property.  "Superior title is held by the vendor where an express vendor's lien is retained to secure unpaid purchase money, and the vendee has a mere equitable right to acquire title by carrying out the agreement."  *Walton,* 956 S.W. 2d at 651; *Lambert v. First Nat. Bank of Bowie*, 993 S.W.2d 833 (Tex.App.–Fort Worth 1999, pet. denied).

Under either the contracts for deed and the deeds of trust, plaintiffs were contractually obligated to make monthly payments for the houses and defendants were obligated to deliver the houses as promised in the contracts.  This court cannot conclude that the defendants' superior title interest precludes, as a matter of law, plaintiffs' breach of contract claims without addressing the issue of whether defendants materially breached the contracts before plaintiffs stopped making payments.

### C.      The Enforceability and Legal Effect of the "As Is" Clauses

A contract is breached when a party fails or refuses to perform an act that it expressly promised to do.  *Methodist Hosps. v. Corporate Communicators, Inc*., 806 S.W.2d 879, 882 (Tex.App.–Dallas 1991, writ denied).  Whether a party has breached a contract is a question of law for the court.  *See Willis v. Donnelly*, 118 S.W.3d 10, 25–26 (Tex.App.–Houston [14th Dist.] 2003, no pet.); *Chappell Hill Bank v. Lane Bank Equip.*

*Co.*, 38 S.W.3d 237, 245 (Tex.App.–Texarkana 2001, pet. denied); *Lafarge Corp. v. Wolff*, 977 S.W.2d 181, 186 (Tex.App.–Austin 1998, pet. denied) ("The judge determines what conduct is required of the parties."). Whether a party's breach of contract is so material as to excuse the other party's obligation to perform is a question of fact. *Hudson v. Wakefield*, 645 S.W.2d 427, 430 (Tex. 1983). Texas courts follow the *Restatement Second of Contracts* in determining whether a party has materially breached the contract, so as to discharge the other party's obligation to perform his contractual duties. *See Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam).[13] A breach is material if the injured party does not receive the substantial benefit of the bargain. *See Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex .1994); *Lazy M Ranch Ltd. v. TXI Operations*, 978 S.W.2d 678 (Tex.App.–Austin 1998, pet denied).

---

[13] The *Restatement* identifies five circumstances significant to determining whether a party's failure to perform is material:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances; and
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981).

The ability of the plaintiffs to recover under the contracts for deed and deeds of trust depends on whether there is a triable issue of fact that their nonpayment was excused by defendants' material prior breach of the contracts.  The issue of whether defendants materially breached the contracts, in turn, depends in large part on the enforceability of the "as is" clauses.  If the clauses are enforceable, the plaintiffs who contracted to accept the property "as is" cannot, as a matter of law, assert a breach of contract claim arising out of the condition of the property and cannot excuse their failure to pay under the contract.

In *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995), the Texas Supreme Court approved the enforcement of an "as is" clause that is not the product of the seller's fraudulent representation or concealment.  A buyer who agrees to purchase property "as is," the Court explained, agrees to make his own appraisal of the bargain and accept the risk that he may be wrong.  Such a buyer cannot hold a seller liable for the physical condition of the property because the buyer has agreed to rely on his own determination of the condition and value of the purchase, removing the possibility that the seller's conduct can legally cause damage.  *Id.* at 161; *see also Cherry v. McCall,* 138 S.W.3d 35 (Tex.App.–San Antonio 2004, pet. denied).

In *Cherry,* the home buyers signed a real estate contract with an "as is" clause.  After moving in, they discovered a "hidden" room in the basement contaminated with mold and filled with trash and found defective pipes.  The buyers sued for breach of contract and argued that the clause was unenforceable on the grounds that the defects

were hidden, they were unsophisticated parties, and the "as is" provision was boilerplate language in a form contract. The trial court granted summary judgment for the seller on the basis that the buyers had agreed to accept the entire risk as to the quality of the property and could not recover for breach of contract as a matter of law. On appeal, plaintiffs' counsel argued that the trial court erroneously excluded statements from the home buyer's deposition testimony that she did not "intend to buy a house with hidden rooms full of debris, leaky sewer pipes, faulty wiring, and rodents." The appellate court affirmed the grant of summary judgment and stated that what the buyer had intended to buy failed to raise a fact issue as to whether the sellers breached the contract. *Id.* at 42.[14]

Plaintiffs argue that the "as is" clauses in the contracts they executed are not enforceable, as a matter of law. Defendants urge that the clauses meet the criteria for validity under Texas law. In *Prudential*, the Texas Supreme Court set a "totality of the circumstances" test to determine whether an "as is" clause is enforceable. The Court explained its holding and test as follows:

> A valid "as is" agreement, . . . prevents a buyer from holding a seller liable if the thing sold turns out to be worth less than the price paid because it is impossible for the buyer's injury on account of this disparity to have been caused by the seller. The sole cause of a buyer's injury in such circumstances, by his own admission, is the buyer himself. He has agreed to take the full risk of determining the value of the purchase. He is not obliged to do so; he could insist instead that the seller assume part or all of that risk by obtaining warranties to the

---

[14]  The plaintiffs also appealed the denial of their request for additional time to discover evidence that the sellers "had knowledge of the rooms hidden in the basement and had knowledge of the toxic trash heap." The court denied the request and stated that the seller's knowledge of the defects was not material to the breach of contract or mutual mistake claims asserted. 138 S.W.3d at 40.

desired effect. If the seller is willing to give such assurances, however, he will ordinarily insist upon additional compensation. Rather than pay more, a buyer may choose to rely entirely upon his own determination of the condition and value of his purchase. In making this choice, he removes the possibility that the seller's conduct will cause him damage. . . .

By our holding today we do not suggest that an "as is" agreement can have this determinative effect in every circumstance. A buyer is not bound by an agreement to purchase something "as is" that he is induced to make because of a fraudulent representation or concealment of information by the seller. A seller cannot have it both ways: he cannot assure the buyer of the condition of a thing to obtain the buyer's agreement to purchase "as is", and then disavow the assurance which procured the "as is" agreement. Also, a buyer is not bound by an "as is" agreement if he is entitled to inspect the condition of what is being sold but is impaired by the seller's conduct. A seller cannot obstruct an inspection for defects in his property and still insist that the buyer take it "as is." . . .

We also recognize that other aspects of a transaction may make an "as is" agreement unenforceable. The nature of the transaction and the totality of the circumstances surrounding the agreement must be considered. Where the "as is" clause is an important part of the basis of the bargain, not an incidental or "boiler-plate" provision, and is entered into by parties of relatively equal bargaining position, a buyer's affirmation and agreement that he is not relying on representations by the seller should be given effect.

896 S.W.2d at161 (citations omitted).

Under *Prudential*, courts consider: (1) the terms of the "as is" agreement; (2) the

sophistication of the parties and the surrounding circumstances; (3) whether the "as is"

agreement was freely negotiated; (4) whether the agreement was an arm's length

transaction; and (5) whether there was a knowing misrepresentation or concealment of

known fact. *See Procter III v. RMC Capital Corp.*, 47 S.W.3d 828, 833 (Tex.App.–Beaumont 2001, no pet.); *Smith v. Levine*, 911 S.W.2d 427, 431–32 (Tex.App.–San Antonio 1995, writ denied). Although not an independent factor, whether the buyer was represented by counsel is also considered. *Id.* at 833–34.

1.      *The Terms of the "As Is" Clauses in the Contracts*

The terms of the agreements weigh in favor of upholding the "as is" provisions. In *Prudential,* the Texas Supreme Court analyzed a contract with language similar to that in the contracts in this case. The *Prudential* Court analyzed the following contract language:

> [The buyer] agreed to take the property "with any and all latent and patent defects" "under the express understanding that there are no express or implied warranties" . . . including specifically, "that there is no warranty by Seller that the Property is fit for a particular purpose." [The buyer] acknowledged that he was not "relying upon any representation, statement or other assertion with respect to the Property condition" and was instead relying upon his own "examination of the Property." While it should not be necessary in every "as is" provision to go into this much detail, [the buyer's] contract leaves no doubt exactly what he agreed to. [The] contractual disavowal of reliance upon any representation by [the seller] was an important element of their arm's-length transaction.

*Id*. at 161. The "as is" provisions in this case are similar. The "as is" clauses in the earnest money contracts stated that the contract did not contain any verbal representations or warranties.[15] The "as is" clauses in the contracts for deed clearly stated that the

---

[15]   The earnest money contracts stated: "PURCHASER has examined all information to his/her satisfaction and either examined the property personally or been given the opportunity to inspect the property and has found it to be suitable his needs and purposes. . . . It is further understood and agreed that there is herein contained all the terms and conditions of the agreement, and that no verbal statement of any person or persons

purchaser was relying solely on his or her own inspection and that the buyer was not relying on any warranty or representation of any kind made by the seller.[16]  In addition, the contracts for deed clearly stated that plaintiffs accepted the risk as to the present and future condition of the houses.  The deeds of trust contained "as is" clauses that clearly disclaim any implied warranty.[17]  The language  that the buyer agrees to rely solely on his own inspection of the property is particularly important.  *See Oat Note, Inc. v. Ampro Equities, Inc.,* 141 S.W.3d 274, 279 (Tex.App.–Austin 2004, no pet.) (noting that the contract at issue specifically stated that home buyer "shall rely on its own inspection and investigation" of the property); *Gym-N-I Playgrounds, Inc. v. Snider*, 158 S.W.3d 78 (Tex.App.– Austin, pet. filed) ("contractual disavowal of reliance upon any representation is an important element of an arm's length transaction and is binding unless set aside"); *cf Pairett v. Gutierrez*, 969 S.W.2d 512 (Tex.App.–Austin 1998, pet. denied) (home buyer was not bound by an "as is" clause because the contract did not contain clear and unambiguous language demonstrating the buyer's agreement to rely solely on his own

---

whomsoever not herein incorporated shall be binding upon either party or upon the SELLER, his agent or representatives, and that no warranties of representation of any kind have been made by either party other than as herein incorporated."  (Docket Entry No. 91).

[16]  The "as is" clauses in the contracts for deed stated: "PURCHASER acknowledges that no warranty or representations of any kind have been made by any party or individual other than is herein incorporated, and such property is sold "AS IS" . . . WITH ALL FAULTS.  In purchasing the property, PURCHASER relies only on PURCHASER'S examination and judgment, not on the representation of any other person as to value, future value, condition size, age, use, or any other matter. PURCHASER acknowledges that in selling the property SELLER makes no warranties other than title." (Docket Entry No. 91).

[17]   The deeds of trust stated: "[t]he conveyance of this property is made without any warranty, express or implied, as to the condition of the property, in that all or part of the property herein may be subject to flooding, and the conveyance of the property described herein made by Grantor and accepted by Grantee "AS IS, WHERE IS AND WITH ALL FAULTS. . . .[N]o warranties, either express or implied, are or shall be made to merchantability, fitness for purpose, workmanship or quality, and the conveyance of the property is made "AS IS AND WHERE IS." (Docket Entry No. 91).

inspection).  It is significant that, with the exception of Chesson, each plaintiff signed two contracts containing unequivocal "as is" provisions that described the stage of completion the house would be delivered in.  *See Larsen v. Carlene Langford and Associates, Inc.,* 41 S.W.3d 245 (Tex.App.–Waco 2001, pet. denied) (although the agreement did not use specific "as is" language, the plaintiffs signed an earnest money contract and a contract for deed that both stated the buyers agreed to "accept the property in its present condition").

Although plaintiffs were not represented by counsel, the contracts are not complex legal documents, but single-page documents that used plain language.  In the contracts for deed, the deeds of trust, and the earnest money contracts, the "as is" provisions are conspicuous.  In their depositions, each plaintiff testified that they had read the contracts; none asserted an inability or failure to understand the terms.  *See Tamez v. Southwestern Motor Transport, Inc.,* 155 S.W.3d 564 (Tex.App.–San Antonio 2004, no pet.) ("[A] person who signs a contract. . . must be held to have known and fully comprehended the legal effect of the contract."); *Cole v. Johnson,* 157 S.W.3d 856, 862 (Tex.App.–Fort Worth 2005, no pet.) (in "as is" sale, the seller "gives no express or implied guarantees regarding the value or the condition of the property").

> 2.    *The Surrounding Circumstances: The Opportunity to Inspect*

A buyer is not bound by an "as is" clause if there is no opportunity to inspect or if a seller obstructs an inspection of the property.  *Prudential,* 129 S.W.3d at 789.  Because an "as is" clause precludes recovery for damages arising out of the condition of the property

that a physical examination would reveal, the buyer must allow the seller a reasonable opportunity to inspect the property.  *Id.*

It is undisputed that all the plaintiffs who contracted to purchase previously-owned homes had an opportunity to inspect their individual homes before signing the earnest money contracts and the contracts for deed or deeds of trust.   Glover testified that he inspected his house several times before he signed the contracts.   During his inspection, he found that the master bedroom wall and floor needed repair and that there was a strong odor throughout the house when he inspected it.  (Docket Entry No. 95, Ex. 1, pp. 24–26). Chesson inspected her house before she signed the earnest money contract and identified several problems. She saw that the floor had collapsed in places and the windows were not securely installed.   She also agreed to perform the necessary repairs.   (*Id.,* Ex. 1, pp. 59–61). Eaton stated in her deposition that she inspected her house before she signed the earnest money contract and before she signed the deed of trust.   She noticed that the sheetrock was damaged; the house was uneven; and baseboards and outlet covers were missing.  (*Id.,* Ex. 1, pp. 43, 58–59).   Carson inspected her house before singing both contracts.  She stated in her deposition that she was aware that the house was "run down" but she thought it had potential.   After she signed the earnest money contract in January 2002 and before she signed the deed of trust in September 2002, she came to the property to work on the house "almost every weekend."  (*Id.,* Ex. 1, pp. 29, 33–34; Docket Entry No. 91, Ex. 4).  Johnson inspected his house in April 2002 before he signed an earnest money contract.   At that time he noticed a hole in the roof and damaged shingles.   He

offered to make the repairs if Hall would supply the materials and later signed a deed of trust in October 2002. (Docket Entry No. 95, Ex. 1, pp. 22–25).

The plaintiffs who contracted to purchase new houses allege that they did not have a meaningful opportunity to inspect because the houses were not fully constructed when the contracts for deed were signed.  Courts have recognized that "as is" sales of improved real estate are generally valid only as applied to buildings that could be inspected in the state in which they would be delivered before the contract was signed.  *See, e.g., Diamond v. Mecham,* 699 S.W.2d 950, 952–53 (Tex.App.–El Paso 1985, writ refused n.r.e.).

With one exception, the record does not support the plaintiffs' contention that they did not have a meaningful opportunity to inspect the newly-constructed houses before they signed the contracts for deed.  The plaintiffs – except for Salazar – testified during their depositions that they inspected the houses before signing the contracts.  The plaintiffs' testimony is consistent with the clear representation in the contracts that they accepted the property, after inspection.

In 1996, Breedlove contracted for a completed "shell" house and three acres of land.  Breedlove testified that he bought the property as an investment and intended to rent the house to a tenant. When he inspected the house that he purchased, it was not completed, and was trashed out.  He told defendants that he would clean up the house. (*Id.,* Ex. 1, pp. 22–23, 25).   Trapp inspected the house before moving in.  Throughout the construction of the house, she made home videos of the progress.  She understood that the house was sold "as is" and that she should have hired a professional inspector, but chose

not to do so.  (*Id*., Ex. 1, pp. 28–30, 35).  Dodson contracted for a "shell" home and testified that he was required to inspect the property before singing the contract for deed and that he understood the "as is" provision in the contract.  (Docket Entry No. 95, Ex. 1, pp. 21–23).  Fountain, who owned commercial property and had entered into other contracts with Hall, testified that he inspected his house – it was "brand new" –  before he signed the contract for deed, and that he read the contract and understood its terms.  Fountain agreed to buy the house when it was "95% complete."  (*Id*., Ex. 1, pp. 32–34).

Lockhart, Hensley, and Standley actually moved into the houses before signing the contracts for deed.  Hensley testified that he  moved into the home in October 1999.  He did not sign a contract for deed until December 8, 1999.  Standley moved into the house in November 1999 and did not sign a contract for deed until December 1999.  Lockhart moved into the home in May 1999 when it was unfinished because his previous lease in California had expired; he signed a contract for deed in January 2000.  (*Id*., Ex. 1, p. 48).

Shumate signed the contract for deed in 1999 when the house was "95% complete."  She and her husband lived in a house three lots down from the lot where the home was being constructed and inspected the house several times during its construction, asked that repairs be made to the house before the contract for deed was signed, and was able to inspect the house after the repairs.  (*Id.,* Ex. 1, pp. 43, 49). Stokes, who represents the estate of her husband, testified that she and her husband lived in a tent on the property while the house was being built.  In 1996, her husband inspected the house after it was complete  and defendants made several repairs that he requested.  (*Id*., Ex. 1, pp. 26–27).

The summary judgment evidence does not raise a fact issue as to whether the plaintiffs – with the exception of Salazar – were denied a meaningful opportunity to inspect the houses before signing the contracts.  To the contrary, the evidence supplied by the plaintiffs' own deposition testimony establishes that each had a full opportunity to inspect the houses, both new and existing before signing the contracts.

Salazar's deposition testimony raises fact issues as to when the house was completed, whether there was an opportunity to inspect the house, and when Salazar moved in to the house.  Salazar signed an earnest money contract and contract for deed to purchase a "95% complete" home.  He is the only plaintiff who testified during his deposition that he did not have the opportunity to inspect the house before signing the contracts.  During his deposition, Salazar explained that he originally agreed to buy completed home and signed an earnest money contract for that home and made one down payment installment of $300.00.  After signing the earnest money contract, he returned to the property, inspected the house, and noticed problems.  He then contacted defendants and told them that he had changed his mind and wanted to buy a new house.  On February 2, 1999, Salazar signed an earnest money contract for a "1200 S. F. House 95% completed. Everything except floor coverings and Heat and Air."  The contract was initialed by Sue Hall, explained that Salazar wanted to switch from tract 73 to tract 72, and stated that the price on the tract 72 house – $41,900.00 – was subject to Darrell Hall's approval.  The down payment terms called for a $300.00 payment in March, April, May, and June.  On May 30, 1999, Salazar signed a contract for deed for a "95% complete"

house for $58,100.00 with payments to begin on July 10, 1999.  Salazar paid the balance of the down payment in June 1999 and was told that the house was "ready for occupancy in July 1999."  (Docket Entry No. 91, Ex. 1).

During his deposition, Salazar testified that he inspected the house for the first time in July 1999 and moved into a hotel to wait for requested repairs and additional construction to complete the house.  (Docket Entry No, 95,  Ex.1, pp. 22–25).  Defendants' records indicate that Salazar began making payments in July 1999.  Salazar testified that he did not move in or begin making payments until July 2000 after Hall finally refused the repairs that he had requested when the house was completed in July 1999.  Although the sequence of events as to when the house was completed is unclear, Salazar testified that he signed the earnest money contract in February 1999 and the contract for deed in May 1999 before defendants had even started to build the house.  Because there is a fact issue as to whether Salazar had an opportunity to inspect the house before agreeing to buy it "as is," this court cannot conclude that, as a matter of law, the "as is" provision precludes a breach of contract claim.

Based on the undisputed evidence in the summary judgment record, this court concludes, that with the exception of Salazar, the plaintiffs were not denied an opportunity to inspect the houses.  Plaintiffs do not allege that defendants "obstructed" an inspection of the subdivisions.  *See Prudential,* 896 S.W.2d at 161.  Either Hall or one of its employees showed the plaintiffs the property before the earnest money contracts were executed.  Plaintiffs executed the earnest money contracts in defendants' sales offices located in the

subdivisions.  After plaintiffs signed the contracts, they had additional time to inspect the property.  Most plaintiffs did not sign the contracts for deed or move into the houses for several months until they completed the installment payments for the down payment.[18] Plaintiffs had an opportunity to inspect the conditions of the subdivisions  including the unpaved condition of the roads and the use of septic systems and water wells.

### 3.     Fraudulent Representation and Concealment

Plaintiffs allege that the "as is" clauses are unenforceable because some of the breach of contract and breach of implied warranty of workmanship claims arise from alleged latent defects.  As noted, the case law does not support finding the "as is" clauses unenforceable with respect to latent defects, as long as the buyer had an unimpaired opportunity to inspect before signing the contract containing the "as is" clause and the other requirements for enforcing such a clause are present.  *See Mid Continent Aircraft Corp. v. Curry County Spraying Serv., Inc.,* 572 S.W.2d 308, 313 (Tex.1978) (the buyer "has taken the entire risk as to the quality of the [property] and the resulting loss"); *Cherry,* 138 S.W.3d 35 (rejecting argument that "as is" clause was unenforceable because the plaintiff was inexperienced and sought damages for "hidden" defects and defective

---

[18]  The earnest money contracts stated that:

> Purchaser agrees not to take permanent possession until down payment is completed and all closing papers signed.
> . . .
> Water, septic tanks, telephones, and electricity will be the responsibility of the purchaser.  Purchaser shall have until midnight of the seventh calendar day following the date of this contract to revoke contract and demand his earnest money refunded.

(Docket Entry No. 92, Ex. 1).

electrical wiring); *Erwin v. Smiley*, 975 S.W.2d 335 (Tex.App.–Eastland 1998, reh'g denied) (claims arising out of the sale of termite infested home were not actionable in light of "as is" clause in contract); *cf Lee v. Perez*, 120 S.W.3d 463, 467–68 (Tex.App.–Houston [14th Dist] 2003, no pet.) (deed restriction was not a "condition" of the premises that would be disclosed by an examination of the lots themselves).

The claims for fraud and fraudulent inducement have been dismissed in this case. (Docket Entry No. 73).  In March 2004, defendants moved for summary judgment on all claims asserted by plaintiffs.  Plaintiffs did not produce competent evidence to show that defendants had engaged in fraudulent misrepresentations during the execution of the contracts.  This court granted defendants' motion for summary judgment on the claims for fraud and fraudulent inducement, but denied summary judgment on the claims for breach of contract and negligence.  Both preclusion based on the prior ruling and the present record defeat any fact issue as to the claims for fraud and fraudulent inducement.

"In the context of a summary judgment, a document containing the buyer's disclaimer of reliance conclusively negates the element of reliance." *Bynum v. Prudential Residential Services, Ltd. Partnership*, 129 S.W.3d 781 (Tex.App.–Houston [1st Dist.] 2004, review denied) (citing *Procter v. RMC Capital Corp*., 47 S.W.3d 828, 834 (Tex.App.–Beaumont 2001, no pet.).  To avoid summary judgment, the buyer "must present some summary judgment evidence that 'but for' the representations of the seller regarding the condition of the subject of the contract, the buyer would not have assented to the 'as is' clause in the sales' contract." *Id*.  The evidence on the representations regarding

the condition of the property must raise a fact issue on: (1) the materiality of the representation; (2) falsity; (3) actual knowledge of the defendant; (4) intent to induce reliance; (5) reliance; and (6) injury.  *See, e.g., Procter,* 47 S.W.3d at 834–35.  Texas courts have recognized that the plaintiff must have "actually and *justifiably* relied on the misrepresentation" to show fraudulent inducement.  *See DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858–59 (Tex.App.–Houston [14th Dist.] 2003, pet. denied) ("[A] party who enters into a written contract while relying on a contrary oral agreement does so at its peril and is not rewarded with a claim for fraudulent inducement when the other party seeks to invoke its rights under the contract.").

Plaintiffs did not identify specific conditions in the houses that were known by defendants and should have been, but were not, disclosed.[19]  *See Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001).  Plaintiffs generally alleged that defendants misrepresented that the subdivisions would have access to county-approved water and road systems. Plaintiffs claimed that defendants fraudulently promised "a water system and a road system that was approved according to specifications set forth by governmental authorities and failed to provide these systems."  (Docket Entry No. 95, Carson Deposition, Ex. 10).

---

[19]  In response to defendants' interrogatories as to the factual basis for the fraudulent inducement claims, the plaintiffs responded with similar conclusory answers that read as follows:

> The inducements that were made in writing and in statements are detailed in the produced documents but can be summarized by detailing the promises that the home we purchased would be served by a road system, water system, and drainage system that would serve the community.  The home was not built very well. . .This property and home would not have been purchased had these inducements [sic] been given.  In addition repairs were requested to be made but were never made and completed.

(Docket Entry No. 95, Carson Deposition, Ex. 10, ¶ 9).

Plaintiffs have not produced or identified any evidence that defendants did not comply with the county regulations requirements that applied to subdivisions when the contracts were executed.[20]

During their depositions, several plaintiffs stated that defendants made false oral promises to make repairs to the houses.  A promise regarding a future act is actionable as fraud only if the representation was made with no intention of performing.  *Coffel v. Stryker Corp.*, 284 F.3d 625, 633–34 (5th Cir. 2002).  A failure to perform, standing alone, is insufficient evidence of intent.  *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992).  The evidence presented must be relevant to the defendant's intent at the time the representation was made.  *Id.*  During their depositions, several plaintiffs identified defects that arose after they had lived in the houses for extended periods. Defendants' failure to repair such defects does not show fraudulent intent at the time the

---

[20]  As evidence of defendants' fraudulent intent, plaintiffs  pointed to the deposition testimony of Kristie Lemmons, the TCEQ investigator who concluded that defendants had violated state law due to improper solid waste disposal in the Trails End subdivisions in 2000.  Neither Lemmons's deposition testimony about the improper disposal of construction debris in 2000 or the TCEQ enforcement suit raise a fact issue as to plaintiffs' reliance or defendants' fraudulent intent.  As Lemmons acknowledged in her deposition, the Trails End subdivisions  were approved by the Commissioners' Court in San Jacinto County, Texas on December 14, 1998.

The earnest money contracts stated that the purchaser would be responsible for water.  Only some of the plaintiffs contracted for "community water well access."  Before 2000, the county subdivision approval process generally did not impose specific requirements about water systems. As a result of the TCEQ enforcement suit, the state court ordered defendants to create public water systems in the second generation subdivisions, but there is no law against the use of private water well in subdivisions.  The agreed judgment required compliance with legislation passed in 1999 that imposed new state-wide rules for water and sewage facilities in subdivision  developments.  *See* Model Subdivision Rules of the Texas Water Development Board, TEX. ADMIN. CODE. § 364.1 (February 10, 2000, 25 Tex. Reg. 800), available at www.sos.state.tx.us  Because defendants were not required to build public water systems and plaintiffs were on notice that defendants would not be responsible for water service, the summary judgment evidence does not create a triable issue of fact of fraudulent representation based on promises of county-approved water systems.

contracts were executed.  With respect to defects discovered during the inspections of the houses and brought to defendants' attention, the deposition testimony shows that defendants did in fact make repairs to the houses when the plaintiffs first moved in to the houses.  As described below, the summary judgment evidence shows that in most cases, specific repairs the parties agreed on were included as terms of the contracts.

        4.      *The Sophistication of the Parties and their Negotiations with Defendants*

Most of the plaintiffs worked blue collar jobs and had high school level educations. It is undisputed that the plaintiffs were not represented by counsel.  While these factors by themselves tend to show a lack of relevant knowledge, the record also shows that many of the plaintiffs had experience in the construction or real estate industry.  Dodson worked in the construction industry when he signed the earnest money contract and contract for deed. (Docket Entry No. 95, Ex. 1, pp. 9–10).  Fountain owned commercial property and had entered into other contracts with Hall for investment purposes before he signed the earnest money contract and contract for deed.  (*Id.,* Ex. 1, pp. 6–7).  Hensley worked in the construction industry when he signed his contracts.  (*Id.,* Ex. 1, pp. 11–12).  Standley had extensive experience in the construction industry. (*Id.,* Ex. 1, pp. 11–13, 30).  Johnson worked for Hall as a carpenter when he signed his contracts.  (*Id.,* Ex. 1, p. 9).  Trapp worked for Hall selling houses at the time she signed the contract for deed.  Her husband worked as a superintendent of a construction company. (*Id.,* Ex. 1, pp. 7, 52).  Chesson previously worked in the construction industry.  (*Id.,* Ex. 1, pp. 14–15).  Eaton previously worked as a secretary for a construction company and in the contracts department for a

timeshare resort.  (*Id.*, Ex. 1, pp. 10–11).  Carson had fourteen years of experience as a leasing agent and her husband, who worked in the construction industry, inspected the property with her.  (*Id.*, Ex. 1, pp. 10–11, 14).  Breedlove frequently buys houses as investments.  He stated in his deposition that he was familiar with real estate transactions but that he "had never bought a house in the country with three acres before."  (*Id.,* Ex. 1, pp. 29, 36, 61).  Lockhart worked as an electrical contractor and operated his own business – "Lockhart Home and Repair Services" – when he signed his contracts.  (*Id.,* Ex. 1, pp. 8–9).

There are two plaintiffs as to whom the record does not disclose details as to relevant knowledge or experience.  Shumate worked as a restaurant manager, but testified that her husband signed the contract for deed.  There is no evidence in the summary judgment record as to his experience or occupation.  Stokes testified that her husband was trained as a surgeon's assistant, but the record does not contain other evidence as to his knowledge or experience.  The one plaintiff who purchased a previously-owned home and did not have experience in real estate or in construction is Glover, who drove a truck and previously worked as a mechanic.  (*Id.*, Ex. 1, pp. 24–26). [21]

---

[21]   Even if there was a fact issue as to the enforceability of the "as is" clauses with respect to Shumate, Stokes, and Glover, the defects they identify are not severe enough to excuse their failures to pay, as a matter of law.  Shumate complains that defendants delivered the home without baseboards and various other amenities, such as eight-foot long kitchen cabinets.  Shumate also complains that an area thirty feet behind her house stays wet and that the ditches in front of her home fill with water when it rains.  These problems do not deprive Shumate of the substantial benefit of her home. Shumate contracted for a "95% complete" house and its market value has increased every year.  (*Id.,* Ex. 1, pp. 97–98).  She testified that she wanted to continue living in her house and did not want defendants to make repairs.  (*Id.* pp. 114–15).

Stokes testified that around 1997, the floors began to "bow" in areas and the ceiling began to "sag." When it rained, the ceiling leaked in the kitchen. Stokes testified that she did not have these problems checked or fixed.  The problems were never repaired before the house was destroyed by fire in 2001. (Docket Entry

The testimony as to the negotiations that preceded execution of the contracts for deed and deeds of trust confirm the plaintiffs' ability to bargain with defendants. Chesson's earnest money contract explicitly states that she agreed to refurbish the house in trade for partial satisfaction of the down payment. (*Id.*, Ex. 1, pp. 14–17). Eaton negotiated to obtain kitchen cabinets after she inspected the house, and agreed to hang them. (*Id.,* Ex. 5). Glover's contract provided for new exterior paint and repairs to the master bedroom. (*Id.,* Ex. 1, p. 34). Breedlove testified that after he inspected the house, he saw that it needed to be cleaned and he agreed to do the work. (*Id.*, Ex. 1, p. 25). Shumate negotiated for certain repairs after inspection and before signing the contract for deed. Shumate testified that defendants replaced the water heater originally delivered with the house because it was too small. (*Id.*, Ex. 1, pp. 73–75). Shumate also testified that before she moved in, she asked defendants to install attic vents. Defendants informed Shumate that the vents were an "add-on" feature that was not part of the original agreement and prepared a bill for the extra cost, which he paid. (*Id.,* Ex. 1, p. 71). Dodson testified that when he inspected the house, he identified gaps around the molding in certain areas and asked defendants to fix them before he signed the contract for deed.

---

No. 95, Ex. 1, pp. 27–30). Stokes's deposition testimony is insufficient to raise a fact issue that defendants materially breached the contract.

Glover claims that his house is contaminated with mold because it is not protected by a moisture barrier. Glover moved into the home in 2000; has continued to live in the house since June 2001 without making any payments; and relies on mold inspection reports from December 2003 and January 2004. Glover inspected his house several times before he signed the contract for deed and was aware of its condition. He negotiated for repairs, which were made. His testimony does not raise a fact issue that defendants failed to deliver the house as promised or materially breached the contract. (Docket Entry No. 95, Ex. 1, pp. 40–42).

Defendants fixed the gaps and also repaired Dodson's air conditioning unit after he moved in.  (*Id*., Ex. 1, pp. 21–23). Carson's contract provides for a new front door and front window.  (*Id.,* Ex. 4).   Such negotiations are further evidence of arms-length transactions and the exercise of bargaining power by the purchasers.

Plaintiffs do not cite any Texas case in which a finding that the buyers were relatively unsophisticated parties, standing alone, precluded enforcement of an "as is" provision.   To the contrary, Texas courts have enforced "as is" clauses even when the buyers were not sophisticated or represented by professionals.   In *Rader v. Danny Darby Real Estate, Inc.,* 2001 WL 1029355 (Tex.App.–Dallas 2001, no pet.), the court rejected the argument that a home buyer who was not represented by a real estate professional and was not otherwise sophisticated could avoid an "as is" clause based on the buyer's "mere layman" status.   In *Rader,* the buyers did not have a real estate agent, did not have the home professionally inspected to determine whether it was in good condition, were not themselves sophisticated in real estate, and were purchasing from "real estate professionals."   They signed an earnest money contract with an "as is" clause, then lived in the house for several days before signing a contract of deed.   The contracts contained provisions requiring certain repairs. The buyers also attempted to persuade the seller to make various additional repairs, which they refused to do.   The court held that although relative bargaining power was a relevant consideration, the buyer's lack of sophistication, standing alone, was insufficient to make the "as is" clause unenforceable:

> The [buyers] knew when they purchased the house that it was
> not in good condition, despite any assurances to the contrary.

> Instead of taking some action prior to the close of the sale,
> whether it be to have the house professionally inspected,
> opting out of the contract, or consulting with a lawyer about
> their rights, the [buyers] elected to close the sale and buy the
> house in its "as is" condition.   Certainly, even the most
> unsophisticated buyer has a duty, at some point, to protect their
> interests and cannot rely on alleged representations that they
> know are untrue.

*Id.* at *5.

Similarly, in *Cherry v. McCall*, 138 S.W.3d 35, the court rejected the argument

that because the buyer had never handled the purchase of a home on her own before, and

the sellers owned rental properties, that was not sufficient evidence of unequal bargaining

positions or a transaction not at arms' length to make the "as is" clause unenforceable.

The court also rejected the arguments that the provision was standard rather than

separately negotiated in granting summary judgment dismissing the breach of contract

claim arising from the post-purchase discovery of a walled-in room in the basement, filled

with trash and contaminated with mold.   The fact that the room was "hidden" did not

affect the analysis, because the plaintiffs did not allege that they were prevented from

making their own inspections.   The court rejected the plaintiffs' mutual mistake

argument. Under the *Restatement Second of Contracts*, a party bears the risk of mistake

when the risk is allocated to him by agreement or when he knowingly treats his limited

knowledge of the facts surrounding the mistake as sufficient.   RESTATEMENT (SECOND)

OF CONTRACTS § 154(a) & (b) (1981)); *see de Monet v. PERA*, 877 S.W.2d 352, 357

(Tex.App.–Dallas 1994, no writ).   The court stated that "the risk of mistake was allocated

to the [plaintiffs] by agreement when they contracted to accept property 'in its current

condition'" and concluded that "[b]ecause the [plaintiffs] contracted to accept the property "as is," they cannot, as a matter of law, prevail on their breach of contract claim." 138 S.W.3d at 40.

By contrast, in *Oakwood Mobile Homes, Inc. v. Cabler*, 139 S.W.3d 363 (Tex.App.–El Paso 2002, pet. denied), the court held that the seller's disclaimers did not bind a husband and wife who purchased a home, when neither had any education above high school (the husband had only a tenth-grade education) and had never purchased a home before.  In that case, the buyers visited the seller's lot to shop for a manufactured home, picked out a particular model, and were told that their home would be exactly like the model.  After watching a video explaining the warranties and obligations of the sales, the buyers signed a "huge stack" of papers that were summarized by the sales agent.  The contract documents contained a provision stating that any oral statements or promises about the house would be unenforceable.  Before the new home was delivered, the seller called the buyers to inform them that a different, but similar, home was available for immediately delivery.  When the buyers inspected the home, it was in two halves and had several defects.  The seller assured the buyers that the problems would be fixed and told them to prepare a list of all the repairs needed.  The buyers agreed to buy the substitute home and submitted a list of necessary repairs.  Oakwood made a few repairs and told the buyers that many of the repairs were not covered by the original warranty agreement.  The buyers sued Oakwood for DTPA violations, common law fraud, and breach of contract.  The trial court found that the evidence supported the DTPA and fraud claims

and breach of an oral agreement to make the repairs.  On appeal, Oakwood argued that the oral representation disclaimer in the written contract functioned as an "as is" clause that precluded recovery.  *Id.* at 369.  The appellate court affirmed.  After applying the "totality of the circumstances" test from *Prudential,* the court found that the oral agreement disclaimer did not preclude recovery because the evidence supported the trial court's conclusion that Oakwood had committed fraud and that in agreeing to accept the substitute home, the buyers had relied on the oral promise to make the repairs.

The circumstances surrounding the transaction in *Oakwood* are significantly different from the transactions in this case.  First, the contract at issue in *Oakwood* did not contain an "as is" provision, unlike the earnest money contracts, contracts for deed, and warranty deeds in the present case.  Second, the buyers were required to read and sign a "stack" of documents.  In the present case, by contrast, plaintiffs signed a single-page earnest money contract and later signed a single-page contract for deed or warranty deed.  The contracts used clear and unequivocal language.  Third, the buyers in *Oakwood* signed the contract before inspecting the substitute house and before the seller orally promised to repair the house.  In the present case, by contrast, with the exception of Salazar, plaintiffs signed the contracts for deed or warranty deeds after inspecting the houses.

The undisputed evidence in the record shows that the requirements for enforcing an "as is" clause are met by the evidence in the summary judgment record, primarily provided by plaintiffs' own deposition testimony.  As explained by one court, the overall inquiry is to determine, whether the "as is" clause meets the "letter and spirit of

*Prudential*" and should be held valid.  *See Gym-N-I Playgrounds, Inc. v. Snider*, 158 S.W.3d 78 (Tex.App.–Austin 2005, pet. filed).  In this case, the record shows that plaintiffs, with the exception of Salazar, agreed to buy the houses in the condition in which they were delivered, after an opportunity to inspect.  Plaintiffs testified that they understood the "as is" provisions when they signed the contracts.  As a result, defendants are entitled to summary judgment dismissing the breach of contract claims asserted by all but one of the sixteen plaintiffs.  These plaintiffs cannot use the claimed breach of contract to excuse their own failure to pay under their contracts.

Under *Prudential* and *Centex*, defendants are also entitled to summary judgment dismissing the breach of implied warranty of workmanship and negligence claims. *See Prudential,* 129 S.W.3d at 789; *Centex Homes v. Buecher*, 95 S.W.3d 266 (Tex. 2002); *Bynum v. Prudential*, 129 S.W.3d 781, 788–89 (Tex.App.–Houston [1st Dist.] 2004, pet. denied) (accepting property "as is" defeats claims for negligence and breach of the implied warranty of workmanlike construction); TEX. BUS. & COM. CODE ANN. § 2.316(c) ("unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is,' and 'with all faults'").

The implied warranty of habitability raises distinct issues that are addressed separately.

## VI.    The Implied Warranty of Habitability

### A.    The Applicable Legal Standards

In *Centex Homes v. Buecher*, 95 S.W.3d 266, the Texas Supreme Court distinguished the warranty of habitability from the warranty of workmanlike construction. The implied warranty of workmanlike construction serves as a contractual "gap-filler" that can be generally disclaimed.  In contrast, the implied warranty of habitability is "an essential part of the new home sale." *Id.* at 272.   The Court held:

> [T]he warranty of habitability may not be disclaimed generally. This latter implied warranty, however, only extends to defects that render the property so defective that it is unsuitable for its intended use as a home. Further, the implied warranty of habitability extends only to latent defects. It does not include defects, even substantial ones, that are known by or expressly disclosed to the buyer.

*Id.* at 274. The Court explained that a disclaimer must use clear and unambiguous language. Only "when a purchaser buys a problem house with express and full knowledge of the defects that affect its habitability, should a waiver of this warranty be recognized." *Id.* at 274.[22]

The implied warranty of workmanlike construction focuses on a new home builder's conduct and "requires the builder to construct the home in the same manner as

---

[22] In *Prudential,* the Texas Supreme Court held that an "as is" clause between a buyer and seller indicates that the buyer is not relying on any express or implied warranties.  *Prudential,* 896 S.W.2d at 163–64.  After *Centex,* at least one court has indicated that the Court's holding in *Prudential* applies and an "as is" clause may effectively disclaim the implied warranty of habitability.  *See Bynum,* 129 S.W.3d at 794 n. 6. Courts in other states have taken different positions on whether an "as is" clause precludes recovery for implied warranty of habitability claims.  *See Morris v. Rush*, 77 Ark.App. 11, 69 S.W.3d 876 (Ark.App. 2002) (recognizing that, as a rule, an implied warranty of habitability is waived when the buyer purchases the property "as is"); *Warner v. Design and Build Homes, Inc.,* 114 P.3d 664, (Wa. Ct. App. 2005) ("as is" clause was valid and effectively waived implied warranty of habitability even though the clause did not explicitly identify the warranties being disclaimed); *compare Starfish Condo. Ass'n v. Yorkridge Serv. Corp.,* 458 A.2d 805, 810 (Md. 1983) (holding that "as is" provision was insufficient to waive implied warranty of habitability because the provision did not expressly name the warranty); *see also Pontiere v. James Dinert, Inc.,* 627 A.2d 1024 (Pa. 1993) (waiver requires language which is designed to put the buyer on notice of the rights he is waving).

would a generally proficient builder engaged in similar work and performing under similar circumstances." *Id.* at 274.  A builder's failure to perform good workmanship is actionable even when the outcome does not impair habitability.  The implied warranty of habitability, on the other hand, focuses on the completed structure and is more limited in scope.  The implied warranty of habitability requires a builder "to provide a house that is safe, sanitary, and otherwise fit for human habitation."  *Id.* at 272 (citations omitted). Substandard construction is generally not actionable under the implied warranty of habitability.  *Id.*

### B.    The Motion to Strike

Plaintiffs have moved to strike defendants' motion for summary judgment as to the habitability claims and argue that this court did not allow defendants leave to file dispositive motions on those claims. (Docket Entry No. 91, p. 2).  Plaintiffs have, nonetheless, responded to the motion on the merits.  Defendants argue that the summary judgment motion is appropriate after plaintiffs' depositions were taken because their testimony fails to raise a fact issue as to whether the homes are uninhabitable as required under Texas law.

In the March 2004 summary judgment opinion, this court noted that with respect to the allegations of breach of the implied warrant of habitability defendants had "presented no summary judgment evidence and have only asserted that the contractual disclaimers preclude liability." (Docket Entry No. 73).  This court's concern with defendants' earlier dispositive motions related to the implied warranty of habitability stemmed from

defendants' reliance on waiver and disclaimer arguments given the Texas Supreme Court's holding in *Centex,* 95 S.W.3d at 274, that the implied warranty may not be disclaimed generally.  Defendants have deposed the sixteen plaintiffs and now move for summary judgment on the basis of the nature and severity of the defects alleged.  In their depositions, plaintiffs were asked to identify and describe the defects they were aware of when they signed the contracts and the defects for which they were seeking damages in this case.  In light of the difficulties both sides encountered in completing discovery necessary to raise dispositive motions, this court denies the motion to strike and will consider the summary judgment motion.

### C.    Analysis

#### 1.    *The Implied Warranty of Habitability and the Purchase of the Previously-Owned Homes*

Defendants assert that they are entitled to summary judgment against all plaintiffs who either bought land only or a previously-owned home.  In *Gupta v. Rutter Homes, Inc.,* 646 S.W.2d 168 (Tex. 1983), the Texas Supreme Court held that a subsequent purchaser of a "used" house may recover from a builder vendor under the implied warranty of habitability for latent defects that were not discoverable by a reasonably prudent inspection at the time the subsequent purchaser bought the house.  *Id.* at 167.  The Court stated that the implied warranty of habitability and good workmanship was implicit in a contract with a builder vendor and automatically assigned to the subsequent purchaser.  In cases involving "used" homes the plaintiff has the burden of proving a latent defect which is attributable to the actions or inactions of the defendant builder.  A

builder is not liable for defects that "are not attributable to original structural flaws" or for defects resulting from "substantial change or alteration in the condition of the house since the original sale [or] misuse." *Id.* at 170 (Spears, J., concurring).  Assuming the plaintiff has presented evidence of a latent defect attributable to the builder, and in the absence of evidence of intervening causes, the fact that the home is 'used' does not in and of itself limit the liability of a builder." *Id.* at 69.

In the context of UCC warranties, the Texas Supreme Court recently stated that a downstream consumer "can assert breach of warranty claims against [a remote seller] because, unlike DTPA claims, warranty claims pass with the underlying goods and are assignable to the subsequent purchaser." *See PPG Indus., Inc. v. JMB/Houston Ctrs. Partners L.P.,* 146 S.W.3d 79, 89 (Tex. 2004).  In *PPG Indus.,* the Court noted that *Gupta* involved breach-of-warranty claims asserted under the DTPA, and was "apparently overruled." *Id.* at 86 n. 27.  The Court also made clear that common-law breach of warranty claims may be brought by subsequent purchasers under Texas law. *Id.* at 81 (a "downstream buyer *can* sue a remote seller for breach of an implied warranty, but *cannot* sue under the DTPA") (emphasis in original).  Plaintiffs do not assert DTPA claims.

Defendants do not cite to case law that specifically addresses the Court's holding in *Gupta.*  Defendants rely solely on references to "new" homes in the *Centex* opinion. *See Centex,* 95 S.W.3d at 274 (implied warranties protect "the average homebuyer who lacks the ability and expertise to discover defects in a *new* house"); *id.* at 273 ("the implied warranty of good workmanship attaches to a *new* home sale if the parties'

agreement does not provide how the builder or the structure is to perform"); *id.* at 274 (the implied warranty of habitability "only protects *new* home buyers from conditions that are so defective that the property is unsuitable for its intended use as a home") (emphasis added).  It is undisputed that defendants built and sold the plaintiffs' houses.  Defendants maintained a sales office in some of the subdivisions and the record indicates that the existing houses were only three or four years old when the plaintiffs signed the contracts. Because defendants built and sold the houses and plaintiffs do not assert DTPA claims, this court cannot conclude that the plaintiffs who purchased previously-owned homes do not have viable claims, as a matter of law, because they are subsequent purchasers. However, this court agrees that Farnkoff, who purchased undeveloped lots from defendants, cannot assert a claim for a breach of the implied warranty of habitability.

2.      *The Nature of the Warranty*

Defendants argue that under *Centex,* a house must be literally uninhabitable to state a cause of action under the warranty.  Because most plaintiffs still live in the houses and have done so for an extended period, defendants argue that the implied warranty of habitability claims fail as a matter of law.  Plaintiffs argue that the standard is not one of literal inhabitability and that remaining in a house does not forfeit the claim that the warranty of habitability was breached.

Defendants rely on *Centex* and the constructive eviction doctrine that applies  for breaches of the implied warranty of habitability under residential leases.  In *Centex,* the Texas Supreme Court noted that other state courts had observed that the implied warranty

of habitability "is unfortunately named because it does not mean that the house is literally uninhabitable" and stated that "[i]n contrast, we have defined a breach of this implied warranty in Texas to be a defect 'of a nature which will render the premises unsafe, or unsanitary, or otherwise unfit for living therein.'" *Id.* at 272 (citations omitted). In distinguishing the warranty of habitability from the warranty of workmanlike construction, the Court again described the habitability warranty as a protection against defects that create a significant safety risk for residents. Although *Centex* sets a high standard for a breach of the warranty of habitability, the Court did not impose a requirement that the plaintiff move out of the house. Defendants have not cited to any case in which a Texas court has stated that the implied warranty of habitability is not breached if the home buyer still lives in the house.[23] In the absence of controlling case law involving the implied warranty of habitability, this court cannot conclude that as a matter of law, a plaintiff cannot recover for a breach of the implied warranty because he

---

[23] Defendants cite to Texas law on the doctrine of constructive eviction. Under Texas law, constructive eviction requires a tenant to show a material act by the landlord that substantially deprives the tenant of the use and enjoyment of the premises and "*the tenant must abandon the premises* within a reasonable time after the commission of the act." *Downtown Realty, Inc. v. 509 Tremont Bldg., Inc.*, 748 S.W.2d 309, 311 (Tex.App.–Houston [14th Dist.] 1988) (emphasis added). "Generally in cases where a breach of the warranty of quiet enjoyment is claimed, a landlord seeks to collect rent payments still remaining under the lease . . . By way of defense, the tenant will claim that he is not obligated to pay the remaining installments because the landlord has breached the warranty of quiet enjoyment or has constructively evicted him. If he proves his claim, the lease is effectively rescinded, and the tenant will be excused from any further obligation to pay rent." *Lazell v. Stone*, 123 S.W.3d 6 (Tex.App.–Houston [1st Dist.] 2003, pet denied). The doctrine of constructive eviction provides an exception to the common law rule of independent covenants. A tenant's duty to pay rent is not excused by the landlord's breach. *Davidow v. Inwood N. Prof'l Group–Phase I*, 747 S.W.2d 373, 377 (Tex. 1988); *Holmes v. P.K. Tubing, Inc.* 856 S.W.2d 530, 539 (Tex.App.–Houston [1st Dist.] 1993, no writ). The Texas Legislature superceded the common law warranty of habitability for leased residences with a statutory duty of repair, TEX. PROP. CODE § 92.001 *et seq,* which requires a landlord to remedy a condition that materially "affects the physical health or safety of an ordinary tenant." The duty of repair extends only to tenants who are current on payments and give proper notice to the landlord. *Id.* § 92.0252. Defendants do not cite to any Texas cases in which a court has compared the implied warranty of habitability standard of protection to constructive eviction.

still lives in the allegedly defective home.  However, the fact that the plaintiffs still live in

the houses is relevant for the purpose of determining whether the alleged defects are

actionable under the implied warranty of habitability and the measure of any damages.

Chesson, Eaton, Carson, Glover, Dodson, Fountain, Hensley, Shumate, Salazar, and

Trapp still live in the houses.  Stokes lived in her home for five years before the house

was destroyed by fire. (Docket Entry No. 95,  Ex. 1).

> 3.      *The Nature and Severity of the Alleged Breaches*

Plaintiffs primarily rely on three categories of defects in support of their claims of

breach of the implied warranty of habitability: poor construction of the houses; defective

septic systems; and defective water systems.   The evidence in the summary judgment

record as to substandard construction shows that many of the defects alleged were evident

on inspection and were not latent.   Poor construction that could have been detected on

inspection does not give rise to a breach of the warranty of habitability.   *Centex,* 95

S.W.3d at 272.

Shumate testified that defendants did not deliver the cabinets described in the

contract and did not provide baseboards and interior details that a "100% complete" home

should have.  These problems do not present the nature or type of problems that give rise

to a breach of the implied warranty of habitability.  She also testified that the house was

poorly constructed and uneven; the sheetrock is not properly installed; and the kitchen

plumbing leaks.  Shumate stated in her deposition that she did not want repairs and that

she wanted to keep her house.  (Docket Entry No. 95, Shumate Depo., Ex. 1, pp. 60–64,

114).  Trapp claims that defendants built the house with the wrong type of lumber and did not follow the correct floor plan.  Trapp does not provide any detail as to how the allegedly substandard lumber affects the suitability of the house for residential use.  The failure to follow the correct floor plan is not a latent defect, but should have been evident on inspection, and in any event is not the type of problem that gives rise to a breach of the implied warranty of habitability.  (Docket Entry No. 95, Trapp Depo., Ex. 1, pp. 32–36).

Dodson and Hensley both complain about substandard construction and problems with the air conditioning units delivered with the houses.  Hensley's air conditioning unit is undersized and Dodson had to buy new window units because the central air conditioning did not cool sufficiently.  (Docket Entry No. 95, Dodson and Hensley Depos., Ex. 1, pp. 26–29, Ex. 1, pp. 53–56).  In the absence of a substantial safety risk, substandard construction is actionable only under the implied warranty of workmanlike construction, which the plaintiffs waived by agreeing to accept the houses "as is."  It is unclear that appliances, which are usually covered by a manufacturer's warranty, give rise to a breach of the implied warranty of habitability, and in any case, the problems with the air conditioning units are not sufficiently severe.

Standley identified several defects with his house: the bathtubs drain slowly; the exterior siding is buckling; faulty wiring results in power surges; the lack of an adequate venting system; and a defective air conditioning unit, which has been repaired.  Standley also noted that defendants did not install back steps or interior molding. (Docket Entry No. 95, Standley Depo., Ex. 5).  Standley did not allege that the defects created unsafe

conditions.  Again, these problems are either not latent or not sufficient to give rise to a breach of the implied warranty of habitability.

Lockhart testified that his home was not totally completed and was poorly constructed.  He testified that he had incurred costs for the installation of cement culverts, landscaping items, tree removal, and new appliances.  Again, these problems are either not latent or not sufficient to give rise to a breach of the implied warranty of habitability. Moreover, Lockhart specifically testified that before he moved out of his house in 2004 his home was habitable, but not totally completed.  (Docket Entry No. 95, Lockhart Depo., Ex. 1, pp. 47–51, 52).

Stokes's house was destroyed in a fire in 2001.  Stokes and her husband lived in the house from 1996 until 2001 and made monthly payments until the end of 2000. Stokes testified that the floors bowed in areas and the ceiling leaked in the kitchen. Although the problems developed in 1997, she and her husband did not repair the problems.  Stokes did not claim that the house was unsafe. (Docket Entry No. 95, Stokes Depo., Ex. 1, pp. 27, 33–35).  Occasional leaks and damaged floors do not make the house unfit for residential use and are not sufficient to give rise to a breach of the implied warranty of habitability.

Fountain testified that the foundation in his home was defective.  After a year and half, he noticed foundation movement and that the house had "settled."  Fountain did not submit any evidence other than his testimony in support of his foundation claim.  During his deposition, he primarily discussed claims for a house that he intended, but was unable,

to sell as an investment; and claims against Hall involving commercial property.   The only other problems Fountain identified with the house he used as a residence involved missing vents and a defective air conditioning unit.   Fountain stopped making payments in 2002 and has continued to live in the house.   The problems he described do not undermine the basis of the bargain or make the house unfit for residential use.   (Docket Entry No. 95, Fountain Depo., Ex. 1, pp. 43–47).

Carson's major complaint is that her house sits on her neighbor's lot.   Carson also identified plumbing problems and submitted an estimate for the cost of replacing all the pipes in the house and installing new faucets.   Carson testified that she and her family like the home but she wants it repaired.   The need for repair as claimed by Carson  – new copper pipes and new appliances – does not satisfy the standard for a breach of the implied warranty of habitability.   (Docket Entry No. 95, Carson Depo., Ex. 1, pp. 57–59). Based on Carson's testimony, it is clear that the defects did not undermine the benefit of the bargain.

Eaton testified that defendants did not deliver certain cabinets or repair the kitchen flooring.   Eaton also stated that the sheetrock is damaged; the house is uneven; and there is a gap between the floors and the doors.   Since she moved in, the walls have cracked and the ceiling has began to "sag."   Eaton testified that except for these defects, she knew that the house had structural problems.   The implied warranty of habitability extends only to latent defects.   Because Eaton admitted that she was aware that the house was uneven and was poorly constructed in areas when she signed the contract, she cannot recover

under the implied warranty.  (Docket Entry No. 95, Carson Depo., Ex. 1, pp. 62–64, 68).
Eaton moved into her house in 2002 and has continued to live there without making any
monthly payments under the contract.

Glover and Johnson, two plaintiffs who purchased previously-owned homes, seek
damages for mold contamination.  Both inspected the houses before signing the contracts.
Johnson noticed a hole in the roof when he moved in and Glover noticed a strong odor
and "rotting" damage on the walls.  Glover testified that the mold contamination was
caused by defendants' failure to install the house with a moisture barrier, the absence of
which could have been discovered upon inspection.  Johnson testified that when he
inspected the house, there was a hole in the roof and damaged singles.  Johnson has not
met his burden under *Gupta* to show that the defect – the mold contamination – is
attributable to the actions or inactions of defendants.  A builder is not liable for defects
that "are not attributable to original structural flaws" or for defects resulting from
"substantial change or alteration in the condition of the house since the original sale [or]
misuse."  *Gupta*, 646 S.W.2d at 170.  Both Glover and Johnson detected the mold damage
before they accepted the property "as is."

The summary judgment record also fails to raise a triable issue of fact that
defendants breached the implied warranty of habitability by delivering defective septic
systems for the individual houses and road systems in the subdivisions.  The undisputed
evidence in the summary judgment record shows that county authorities inspected the
installation of the septic systems and they functioned properly.  Two plaintiffs, Glover

and Shumate, stated during their depositions that the septic systems produce strong odors. Other plaintiffs voiced no complaints about the septic systems. Defendants agreed to install the septic systems, but plaintiffs assumed responsibility for their maintenance.[24]

Plaintiffs allege that defendants breached the implied warranty of habitability by negligently maintaining the roads and failing to install paved roads. The road conditions – unpaved and without drainage improvements – were not latent defects. It is undisputed that plaintiffs were aware that the roads were not paved when they purchased the houses. The contracts for deed do not provide for the future installment of paved roads or draining improvements and the plaintiffs were aware of the subdivision conditions before they signed the contracts. The implied warranty of habitability does not extend to known defects or a builder's failure to provide future development services.[25] It is undisputed

---

[24] Since 1989, the TCEQ has required a permit for the installation of most septic systems. Under Texas law, a person may not "construct, alter, repair, or extend, or cause to be constructed, altered, repaired, or extended, an on-site sewage disposal system" without obtaining a permit from the TCEQ or an authorized agent unless the septic system is for a single-family home on land of ten or more acres. TEX. HEALTH & SAFETY CODE ANN. §§ 366.001-004.

Shumate testified that the county never inspected the installation of her septic system. She testified that she did not ever see an inspector examine the septic system. This failure does not give rise to a breach of the warranty of habitability, given that Shumate's only complaint about her system was that it occasionally smelled bad. (Docket Entry No. 95, Ex. 1, pp. ).

[25]   In *Parkway Company v. Woodruff,* 901 S.W.2d 434, 438–40 (Tex. 1995) the Texas Supreme Court refused to allow home buyers to recover for post-sale development services under an implied warranty theory. The plaintiffs had purchased a home in a developed community and claimed that as the result of the defendants' drainage work performed several years later, their home was flooded. The lower court found that offering homes in a planned community "implies provision of continued competent development including flood control, drainage management, and maintenance services." The Texas Supreme Court reversed, concluding that there was no reasonable basis to conclude that the defendant impliedly agreed to perform future development services for the plaintiffs' benefit. 901 S.W. 2d 434, 440; *see also Hershewe v. Perkins,* 102 S.W.3d 73 (Mo. Ct. App., 2003) (implied warranties in sale of new home does not apply to improvements outside the home, which are not integral to the structure of the house or integral to its use).

that plaintiffs had knowledge that the property was subject to flooding and that the roads did not contain drainage improvements.  To the extent that plaintiffs rely on the effects of drainage problems and flooding, their claims for breach of the warranty of habitability fail.  *See Centex*, 95 S.W.3d at 274 (warranty does not extend to defects – even "substantial defects" – expressly disclosed to purchaser); *see also Todd v. Perry Homes*, 156 S.W.3d 919, 920 (Tex.App.– Dallas 2005, no pet.) (holding that buyers had presented no evidence of a latent defect when the cause of the drainage problems was a visible condition known to the buyers).

    *4.*     *The Water Systems*

Throughout this litigation, plaintiffs have emphasized problems with the water supplied to the subdivisions and their houses.  Neither party cites to a case in which a Texas court has addressed whether a home builder or developer may be liable under the implied warranty of habitability for the construction and maintenance of water wells. Courts in other jurisdictions have recognized that without safe drinking water, a residence is uninhabitable.  *See Tucker v. Hayford*, 75 P.3d 980 (Wash.App. 2003) ("It is well settled that unsafe drinking water renders a home uninhabitable."); *Mathes v. Adams*, 838 P.2d 390 (Mont. 1992) (landlord breached the warranty of habitability when he failed to remedy sewage leaks that contaminated water systems); *McDonald v. Mianecki*, 398 A.2d 1283 (Okla. 1979) (holding that "the implied warranty of habitability encompasses the potability of the water supply" in case of sale of home by a builder-vendor).

In *Centex,* the Texas Supreme Court recognized that unknown defects in a house may result in a breach of the implied warranty of habitability even though the house itself is well constructed.  The Court gave the example of a house built on a toxic waste site. 95 S.W.3d at 274.  The summary judgment evidence does not show that the problems substantially affected the habitability of the houses.  Unlike the toxic waste site example cited in *Centex*, the water supply problems are not the result of an intractable defect with the land that makes the houses unfit for living on a permanent basis.

The summary judgment evidence shows that since 2001, there has been an adequate supply of potable water for the houses in the subdivisions and the defects in the water systems have been remedied.  The implied warranty of habitability protects a buyer only against defects that undermine the basis of the bargain and make a house unsuitable for its intended use.  The temporary problems that the plaintiffs experienced with the water being supplied to their houses did not undermine the very basis of the bargain as required under *Centex.*

Five plaintiffs made statements during their depositions about the water systems in the subdivisions, indicating that some time during 2000, the water made them sick or that the water occasionally smells like bleach or is discolored.  Four of the plaintiffs who testified about defective water systems – Stokes, Trapp, Shumate, and Farnkoff – moved on to the property before the state intervened.  Eaton moved into a previously-owned house in January 2002 and testified that the water occasionally smells like bleach.  She also testified that she receives water reports stating that the water is safe to drink.

(Docket Entry No. 95, Ex. 1, pp. 66–67).  Farnkoff claims that the water made him sick in the summer of 2000, but he did not buy a house from defendants.  (Docket Entry No. 95, Ex. 1, pp. 85–87).  Stokes, who lived in a first generation subdivision, stated in her deposition that the water was not drinkable in 2000, explaining the problem by reference to the September 2000 letter announcing the receivership.  Stokes did not testify that the water made her family sick or that she was unable to use the water.  The letter did not state that water was not safe to drink.  Stokes lived in her home from 1996 to 2000 and did not testify about any other problems with the water supply.  The receivership went into effect in September 2000 and Stoke's house was destroyed by fire in April 2001.  Her testimony does not raise a fact issue that her house was not fit for residential living due to problems with the water supply.

Viewing the evidence in the light most favorable to plaintiffs, the record shows that before the State of Texas intervened, the water supplied to some houses had significant problems.  Trapp and Shumate did describe health problems due to the water, but they referred only to discrete and isolated incidents.   In 2000, Trapp's youngest child was treated for exposure to bacteria, which Trapp claims resulted from the water, on the basis that her son's doctors recommended that she stop using the water until it had been checked for contamination. (*Id.,* pp. 26–28, 31).  After the reported incident, defendants provided a filter for the water well on Trapp's property.  In an affidavit Trapp stated that the water well was not installed in the proper location and that the "water well is not any good."  She further stated that "[j]ust recently we have been advised that our well cannot

be used but that we must pay for water from a water supply company as the State of Texas has taken over the water service to our subdivision."  (Docket Entry No. 92, Ex. 11).  Trapp moved into her home in the 59 Estates subdivision in 1998.  She has not made any payments on her home since 2002 and did not identify any other problems with the water supply other than the incident in 2000.

Shumate stated in her deposition that around 2000, her children were sick on several occasions, which she felt resulted from the water.  (Docket Entry No. 95, Ex. 1, pp. 80–84, 103).  Shumate also described continuing problems with the water supplied to her house.  She testified that she believes that the water is not properly chlorinated because it sometimes smells like bleach and the water pressure is low.  Shumate stated in an affidavit filed after her deposition that "the water smells like rotten eggs and the faucets have algae and sand coming through them."  (Docket Entry No. 92, Ex. B, p. 10).  Shumate moved into the Peaceful Place subdivision in June 1999 and has not made any payments since 2001.

Several plaintiffs made complaints about the water systems for the first time in affidavits filed in January 2005, after defendants moved for summary judgment, and after depositions in which defense counsel asked each plaintiff to identify every defect that they sought damages for in this suit.  (Docket Entry No. 95).  In the  affidavits plaintiffs claim that water supplied to the houses was an odd color or smell and "not drinkable."  (Docket Entry No. 91).  Plaintiffs did not provide any details as to the nature or duration of these problems.

Deborah Fountain, who was not deposed in the case, submitted an affidavit stating that "[t]he water service to house has repeatedly broken and cannot be repaired." (*Id.*, Ex. 12). Roger Fountain, who lives in the Country Towns Estates subdivision and was deposed in this case, did not testify about problems with the water supply. Breedlove – who never lived in the house he bought from defendants – stated in his affidavit that "the water pressure was very low and the water is not drinkable." (*Id.*, Ex. 7). Glover, who lives in the Five Oaks Estates subdivision, stated in an affidavit that the water is occasionally brown. (Docket Entry No. 91, Ex. 8). Lockhart stated that "the water pressure was very low and the water was not drinkable. The water service was taken over by the State of Texas and will be more than the $280.00 per year as promised." (*Id.*, Ex. 6). During his deposition, Lockhart testified that after he moved in, the water and septic systems functioned properly. (Docket Entry No. 95, Ex. 1, pp. 22–24).

The plaintiffs who contracted for community water well access in the Trails End subdivisions for an annual maintenance fee of $280.00 – Standley, Hensley, Dodson, and Chesson[26] – also made statements about the water for the first time in affidavits filed in January 2005 after the depositions and in response to defendants' motion for summary judgment. Standley stated in his affidavit that "the water had a brownish color and left

---

[26]   The record shows that the Trails End subdivisions were added to the TCEQ enforcement suit after plaintiffs reported unauthorized dumping or burying of hazardous materials in the subdivisions. Hensley and Chesson accompanied Kristie Lemmons, the TCEQ investigator during her inspection of the subdivision. Neither plaintiff reported to Lemmons problems with the water wells or that they could not drink the water supplied to their homes. Lemmons concluded that because of the improper disposal of solid waste – mostly construction debris – defendants violated the Texas Administrative Code and the Texas Water Code. According to Lemmon's deposition testimony, the Water Code violations were based on the potential threat of contaminants and runoff created by the piles of construction debris, not specific problems with the water. (Docket Entry No. 68, Ex. D, pp. 37–38).

stains in the sinks, commodes, and tubs.  It also had a strange odor and could not be consumed.  The water pressure was weak and sometimes the house was without water." (*Id.,* Ex. 2).  Hensley stated  that "the water pressure was very low and the water was not drinkable.  The water service was taken over by the State of Texas and will be more than the $280.00 per year as promised."  (*Id.,* Ex. 5).  Dodson did not make complaints about the water supplied to his home but stated that he did not have community water for $280.00 year as promised and that the State of Texas "is going to charge more than that amount for our water."  (Docket Entry No. 91, Ex. 15).

A party may not defeat a motion for summary judgment by using an affidavit that, without explanation, impeaches prior testimony. *See Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir.2000).  "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."  *Id.* (citations omitted); *Copeland v. Wasserstein, Perella & Co., Inc.*, 278 F.3d 472 (5th Cir. 2002); *see also Valleza v. City of Laredo, Tex.*, 331 F. Supp. 2d 579 (S.D. Tex. 2004) (in case of contradiction, deposition testimony is given credence over statements subsequently made by a party in an affidavit attached to a response to a motion for summary judgment).  Plaintiffs were asked during their depositions to identify every problem or defect for which they were seeking damages and offer no explanation for their failure to raise the allegations about the water in their depositions.   The conclusory statements in the affidavits are insufficient to defeat defendants' motion for summary judgment.

The water problems on which plaintiffs rely to support their claim of breach of the warranty of habitability had ended for some of the houses by 2000 and the remainder of the houses by 2001.  Although the intervention by the State supports the existence of a temporary problem with the water being supplied to the subdivisions, as a result of the TCEQ enforcement suit, the water systems were under the control of a receiver by 2000 (in the first generation subdivisions) and 2001 (in the second generation subdivisions).[27]

Even if some of the houses were in breach of the implied warranty of habitability for a period, that period ended years ago.  Assuming that the houses were in breach of warranty before the water systems problems were resolved, the houses have not been in breach of warranty for at least four years, yet plaintiffs have continued to rely on the asserted breach to excuse their failure to pay under the contracts while living in the houses free.

Plaintiffs who purchased a home with a water well from defendants and testified as to problems with the water during 2000 or 2001, would be able to assert a damages claim for that period.  These claims, however, would be subject to defendants' claim for the fair market rental value of the houses for the time that plaintiffs have lived in the houses for free.  *See Cruz Management Co. v Wideman*, 633 N.E.2d 384 (Mass. 1994) (damages for

---

[27]  The Texas Supreme Court has identified two reasons that justify an implied warranty: the lack of quality control in the particular transaction and the lack of an adequate legal theory to compensate the injured party. *Melody Home Manufacturing Co. v. Barnes,* 741 S.W.2d 349, 353 (Tex. 1987) ("An implied warranty arises by operation of law when public policy so mandates."). Because the water systems are subject to extensive federal and state regulation, *see FM Properties Operating Co. v. City of Austin*, 22 S.W.3d. 868 (2001) ("water quality regulation is a legislative power"), neither policy reason weighs in favor of holding defendants liable under the implied warranty of habitability.

breach of implied warranty of habitability are measured by difference between value of dwelling as warranted and value of dwelling as it exists in its defective condition); *Weingarden v Eagle Ridge Condominiums*, 653 N.E.2d 759 (Ohio 1995) (tenant was entitled to diminution of value for breach of implied warranty of habitability). The plaintiffs who complain about problems with the water systems did not present evidence of damages that exceed what they owe for their continued possession of the houses. Shumate stopped making payments in 2001, the year the receiver assumed control of the water systems.  As noted, Trapp stopped making payments in 2002, after defendants provided a new filter for the water well. Hensley has lived in the house without making payments since 2000.  Lockhart stopped making payments in 2001 and moved out of the house in 2004; Standley lived in the house from 2000 to 2003 without making a single payment.  In short, the evidence is clear that the limited damages for the asserted breach of the implied warranty of habitability claim are excluded by defendants' counterclaim for damages.

## V.      The Trespass to Try Title Claim

Defendants assert trespass to try title claims, seeking to recover possession of the houses.  A trespass to try title action determines title or the right of possession. TEX. PROP. CODE ANN. § 22.001.  To recover under such a claim, the moving party must show title to the property. *Rogers v. Ricane Enterprises, Inc*., 884 S.W.2d 763, 768 (Tex.1994) (citations omitted).

### A.      The Contracts for Deed

Under Texas law, when a purchaser defaults on a contract for deed, the seller may terminate the contract by serving the appropriate statutory notice of cancellation. *See* TEX. PROP. CODE § 5.064; *Wilkerson v. Wilkerson*, 992 S.W.2d 719, 722 (Tex.App.– Austin 1999, no pet.).  The buyer does not obtain legal title until full performance and, on default, risks losing possession and any right to require the seller to convey title in the future, along with forfeiting amounts already paid.  *Graves*, 958 S.W.2d at 470.

Twelve of the sixteen plaintiffs – Breedlove, Farnkoff, Stokes, Trapp, Shumate, Lockhart, Hensley, Dodson, Standley, Glover, Salazar and Fountain –  signed contracts for deed.  With the exception of Salazar, the plaintiffs have not raise a fact issue on any issue that excuses their default or precludes defendants from regaining possession of the properties.  *See* TEX. PROP. CODE § 5.061 (a buyer under a contract for deed is in "default" if the buyer fails to "(1) make a timely payment; or (2) comply with a term of an executory contract").  Plaintiffs do not assert that defendants failed to comply with the statutory notice requirements or that they were otherwise denied an opportunity to cure their default.[28]  Plaintiffs' only challenge to the enforcement of the forfeiture clause was based on an excuse for their failure to perform based on the alleged prior material breaches by defendants.  This court has concluded that the "as is" clauses are enforceable

---

[28] The record contains default notices and notices to vacate for Chesson; Breedlove; Dodson; Hensley; and Stokes.(Docket Entry No. 95, Hensley Deposition, Ex.7; Dodson Deposition, Ex. 4; Breedlove Deposition, Ex. 4; Stokes Deposition, Ex. 4).

and that defendants did not breach the contracts so as to excuse plaintiffs' failure to perform.[29]

### B.      The Deeds of Trust

Three of the plaintiffs – Eaton, Carson, and Johnson – signed deeds of trust with vendor's liens for previously-owned homes. A vendor's lien secures unpaid purchase money.  A seller who retains an executory interest in the property to secure either total or partial payment of the purchase price may use this lien interest to assert superior title against a purchaser who has not paid the purchase money when due.  *Jones v. Bank United of Texas,* 51 S.W.3d 341, 343 (Tex.App.–Houston [1st Dist.] 2001, pet. denied). "Superior title is held by the vendor where an express vendor's lien is retained to secure unpaid purchase money, and the vendee has a mere equitable right to acquire title by carrying out the agreement."  *See Walton,* 956 S.W.2d 647, 651.

---

[29] During his deposition, Fountain claimed two breach of contract claims in addition to the claim arising from the condition of the house that he lived in.  The asserted claims relate to the commercial property he leased from Hall and a second house that he purchased as an investment.  Fountain has failed to raise a triable issue of fact on either claim.

With respect to the commercial lease, Fountain asserts breach of contract based on Hall's oral agreement to build a new building for his restaurant.  A contract, whether written or oral, must define the essential terms with sufficient provision to enable the court to determine the obligations of the parties.  Fatal indefiniteness in an agreement may concern the time of performance, the price to be paid, the work to be done, or the property to be transferred.  *See T.O. Stanley Boot Co., Inc. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex. 1992).  Fountain's deposition testimony that Hall accepted $550.00 as down payment is insufficient to raise a fact issue that a binding contract existed for the construction of a new building.

Fountain also asserts breach of contract based on his inability to sell the house that he purchased as an investment, made repairs to, and attempted to sell.  The contract for deed precludes this claim as a matter of law.  Fountain did not have legal title to the house under the contract for deed.  The contract for deed stated that "[i]t is a condition of this agreement that neither this contract nor the property herein described may be assigned, sold, pledged, or mortgaged by PURCHASER without first obtaining the written consent of the SELLER."  (Docket Entry No. 95, Fountain Depo., Ex. 3).

Although the usual remedy for a debtor's default is a foreclosure sale, under Texas law, the seller may sue for the money owed, rescind the contract and take possession, or sue to recover title and possession.  The seller may enforce the deed through a trespass to try to title claim:

> The courts of our state have long been committed to the proposition that a deed conveying land and reserving a lien for the unpaid purchase money is treated as an executory contract that will ripen into a title in the purchaser when he has performed his obligation to pay the purchase money. . . . Where the vendee defaults in the payment of the purchase price there are several remedies available to the vendor. He may file a suit for debt and foreclosure. He may file a suit in trespass to try title to recover the land thereby effecting a rescission.

*Whiteside v. Bell*, 347 S.W.2d 568, 570 (Tex. 1961);  *Lusk v. Mintz*, 625 S.W.2d 774, 776 (Tex.App.–Houston [14th Dist.] 1981, no writ).  The remedy of rescission is separate and distinct from and wholly independent of the remedies to enforce payment.  *Id.* at 776; *see also Zapata v. Torres*, 464 S.W.2d 926, 928 (Tex. Civ. App.–Dallas 1971, no writ).  The deeds of trust, unlike the contracts for deed, do not contain a forfeiture provision that allows defendants to retain any payments plaintiffs made as liquidated damages.  In this case, this difference does not matter.  Plaintiffs have failed to raise a fact issue that their performance under the contracts was excused and defendants would be entitled to an offset of damages for the fair rental value of the houses during the plaintiffs' possession.  Eaton did not make any monthly payments on the property; Carson made one monthly

payment.  Eaton and Carson still live in the houses.  Johnson made one monthly payment and no longer lives in the house.[30]

### C.     The Issue of Title

It is undisputed that defendants hold legal title to the houses and that plaintiffs have breached the contracts.  Texas law does not support plaintiffs' argument that they have equitable title to the properties.  Both a contract for deed and a deed with a retained vendor's lien are executory real estate contracts under which the seller has a superior title interest in the property until the buyer fully performs the obligation to pay the purchase price.  *See Bucher v. Employers Cas. Co.*, 409 S.W.2d 583, 584–85 (Tex. Civ. App.–Fort Worth 1966, no writ).  "Equitable title may be shown when the plaintiff proves that he has paid the purchase price and fully performed the obligations under the contract. Upon such performance, he becomes vested with an equitable title to the property which is sufficient to allow him to maintain his action in trespass to try title." *White v. Hughs,* 867 S.W.2d 846, 849 (Tex.App.–Texarkana 1993, no writ) (citing *Johnson,* 138 Tex. 106)).  If the purchaser defaults, the seller "may have his action in trespass to try title." *See Young v. Fitts*, 157 S.W.2d 873, 875 (Tex. 1942); *Club Corp. Of Am.*, 881 S.W.2d 620; *Neeley v. Intercity Mgmt. Corp.*, 623 S.W.2d 942, 951 (Tex.App.–Houston [1st Dist.] 1981, no

---

[30]  Plaintiffs do not assert that defendants are not entitled to possession of the properties because they failed to give them notice to cure.  Tex. Prop. Code Ann. §§ 51.002 (b-e); *Mills v. Haggard*, 58 S.W.3d 164, 167 (Tex.App.–Waco 2001, no pet.) (discussing separate statutory requirements of notice-to-cure and notice-of-foreclosure on real property used as the debtor's residence).  In this case, foreclosure sale is not an issue and  the real estate lien notes contained a provision waiving the right to notice of intent to accelerate and notice of acceleration. *See Shumway v. Horizon Credit Corp*., 801 S.W.2d 890, 893 (Tex.1991); *Powell v. Stacy*, 117 S.W.3d 70 (Tex.App.–Fort Worth 2003) (noting that debtor may waive right to notice); *Parker v. Frost Nat'l Bank of San Antonio*, 852 S.W.2d 741, 745 (Tex.App.–Austin 1993, writ dism'd by agr.) (waiver is effective if contained in note or deed of trust).

writ) "A mere equitable right rises to the dignity of an equitable title when performance under the particular contract occurs. . . ."). Under a contract for deed, the purchaser fails to make payments when due, the seller is entitled to terminate the contract and regain possession of the property. *Dixon v. Brooks*, 604 S.W.2d 330, 334 (Tex. Civ. App.–Houston [14th Dist.] 1980, writ ref'd n.r.e.).

Because plaintiffs have failed to show that their nonperformance was excused, defendants have title to the houses and may enforce their right to possession. Defendants' counterclaim for trespass to try title claim is granted with the exception of Salazar.

## VI.    Conclusion

Ron LeBlanc, who has failed to appear for scheduled depositions, and Jacquelyn Chesson, who signed only an earnest money contract and then breached that contract, cannot maintain any claim against defendants. With the exception of Salazar, this court concludes that the "as is" clauses are enforceable and preclude the claims based on the condition of the properties.  The plaintiffs who experienced problems with unpotable water during 2000 or 2001 have raised a fact issue as to a breach of the implied warranty of habitability, subject to defendants' counterclaim for the fair market value of plaintiffs' continued possession without payment.

A status conference is set for **September 7, 2005, at 10:00 A.M.**   At that conference, the parties should be prepared to discuss the implications of this opinion for the remaining claims of the sixteen plaintiffs and for the claims of the remaining plaintiffs.

SIGNED on August 25, 2005, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge