# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| JACQUELYN CHESSON, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-01-315 |
| | § | |
| DARRELL HALL, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

This case involves claims against Darrell Hall and entities he owns or controls. The defendants build and sell houses and develop subdivisions near Houston, Texas. The plaintiffs, who at one time numbered more than three hundred, alleged that the homes they purchased from Hall and his companies were poorly constructed. The plaintiffs alleged problems with the foundations and the sewage, water, and septic systems. The plaintiffs also alleged that the subdivisions had poorly constructed roads and improper drainage. The plaintiffs asserted causes of action under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 *et seq.*, and state-law causes of action for breach of contract, negligent construction, breach of the implied warranty of habitability, and breach of the implied warranty of good workmanship. (Docket Entry No. 37). The defendants counterclaimed for breach of contract and trespass to try title, alleging that many of the plaintiffs had stopped making payments for the houses but continued to live in them.

On March 14, 2004, this court dismissed the plaintiffs' RICO claims and the state-law claims for fraud and fraudulent inducement.  (Docket Entry No. 73).  On August 25, 2005, this court granted in part and denied in part the defendants' summary judgment motion on the claims of sixteen "trial" plaintiffs.  (Docket Entry No. 96).  Specifically, this court granted summary judgment as to all but one of the sixteen plaintiffs' breach of contract claims, holding that the "as is" clauses in the contracts for deed and deeds of trust were enforceable.[1]  This court also held that the plaintiffs had raised fact issues as to whether, by providing homes that had problems with drinkable water in 2000 and 2001, the defendants breached the implied warranty of habitability.

On August 26, 2005, counsel for the plaintiffs was disbarred.  This court gave the plaintiffs ample opportunity to obtain new counsel or proceed *pro se*.  This court also appointed a mediator.  Many of the plaintiffs' claims were settled through mediation and dismissed.  Still others were dismissed for want of prosecution.  Eleven individual plaintiffs remain in this case, comprised of the following six groups: (1) Joseph and Anita Allooh; (2) Joel E. Bergkvist, IV; (3) Claudette and Rick Bishop[2]; (4) John and Regina Doty; (5) Maurice and Margarita LaVoie; and (6) Rickey and Sharon Mosley.  Only John and Regina Doty are represented by counsel.

---

[1]      This court found that the record presented a fact issue as to whether one plaintiff, Jesse Salazar, had a reasonable opportunity to inspect his home before signing the contract for deed and therefore whether the "as is" was clause unenforceable as to him.  (Docket Entry No. 96 at 62–64).  Salazar's claims have since been dismissed on other grounds.  (Docket Entry No. 147).

[2]      Claudette Bishop was formerly Claudette Ferraro and is listed under that name on the docket sheet.

The defendants have supplemented the record with the remaining plaintiffs' depositions and have moved for summary judgment on their claims.  The defendants argue that the plaintiffs who signed contracts for deed cannot recover for breach of those contracts because of the "as is" clauses; that none of the plaintiffs can recover damages for the condition of the properties because they signed contracts with "as is" clauses; that the plaintiffs have failed to raise a fact issue as to the breach of the warranty of habitability; and that the plaintiffs cannot recover damages in excess of the amounts they owe for the periods they lived in the homes without payment.  (Docket Entry No. 335).  The defendants have also moved for summary judgment on their trespass to try title claims against the Bishops, the LaVoies, and the Mosleys.  The Dotys and Bergkvist have responded.  (Docket Entry Nos. 338, 340).  The defendants have replied to these responses. (Docket Entry Nos. 341, 342).  The Dotys have surreplied.  (Docket Entry No. 343).  The Dotys have also moved for summary judgment on the defendants' counterclaims and on their own claims for breach of the warranty of habitability and breach of contract.  (Docket Entry No. 336).  The defendants have responded to this motion.  (Docket Entry No. 339).

This court heard the parties' arguments on the issues presented in the summary judgment motions at a hearing on June 15, 2007.  At the hearing, several of the plaintiffs, including the LaVoies, submitted evidence, most of which was already part of the record. The defendants submitted a posthearing brief.  (Docket Entry No. 350).

Based on the pleadings; the motions, responses, and replies; the parties' submissions and arguments; and the applicable law, this court grants the defendants' motion for summary judgment in part and denies it in part.  This court also grants in part and denies in part the Dotys' summary judgment motion.  Based on these rulings, the following parties' claims remain to be tried:

- The Alloohs' claims for breach of contract, negligence, breach of the implied warranty of workmanlike construction, and breach of the implied warranty of habitability based on the water system.

- Bergkvist's claim for breach of the implied warranty of habitability based on construction defects.

- The Bishops' claims for breach of contract, negligence, and breach of the implied warranty of workmanlike construction.[3]

- The Dotys' claims for breach of contract, negligence, breach of the implied warranty of workmanlike construction, and breach of the implied warranty of habitability based on the septic and water systems.  (The Dotys' partial summary

---

[3]     The defendants' motion for summary judgment on their counterclaim for trespass to try title to the Bishops' home is denied.  The Bishops did not move for summary judgment as to this claim but did present evidence that they have fully complied with their financial obligations to the defendants.

judgment motion on their claim for breach of contract based on the foundation problems is granted.)

•      The LaVoies' claim for breach of contract based on the defendants' failure to install a septic system until one year after they moved into their home, and the defendants' claim for trespass to try title.

•      The Mosleys' claim for breach of the implied warranty of habitability based on the water problems before the State receivership and remediation, and the defendants' claim for trespass to try title.

Docket call is set for **September 14, 2007 at 9:00 a.m.** on the remaining claims. The parties must file exhibit lists and witness lists, and exchange exhibits, no later than **September 7, 2007**.

The reasons for these rulings are set out below.

## I.      Background

The facts of this case were described in this court's August 25, 2005 memorandum and order.   Briefly, almost all of the plaintiffs contracted for homes built by the defendants in subdivisions in the Houston, Texas area developed by the defendants.   The plaintiffs alleged that the defendants failed to deliver properly built homes in subdivisions with adequate water, drainage, and roads.   The plaintiffs asserted federal RICO claims

and state-law claims for fraud, fraudulent inducement, breach of contract, and breach of the implied warranties of workmanlike construction and habitability.

In August 2003, the defendants moved for summary judgment on the basis that the plaintiffs had agreed to buy the properties "as is" and breached their contracts by failing to make installment payments while continuing to live in the homes.  This court granted the defendants' summary judgment motion as to the RICO and state-law fraud claims but found the record inadequate to decide the motions for summary judgment as to the claims for breach of contract, negligence, and breach of the implied warranties of workmanship and habitability.  The parties agreed to treat sixteen plaintiffs as bellwether plaintiffs and the defendants filed dispositive motions as to their claims, based on an expanded record. On August 25, 2005, this court dismissed fifteen of the sixteen plaintiffs' breach of contract claims, based on the "as is" clauses in their contracts for deed and deeds of trust. This court also dismissed the breach of warranty of workmanship and negligence claims as to those fifteen plaintiffs. Finally, the court dismissed the claims for breach of warranty of habitability except the claims of those plaintiffs who raised fact issues as to whether their homes were uninhabitable due to bad water.  The claims that remained for the sixteen plaintiffs have since been settled and dismissed or dismissed for want of prosecution. Many of the other plaintiffs' claims were similarly resolved.

In the pending summary judgment motions as to the remaining plaintiffs, the defendants primarily rely on the terms of the plaintiffs' contracts and this court's August 25, 2005 memorandum and order interpreting those contracts.  The defendants argue that

the "as is" clauses in the contracts apply to the remaining plaintiffs.  The defendants also argue that these plaintiffs cannot recover for breach of contract because they have failed to make payments under their contracts.  Finally, as to the implied warranty of habitability claims, the defendants argue that none of the plaintiffs can recover because the alleged latent defects were not so severe as to make the houses unsuitable for habitation.

### A.    The Plaintiffs' Contracts

Five of the remaining plaintiff groups—the Alloohs, Bergkvist, the Bishops, the Dotys, and the Mosleys—entered into contracts to purchase new houses built and sold by the defendants.  The homes were located in the 59 Estates subdivision in Liberty County, Texas, the Trails End subdivision in San Jacinto County, Texas, the Peaceful Place subdivision in Grimes County, Texas, and the Huntsville West subdivision in Grimes County, Texas.  Bergkvist also contracted to purchase the lot adjacent to the tract of land on which his home was to be built.  The defendants sold the houses in different stages of construction—100% completed, 95% completed, 90% completed, or "completed shell." One of the plaintiff groups, the LaVoies, contracted to purchase a previously built home.

The summary judgment evidence shows that these plaintiffs signed an earnest money contract, made a down payment, and signed a contract for deed.  The earnest money contracts stated in part as follows:

> Purchaser agrees not to take permanent possession until down payment is completed and all closing papers signed.
>
> . . . .

Water, septic tanks, telephones, and electricity will be the responsibility of the purchaser.  Purchaser shall have until midnight of the seventh calendar day following the date of this contract to revoke contract and demand his earnest money refunded.

. . . .

The herein described premises may be subject to flooding. PURCHASER has examined all information to his/her satisfaction and either examined the property personally or has been given the opportunity to inspect the property and has found it to be suitable to his needs and purposes. PURCHASER hereby releases and agrees to hold SELLER harmless from liability arising out of any lease or any claim based on the present condition of the premises and any future condition not caused by the acts of seller. . . . It is further understood and agreed that there is herein contained all the terms and conditions of the agreement, and that no verbal statement of any person or persons whomsoever not herein incorporated shall be binding upon either party or upon the SELLER, his agent or representatives, and that no warranties or representation of any kind have been made by either party other than as herein incorporated.

(Docket Entry No. 335, Ex. 21).

After making down payments under the earnest money contracts, the plaintiffs signed contracts for deed.  The contracts for deed set out the installment payment terms and the consequences of default.  The contracts contained the following provisions:

Purchaser understands and acknowledges that Purchaser does not acquire legal title by this contract and that purchaser will not acquire legal title until Seller's deed is delivered.

. . . .

The herein described premises may be subject to flooding. PURCHASER has examined the property either on the

ground or to PURCHASER'S complete satisfaction and
knows its condition.   PURCHASER acknowledges that no
warranty or representations of any kind have been made by
any party or individual other than is herein incorporated, and
such property is sold "AS IS," "WHERE IS," and WITH ALL
FAULTS.   In purchasing the property, PURCHASER relies
only on PURCHASER'S examination and judgment, not on
the representation of any other person as to value, future
value, condition, size, age, use, or any other matter.
PURCHASER acknowledges that in selling the property
SELLER makes no warranties other than title.   PURCHASER
hereby releases and agrees to hold SELLER harmless from
liability arising out of any lease or any claim based on the
present condition of the premises and any future condition not
caused by the acts of the SELLER. . . . It is further understood
and agreed that there is herein contained all the terms and
conditions of this agreement, and that no verbal statement of
any person or persons whomsoever, not herein incorporated,
shall be binding upon either party or upon the SELLER, his
agent or representatives, and that no warranties or
representation of any kind have been made by either party
other than as herein incorporated.

(Docket Entry No. 335, Ex. 10).[4]

The contracts for deed also contained the following forfeiture provisions:

This contract is accepted by the PURCHASER . . . with the
express understanding that time is of the essence in its
performance and that in the event of any violation of the
above terms and conditions by PURCHASER, or default in
making one or more of said payments, or on breach of any of
the terms and conditions of this contract by the
PURCHASER, then SELLER, at his option, may declare the
entire unpaid principal amount immediately due and owing
and in the event PURCHASER shall fail to pay in full the said

---

[4]      The contracts for deed used for property in the Trails End subdivision stated that "ALL ROADS
INSIDE THIS DEVELOPMENT, TRAILS END, ARE PRIVATE ROADS AND SAN JACINTO COUNTY
WILL NOT NOW OR EVER BE RESPONSIBLE FOR THE MAINTENANCE OF THESE ROADS."
(Docket Entry No. 335, Ex. 11).

entire unpaid principal amount . . . within ten (10) days following notice . . . all right, title and interest of said PURCHASER, his heirs and assigns, in said property shall then and there at the option of SELLER be forfeited and shall revert to SELLER, its successors or assigns, together with all sums theretofore paid by PURCHASER. . . . In the event that the said property reverts to SELLER or his assigns under the terms of this paragraph, PURCHASER shall within 30 days of PURCHASER'S violation, default or breach of this agreement, remove all personal property from the premises. All such property remaining after such thirtieth day shall at SELLER'S option, become the property of SELLER or may be removed by SELLER at PURCHASER'S expense. . . . If the property is used as PURCHASER'S residence, the grace period for default is determined by § 5.061 of the Texas Property Code or its successor. . . .

. . . .

No delay by SELLER in enforcing any part of this contract shall be deemed a waiver of any of SELLER'S rights or remedies.  If SELLER accepts any payment after its due date, the acceptance shall not be construed as a waiver of any other due date, shall not change any other due date, and shall not waive any of SELLER'S rights or remedies.

(*Id.*).[5]

It is undisputed that five of the six plaintiff groups stopped making monthly payments under the contracts for deed; that the defendants sent the plaintiffs default notices under the Texas Property Code[6]; and that the plaintiffs did not cure the defaults.

---

[5]     Section 5.061 defines default as the "failure to (1) make a timely payment; or (2) comply with the terms of an executory contract."  TEX. PROP. CODE § 5.061.

[6]     Section 5.064 of the Texas Property Code provides as follows:

A seller may enforce the remedy of rescission or of forfeiture and acceleration against a purchaser in default under an executory contract for conveyance of real property only if:

The deposition testimony shows that some plaintiffs lived in the houses for several years before they stopped making monthly payments; other plaintiffs never made any monthly payments.  Most plaintiffs, with the exception of Joel Bergkvist and the Bishops, stopped making payments in 2000 or 2001.  Bergkvist made payments on the property on which his home was built until 2005, but did not make payments on the other tract of land after 2001.  The Bishops obtained a third-party mortgage on their property on September 5, 2001, paying off the contract for deed.  The Bishops contend that they have never missed a payment on either the contract for deed or their current mortgage; the defendants offer no controverting evidence.  (Docket Entry No. 335, Ex. 6 at 56:9–59:23).  The Alloohs, the Dotys, the LaVoies, and the Mosleys continued to live in the houses after they stopped making payments on the contracts for deed in 2001 or 2002.

**B.      The Evidence as to the Plaintiffs' Claims**

---

(1)      the seller notifies the purchaser of:

(A)      the seller's intent to enforce a remedy under this section; and

(B)      the purchaser's right to cure the default within the 30-day period described by Section 5.065; and

(2)      the purchaser fails to cure the default within the  30-day period.

TEX. PROP. CODE § 5.064.  Section 5.065 states that:

Notwithstanding an agreement to the contrary, a purchaser in default under an executory contract for the conveyance of real property may avoid the enforcement of a remedy described by Section 5.064 by complying with the terms of the contract on or before the 30th day after the date notice is given under that section.

TEX. PROP. CODE § 5.065.

11

The plaintiffs' depositions and affidavits provide summary judgment evidence as to the inspections they made of the properties before entering into the contracts with the defendants; the communications they had with the defendants; and their experiences with the properties.  That evidence is summarized below.

      1.    *The Alloohs*

On April 28, 1998, the Alloohs signed an earnest money contract for a newly constructed shell home in the 59 Estates subdivision in Liberty County.  (Docket Entry No. 335, Ex. 21).  The defendants were to provide the septic system and a "shell" for the 1,800 square-foot home and the Alloohs were to receive a 1/16 ownership in the community water well for $280.00 per year.  Mr. Allooh was to install the plumbing and electrical systems.  The Alloohs signed a contract for deed on July 28, 1998 to purchase the home for $50,400.00; their monthly payments totaled $521.76.  (*Id.*, Ex. 10).  The Alloohs moved into the house the same day.  (*Id.*, Ex. 4 at 25:14–26:3).  Mr. Allooh testified that he was unable fully to inspect the house before signing the contract for deed because the construction was not sufficiently advanced before the day they moved in.  (*Id.* at 33:1–34:23).

Shortly after moving in, the Alloohs noticed problems.  The siding was not "securely attached" to the home.  The floors had been soaked by rain before the roof was completed, causing them to warp.  The floors also lacked adequate support and were "shaky."  The studs in the walls and rafters in the ceiling were not "centered properly." (Docket Entry No. 335, Ex. 4 at 35:3–36:12).  The house appeared to be built on an

inadequate foundation.  (*Id.* at 54:5–55:25).  Nails had not been fully hammered into the shingles on the roof.  The septic system was not installed for a month after the Alloohs moved in.  After the septic system was installed, it malfunctioned, causing sewer seepage in the yard, where the water well was located.  (*Id.* at 36:14–37:19).  The Alloohs asked Hall to fix these problems.  Hall repaired part of the warped floor, but no work was done on the siding.  The Alloohs did most of the repair work themselves, at a cost of over $15,000.00. (*Id.* at 39:8–41:1).

The Alloohs also allege that when they first moved in, the water in their home made everyone ill.  As a result, they bought bottled drinking water and boiled the water they used for bathing.  The water issue was resolved when the State of Texas put the 59 Estates subdivision's water system into receivership in January 2001.[7]  (*Id.*, Ex. 30).

The Alloohs are seeking damages of approximately $15,000.00 to cover the costs of the material and another $30,000.00 to cover the costs of the labor they expended to repair the problems.  (*Id.*, Ex. 4 at 45:8–12).  The Alloohs stopped making payments on the contract for deed in late 2000 and moved out approximately one year later, in December 2001.  (*Id.* at 47:12–22).

The summary judgment record contains two letters from the defendants' counsel to the Alloohs, dated December 31, 2004 and January 31, 2005.  (*Id.*, Ex. 31).  The first

---

[7]     The State's investigation into allegations of contaminated drinking water and illegal dumping in many of the subdivisions at issue in this case, as well as the agreed judgment the defendants entered into with the Texas Commission on Environmental Quality to require compliance with environmental standards, were discussed at length in this court's August 25, 2005 memorandum and order. (Docket Entry No. 96 at 13–20). Texas placed the 59 Estates and Trails End subdivisions into receivership on January 22, 2001.  (Docket Entry No. 335, Ex. 30).  The Peaceful Place and Huntsville West subdivisions were not put into receivership.

letter is a notice of the Alloohs' default on their payments and of their opportunity to cure that default within thirty days by paying $47,065.36. The second letter notifies the Alloohs that the defendants would be exercising their rights of acceleration on the loan and forfeiture of the property.

### 2. *Joel Bergkvist, IV*

Joel Bergkvist, IV, has a civil engineering degree from Texas A&M University. On January 23, 2000, Bergkvist signed an earnest money contract for a newly constructed, completed 1,200 square-foot home in the Trails End subdivision in San Jacinto County. (Docket Entry No. 335, Ex. 22). The house was not built on the date Bergkvist signed the earnest money contract. On January 27, 2000, Bergkvist signed an earnest money contract for the adjacent lot. (Docket Entry No. 335, Ex. 23). He signed the contracts for deed on the two properties on May 31, 2000, negotiating a price of $80,294.00 for the property with the house and $19,900.00 for the neighboring lot. (Docket Entry No. 335, Exs. 11, 12). The contract for deed on the property with the house stated, "Purchaser to pay Darrell Hall 3 payments of $724.73 while seeking 3rd party financing." (*Id.*, Ex. 11). The contract for deed also stated that the defendants would provide "septic, A/C, skirting, culvert/1 load of driveway material, 6 x 50 front porch, upgrade on vinyl." (*Id.*). Bergkvist did not read the earnest money contracts or the contracts for deed. He testified: "I knew my credit was shot and I knew I wanted the property and I didn't know much about this stuff; so I signed it." (*Id.*, Ex. 5 at 71:7–9). He did not read the contract for deed because "[i]t was very intimidating, and I just—I

read the top part that says—you know, where it was typed in, but the boilerplate or standard legalese stuff I didn't read." (*Id.* at 85:14–21). Bergkvist testified that on May 31, 2000, the day he signed the contracts for deed, he "was signing a bunch of documents" in a "big packet of things." (*Id.* at 98:19–99:4). He also testified that he had inspected the house—which was built—and the properties before he signed the contracts for deed. (*Id.* at 85:6–13).

In response to the defendants' summary judgment motion, Bergkvist submitted an affidavit from Theresa Bergkvist, his mother and a former plaintiff in this case. (Docket Entry No. 340, Ex. 1). Theresa Bergkvist lived in the home with her son and was involved in purchasing the properties. She stated that in January 2000, when they signed the earnest money contracts, she asked one of the defendants' employees about two provisions in the contract. (*Id.*). She asked whether the "as is" clause applied to their earnest money contract, since no home had been built. She was told that the clause must have been a mistake because an "as is" clause "could not apply if there was no house." (*Id.*). She also asked about the disclosure in the earnest money contract that the property was subject to flooding. The defendants responded that this clause did not apply to the Bergkvist lot but only to lots in the 100-year flood plain. (*Id.*).

Bergkvist complains that the house was built on an improper foundation, has leaky plumbing that caused the floor behind the refrigerator and under the bathtub to rot and cave in, poor wiring that resulted in few functioning electrical sockets, inadequate air conditioning, and drainage problems that caused the septic system to stop working.

15

(Docket Entry No. 335, Ex. 5 at 114–20).   Hall did make foundation repairs, but, according to Bergkvist, the repairs did not resolve the problems.   Bergkvist became frustrated after his repeated requests for repairs went unanswered and decided to repair some of the problems himself.   He does not know how much money he spent making repairs to the house.

On July 12, 2001, Bergkvist obtained a quote from J&J Foundation Repair on the cost to fix the foundation.   (Docket Entry No. 340, Ex. 1).   J&J Foundation Repair quoted Bergkvist a price of $8,450.00 and stated that the home's "beams and blocks and bases [were] not installed properly."   (*Id.*).   Bergkvist submitted a June 16, 2005 inspector's report.   The inspector observed the following defects in the home:   cracks in the walls due to structural settlement; a poorly graded lot, which allowed storm water to pool near the home; a sloping floor in the hallway and in one of the bedrooms; several electrical outlets either improperly installed or inoperative; a bathroom that lacked water supply; a leaky kitchen sink; and a major plumbing leak under one of the bathrooms.   (*Id.*).   Bergkvist also submitted documents from the San Jacinto County Appraisal District showing the appraised value for his property between 2000 and 2006.   (*Id.*).   In 2000, the year before the home was built, the property was appraised at $13,500.00.   In 2001, the property—with the home—appraised at $61,020.00.   In 2002, the property had an appraised value of $46,760.00.   In 2003 and 2004, the property's appraised value was $39,580.00; in 2005, the appraised value was $26,170.00; and in 2006, $28,787.00.

16

In August 2000, Bergkvist obtained third-party financing on the property. That financing was not enough to pay off the contract for deed. On August 23, 2000, Bergkvist and the defendants executed a lien on the property with the home for $13,200.00. (*Id.*, Ex. 19). The lien was secured by a deed of trust. The defendants state that this lien was to cover the $13,200.00 difference between the amount owing under the contract for deed and the third-party mortgage Bergkvist obtained. On August 24, 2000, the defendants and Bergkvist had entered into a warranty deed with a vendor's lien on the property, transferring ownership in the property to Bergkvist. The lender provided $70,400.00 in mortgage proceeds, which Bergkvist used to pay off the balance remaining on the contract for deed. (*Id.*, Ex. 28). The defendants' records show that Bergkvist does not owe money under that contract for deed. (*Id.*, Ex. 18). The defendants contend that Bergkvist has not paid the balance owing on the $13,200.00 note. Bergkvist made the monthly mortgage payments to the third-party lender until 2005. The property was foreclosed on shortly thereafter. (*Id.*, Ex. 5 at 34:25). As for the second lot, Bergkvist stopped making the monthly payments after June 2001 but kept the land until 2005.

The summary judgment record contains four letters from the defendants' counsel to Bergkvist, dated December 31, 2004 and January 31, 2005. (*Id.*, Ex. 31). The first two letters are notices of Bergkvist's default on his payments for the two properties and of his opportunity to cure by paying $13,105.85 and $18,898.56. The second two letters are notices of the defendants' intention to exercise their right to accelerate the loans and foreclose.

3.     *The Bishop*s

On March 6, 1999, the Bishops signed an earnest money contract for a home in the Peaceful Place subdivision in Grimes County, Texas.  (Docket Entry No. 335, Ex. 24). The Bishops contracted for a newly constructed "95% complete" home with everything except the heating and air conditioning systems provided by the defendants, including "water [at] $280.00 per year" through access to a community well.  (*Id.*, Ex. 13; Ex. 6 at 31:9–23, 62:14–16).  The Bishops signed two contracts for deed.  The first was signed on March 13, 1999, before the home had been built.  The price listed on the first contract for deed was $42,900.00.  (*Id.* at 37:18–22).  The second contract for deed was signed on September 12, 1999, after the home was completed.  (*Id.* at 49:10–50:6).  The price on the second contract for deed was $46,350.00.  (*Id.*, Ex. 13).  The Bishops moved into the home on September 1, 1999.  (*Id.*, Ex. 6 at 52:2–4).  Ms. Bishop testified that when they signed the second contract for deed, "I was told [by the defendants] I either sign this or walk away from the home, which at that point we could not do; we had already installed Pergo flooring [and] Berber carpet."  (*Id.* at 50:18–22).  Ms. Bishop stated that the defendants offered to return the $1,500 down payment.  The Bishops declined that offer because the money they had already put into the house far exceeded that amount.  "So we didn't have a choice but to sign this so we could move into—be in our home and not lose what we had into it already.   Plus, we had already paid for the electrical to be done. . . . We had quite a discussion on the price.  We didn't understand why it kept going up."  (*Id.* at 50:18–51:10).  Before they moved in, the Bishops inspected the home several

18

times.  (*Id.* at 52:5–8).  Ms. Bishop testified that when they signed the second contract, an

agent of the defendants told them that the "as is" clause only applied to previously built

homes, not to newly constructed homes.  (*Id.* at 52:14–53:19).

The evidence shows that the Bishops made the monthly payments on the house.  In

September 2001, the Bishops obtained a mortgage from a third-party mortgage company

and paid off the contract for deed.  They still live in the home.  (*Id.* at 56:4–57:2).

The Bishops complain that the defendants failed to install baseboards, window

sills, a truck pad, and miscellaneous plumbing fixtures; the house has foundation

problems; their septic system was installed partially on their neighbor's property; and

their well water is undrinkable.  The Bishops allege that the water is "so heavy with

sulfur, it stinks like rotten eggs so you just can't drink it."  (*Id.* at 62:6–13).  The water

system in the Peaceful Place subdivision in Grimes County was not put into receivership

by the State of Texas.  As part of their damages, the Bishops seek approximately

$28,000.00 in repairs they made to the home's electrical system, the foundation, and the

plumbing, and for the costs of cleaning up construction debris they allege was left on the

homesite after the home was built.

### 4.   *The Dotys*

The Dotys signed an earnest money contract with the defendants on September 12,

1998 to purchase a 1,400 square-foot, five-bedroom, "90% completed shell" home in the

59 Estates subdivision in Liberty County, Texas.  (Docket Entry No. 335, Ex. 25; Docket

Entry No. 336, Ex. A).   The defendants were to provide the septic system, air-conditioning and heating systems, and a shared ownership in the community water well at a cost of $280 annually.  (Docket Entry No. 335, Ex. 25).  The Dotys were to provide cabinets and vinyl flooring and agreed to pay $69,600 for the home.  The Dotys signed a contract for deed for the purchase of that home, but the record is unclear as to when the contract for deed was signed.  (*Id.*, Ex. 14).  The date was not written on the contract itself.  Nor does Ms. Doty's testimony indicate when the contract was executed.  The following exchange about the execution of the contract for deed occurred during Ms. Doty's testimony:

> Q:   Do you know when this [contract for deed] was signed?
>
> A:   Again, I wasn't there when this was signed.
>
> Q:   Since there is not a date on it, do you remember—did your husband tell you what date he signed this document?
>
> A:   I believe it was September 12th.
>
> Q:   Of '98?
>
> A:   Yes.
>
> Q:   Do you know if he signed this the same time he signed the earnest money contract?
>
> A:   I wasn't there, so . . . .
>
> Q:   And again what was the price listed on here for the home?

20

A:     $69,600.

Q:     And what were the monthly payments?

A:     $730.46.

Q:     And when was the first payment due?

A:     November 10th, 1998.

Q:     And you said that the first payment was due 30 days
       after the document was—or after the document was
       signed; is that correct?

A:     Yes.

Q:     Does that help refresh your memory?

A:     No, I'm sorry.  My understanding, he told me the first
       payment was due 30 days after the completion of the
       home.

Q:     Okay.  So you weren't there, so you can't say when
       your husband signed this contract; is that correct?

A:     Right.

(Docket Entry No. 335, Ex. 7 at 33:25–35:4).

The Dotys, the only plaintiffs now represented by counsel, submitted affidavits in
response to the defendants' summary judgment motion.  Mr. Doty stated that "[o]n
September 12, 1998, I met with the Defendants for the first time.  I contracted to have the
Defendant build a five bedroom home by signing a contract for deed," and that "[o]n
September 18, 1998, I met with the Defendants and paid the balance of the down
payment."   (Docket Entry No. 338, Ex. A).  Ms. Doty similarly stated that "[o]n

21

September 12, 1998, and September 18, 1998, John Doty met with and contracted to have the Defendant build a five bedroom home by signing a contract for deed." (*Id.*, Ex. B).

Construction was completed during the first week in October 1998 and the Dotys moved in on October 8, 1998. (Docket Entry No. 335, Ex. 7 at 30:23–31:1). Ms. Doty testified that they had been told the house would be ready for move-in on October 1, 1998. When they arrived, there was no sheetrock on the walls, no electrical wiring had been done, no plumbing was in place, and the house had no water access. (*Id.* at 71:9–13). Ms. Doty testified that when her husband inspected the home on October 1, 1998, before they moved in, the construction was not complete. (*Id.* at 65:20–25). The Dotys moved out four years later, on February 15, 2002. (*Id.* at 49:7–9).

On May 18, 2000, the defendants assigned the Doty contract for deed—along with twenty-four others covering homes in Liberty County, Texas—to a third-party mortgage company, Chaminade Capital Corporation. (Docket Entry No. 342, Ex. 4). The defendants assigned Chaminade all "right, title, and interest in all the contracts for deed." (*Id.*). On the same day, the defendants and Chaminade signed an agreement to reconvey the properties back to the defendants after a specified period. (*Id.*, Ex. 3). Chaminade was to receive 100 monthly payments, beginning in June 2000. (*Id.*). The record shows that the Dotys made their monthly payments on the home to the defendants at least until May 2000, when the defendants conveyed the contract for deed to Chaminade. The record does not indicate whether the Dotys continued making regular payments to Chaminade between May 2000 and when they moved out in February 2002. (Docket

22

Entry No. 335, Ex. 7 at 88:12–93:11; Docket Entry No. 338, Ex. B).  Ms. Doty testified that she had made several payments to Chaminade after May 2000, but she did not have records available during her deposition to confirm which payments were made.  (Docket Entry No. 335, Ex. 7 at 88:12–93:11).  The record does not indicate how many monthly payments the Dotys have made to Chaminade.

The summary judgment record contains two letters from the defendants' counsel to Mr. Doty, dated December 31, 2004 and January 31, 2005.  (*Id.*, Ex. 31).  The first letter is a notice of the Dotys' default on their payments and of their opportunity to cure that default within thirty days by paying $62,067.14.  The second letter notifies the Dotys of the defendants' intent to exercise their rights of acceleration of the loan and of forfeiture of the property.

The Dotys complain that the home was built on an inadequate foundation.  They complain that the water was cloudy, had a "slick white color to it," and "felt slick on your skin."  (Docket Entry No. 335, Ex. 7 at 48:1–4).  The Dotys seek reimbursement for the money spent on purchasing bottled water.  (*Id.* at 63:4–5).  They also complain that within one month of moving into the home, they experienced problems with their septic system.  (*Id.* at 49:10–14).  The Dotys allege that these problems included sewage backup in the house, sewer gas in the house, clogged pipes, insufficient drainage, and sewage spilling into the ground around the home.  (Docket Entry No. 338, Ex. A).  According to the Dotys, the sewage problems arose because the defendants installed a septic tank that was too small for a five-bedroom home.  The Dotys claim that the septic tank the

23

defendants installed had 1,000 gallons of capacity, but that county regulations require a tank with 1,250 gallons of capacity for a five-bedroom home.  The record shows that the defendants obtained a permit for two five-hundred gallon septic tanks from Liberty County on February 27, 1998.  (Docket Entry No. 338, Ex. E).  The permit application, filled out by an employee of the defendants, Hayden Archer, states that the septic tank was to be installed on a 1,400 square-foot, three-bedroom home.  The Dotys allege that the defendants fraudulently obtained this permit by misrepresenting that the house had three bedrooms rather than five.  (Docket Entry No. 336 at 9–10).

The Dotys also allege that the defendants failed to clear their property of construction debris after they finished building the home, that the home's electrical wiring was substandard, that the roads in the 59 Estates subdivision were in poor condition, that a sink leaked, and that they were unable to obtain insurance for the home. (Docket Entry No. 335, Ex. 7 at 54:6–64:4).  The Dotys claim that within one year of living in the home, the thermostat stopped working; they had to purchase and install a replacement.  (*Id.* at 64:5–18).  Additionally, the Dotys installed vinyl tile in the bathroom, ventilation ducts in the attic, and new cabinetry in the kitchen.  (*Id.* at 64:20–68:10).  The Dotys seek reimbursement for the costs of the repairs they made.  The Dotys also allege that pipes burst on at least two occasions, although it appears that the defendants fixed those problems.  (*Id.* at 69:1–20).

On February 22, 2001, the Dotys had their home inspected by a third party. (Docket Entry No. 336, Ex. G).  The inspector concluded that the home suffered from

24

many problems, the most significant of which were an unstable foundation, an improperly

grounded and wired electrical system, an improperly installed air-conditioning system,

and a substandard plumbing system.  (*Id.*).  The inspector filed a report that included the

following criticisms about the foundation:

> There were numerous piers which appeared to be unstable
> under the structure.  There were beams which appeared to be
> inadequately supported and were sagging.  The stump in the
> front has decayed causing significant settlement at the
> abutting pier.  The right rear corner pier was also in need of
> repair.  Numerous sheetrock cracks were observed in the
> interior wall corners of the structure.  The left rear corner
> beam had separated above the pier and may fail at any time.
> The left rear bedroom closet door was out of square.  It is
> recommended that a foundation leveling company further
> evaluate the structure and estimate cost of repairs.

(*Id.*).  The inspection report stated that the main breaker panel in the home's electrical

system had one breaker installed with undersized wires and several electrical outlets were

missing ground fault circuit interrupters.   The report recommended that a licensed

electrician do further work.  The report also stated that the air conditioner's drain line was

routed to a sewer vent rather than to a "wet vent."  Finally, the report stated that the

plumbing system's drain lines were installed directly on the ground under the home and

"appeared to be stressed by the settlement of the foundation," which could result in

"[r]andom failures in the drain lines."  (*Id.*).

On March 25, 2002, Liberty County "red-tagged" the Doty home, deeming it

uninhabitable.  (Docket Entry No. 336, Ex. B).  The notice from the county's engineering

and permit department states that the "clean out has overflowed with sewer running under

the home and pooling," and that before the home could be occupied, the septic tanks had to be pumped and inspected.  (*Id.*).  Darrell Hall testified that a red-tagged home would have to be repaired before it could be sold or rented.  (Docket Entry No. 336, Ex. J at 117:20–118:8).  On March 27, 2002, the Dotys notified the defendants and Chaminade that they were surrendering their rights in the home because it was unsafe to live in.  (*Id.*, Ex. D).

### 5.    *The LaVoies*

The LaVoies entered into an earnest money contract on May 23, 1998 for a previously built 1,200 square-foot home in the Huntsville West subdivision in Grimes County, Texas.  (Docket Entry No. 335, Ex. 26).  The purchase price was $37,900.00 and the down payment was $1,500.00.  The earnest money contract provided that the defendants would furnish rough wiring, plumbing, insulation, one completed bathroom, a kitchen-cabinet-and-sink package, and the septic system, and would replace broken windows.  The LaVoies signed the contract for deed on July 18, 1998.  (Docket Entry No. 335, Ex. 15).  The contract for deed provided, in addition to the terms in the earnest money contract, that the defendants would put sheetrock in the ceiling and would remove construction debris from the homesite.

Maurice LaVoie is unemployed and cares full-time for his mentally disabled wife and the six children who live with them.  (Docket Entry No. 335, Ex. 8 at 12:3–15:14, 19:11–13).  LaVoie has a high-school education and has worked a variety of jobs, including as a bus driver, a mechanic, and a butcher.  (*Id.* at 20:14–26:14).  Between

August 1999 and March 2000, LaVoie worked for Darrell Hall remodeling homes.  (*Id.* at 28:1–6).  Hall paid him in "house notes."  (*Id.* at 29:22).  Sometime in 2002, the LaVoies filed for bankruptcy.  (*Id.* at 34:25–35:16).  Mr. LaVoie testified that the result of the bankruptcy was "[p]retty much we ended up with the house."  (*Id.* at 36:1–3).  When asked whether the mortgage had been paid on the home, Mr. LaVoie answered, "No, sir. It's been bankrupt."  (*Id.* at 81:19–20).  Mr. LaVoie testified that his bankruptcy case had been dismissed once but was reinstated a short time later.  (*Id.* at 37:8–13).  The record contains no additional information as to the outcome of the bankruptcy.  Mr. LaVoie testified that he has not made any payments on the mortgage since March 10, 2000.  (*Id.* at 85:20–86:11).

The summary judgment record contains two letters from the defendants' counsel to the LaVoies, one dated December 31, 2004 and the other January 31, 2005.  (*Id.*, Ex. 31). The first letter is a notice of their default on the house payments and of their opportunity to cure that default within thirty days by paying $36,240.00.  The second is a notice of the defendants' intent to accelerate the loan and seek forfeiture of the property.

The LaVoies moved into the house close to the time they signed the contract for deed in July 1998.  They continue to live there.  Mr. LaVoie testified that he inspected the home on May 23, 1998, the date he signed the earnest money contract and before the family moved in.  On that date, he found numerous problems with the house:

> [u]pon arriving at that house, the lot was overgrown with weeds, trees.  There was trash all over the yard.  You really couldn't even see the house until you walked past a bunch of

27

> weeds. . . . So, we get up to the house and we're stepping
> around all kinds of stuff: Paint buckets, syringes with needles
> in them, razor blades, metal cans, pain thinner cans.  Just—it
> looked like a junkyard.  But they said they would clean it
> up. . . . So, we get to the door.  There's no steps to go in, to
> start with—not that we couldn't have climbed in.  But when
> he opened the door, there was so much stuff in there, it was
> like a biological hazard.  There were syringes laying there,
> rusty razor blades, diapers, dog feces, human feces, kids'
> clothes, sheetrock, insulation. . . .

(*Id.* at 62:17–63:8).  On the same date, Mr. LaVoie also noticed that the roof was not

straight, the floors and the ceiling were bowed, and the siding in the back was separated

from the frame.  (*Id.* at 64:12–66:11).  According to Mr. LaVoie, one of Hall's employees

told him that all these problems would be fixed.  "And Mr. Boyce said that they would

replace all of that.  They would level that roof out.  They would redo the ceiling.  They

would redo the floor.  They would level it, paint it on the outside, install our sewer system

and give us adequate water supply."  (*Id.* at 66:6–11).  Mr. LaVoie stated that he and his

wife discussed buying a newly built home without these problems, but Boyce said that

this home was the only one left and no new homes were to be built. Boyce assured the

LaVoies that "when you buy the house, we will have it taken care of.  You will have

everything according to—it's going to look like the house we've got by the office."  (*Id.*

at 64:15–69:6).

Mr. LaVoie was asked in his deposition if he was able to see the flaws when he

inspected the house.  He responded:

> Everybody could.  But when somebody says they're going to
> fix the house according to the floor model beside their

> building and to make it look just like it except it's going to be
> a different color, that's their word, too.  This earnest money
> contract, that's the same as your contract for deed.  This is
> legal and binding, just like you're saying.  But what he said he
> was going to do, he didn't do.

(*Id.* at 86:24–87:8).  Mr. LaVoie acknowledged that he did not read the earnest money

contract or contract for deed closely before he signed them because Boyce told him it was

"just standard stuff."  (*Id.* at 74:11–15; 79:23–80:3).

According to Mr. LaVoie, the defendants did not make the promised repairs and

improvements.  (*Id.* at 69:16).  The LaVoies contend that after they moved in, the

defendants did not install a septic system for nearly one year and did not provide access to

water for three months.  (*Id.* at 88:6–10).  The LaVoies seek reimbursement for the costs

of buying bottled water for the first three months they lived in their home.  (*Id.* at

98:11–13).

The LaVoies allege as damages the costs they incurred to repair their home.  They

also claim that an inadequate sewage system caused Ms. LaVoie to miscarry a child.  (*Id.*

at 88:4–89:4).  The LaVoies state that the following improvements still need to be

completed: "The roof, the ceiling, the house needs leveled, the sewer system needs

moved, [and] the water is contaminated."  (*Id.* at 90:14–16).  They estimate the cost of

repairs at approximately $150,000.00 and they seek $800 million in punitive damages for

the miscarriage.  (*Id.* at 94:6–96:7).

6. *The Mosleys*

29

On December 19, 1999, the Mosleys signed an earnest money contract for the purchase of a home in the 59 Estates subdivision in Liberty County, Texas, after swapping that home for one they had earlier contracted to buy in the Five Oaks subdivision.  (Docket Entry No. 335, Ex. 9 at 48:12–58:1).  The purchase price for the home in the 59 Estates subdivision was $74,900.  (*Id.*, Ex. 27).  Before they signed the contracts, the Mosleys inspected the home.  (*Id.*, Ex. 9 at 47:8–20, 51:16–52:1, 58:10–15).  The Mosleys had paid a $200.00 down payment on the Five Oaks home. That balance was applied to the purchase of the home in 59 Estates.  According to Ms. Mosley, they agreed to pay the rest of the down payment through the labor and the work they were doing remodeling other homes for the defendants.  (*Id.* at 59:9–18).

On June 2, 2000, the Mosleys signed the contract for deed.  (*Id.*, Ex. 16).  Ms. Mosley testified that she and her husband inspected the home and moved in before signing the contract for deed, but she could not recall the exact date they moved in.  (*Id.*, Ex. 9 at 64:15–24, 80:4–16).  She also testified that she read and understood both the earnest money contract and the contract for deed when she signed them.

When the Mosleys inspected the home and signed the contract for deed, they were both working for Darrell Hall in the home-remodeling business.  (*Id.* at 68:14–23).  The summary judgment record contains inconsistent evidence as to whether the defendants were to provide the Mosleys with a completed home.  Both the earnest money contract and the contract for deed stated that the home was to be "100% complete."  (*Id.*, Exs. 27, 16).  Ms. Mosley testified in her deposition that she understood that she and her husband

30

contracted for a shell home, that the defendants were responsible for supplying the materials to finish the interior, and that the Mosleys would finish the inside construction. (*Id.*, Ex. 9 at 70:11–22).

One of the Mosleys' complaints is that the defendants failed to provide many of the materials needed to complete the inside of the home, such as flooring and cabinets. (*Id.* at 70:5–10). The Mosleys also complain that the home had structural problems, that the septic system was placed too close to the water well, and that the subdivision roads were not properly maintained. (*Id.* at 77:18–78:15). They also contend that the defendants did not install a driveway as they had verbally promised. The Mosleys also alleged that their water was undrinkable before the State of Texas put the subdivision's water system into receivership. (*Id.* at 89:22–90:1). Ms. Mosley testified that her daughter became ill and had to see a doctor during that time. (*Id.* at 90:7–91:7).

Apart from the down payment and labor, the Mosleys never made any payments on the house. (*Id.* at 59:19–60:5). The summary judgment record contains two letters from the defendants' counsel to Mr. Mosley, dated December 31, 2004 and January 31, 2005. (*Id.*, Ex. 31). The first letter is a notice of the Mosleys' default on their payments and of their opportunity to cure within thirty days by paying $71,100.00. The second letter is a notice of the defendants' intention to exercise their right to accelerate the loan and foreclose. The Mosleys still live in the home. (*Id.*, Ex. 9 at 59:25–60:2).

**D.     The Summary Judgment Issues**

The parties dispute whether, as a matter of Texas law, the plaintiffs may recover for breach of contract.  The defendants make three arguments.  First, the defendants assert that the plaintiffs have no legal interest or title under the contracts for deed that survives their failure to make payments, and no claim for breach of contract or other cause of action arising out of the condition of the property.  Second, the defendants argue that because the plaintiffs agreed to buy the property "as is" and had reasonable opportunities to inspect, they cannot recover damages for breach of contract, negligence, or for breach of the warranty of workmanship.  The defendants argue that even if the "as is" disclaimers do not preclude claims for breach of the implied warranty of habitability, the plaintiffs have failed to meet the legal requirements for asserting such claims.  Finally, the defendants argue that any recovery would be exceeded by recovery on the counterclaims for the fair-market rental value of the houses for the periods the plaintiffs lived in them without making payments.  The defendants have submitted records showing the payments made by the plaintiffs compared to the amounts allegedly due.  (Docket Entry No. 335, Exs. 17, 18).

The plaintiffs assert that the defendants materially breached the contracts by delivering houses and subdivisions that were not in the promised condition, excusing their obligation to make the monthly payments.  The plaintiffs argue that the "as is" clauses are unenforceable.  The plaintiffs emphasize their lack of sophistication, the boilerplate nature of the clauses, and the absence of a meaningful opportunity to inspect the houses

before signing the contracts.  The plaintiffs also assert that there are disputed fact issues material to deciding whether the defendants breached the implied warranty of habitability.

Each argument and response is examined below.

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c). The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact.  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element or claim.  *Celotex*, 477 U.S. at 330. The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  "An issue is material if its resolution could affect the outcome of the action."  *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  If the moving party fails to meet its initial burden, the summary

judgment motion must be denied, regardless of the nonmovant's response.  *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim.  *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 302 (5th Cir. 2004).  This burden is not satisfied by "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.  "Rule 56 mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

## III.    The Breach of Contract Claims

The defendants argue that the six remaining plaintiff groups have no rights in the property because they did not hold legal title and the contracts for deed provided for forfeiture if the plaintiffs defaulted in their payments.  A contract for deed is an executory contract to purchase real property.  *Brown v. De La Cruz*, 156 S.W.3d 560 (Tex. 2004).

34

Under Texas law, a purchaser's rights under a contract for deed are conditioned on fulfilling the contractual obligation to pay. *Johnson v. Wood*, 157 S.W.2d 146 (Tex. Comm'n App. 1941, opinion adopted); *see* TEX. PROP. CODE § 5.061. Under a contract for deed, the buyer agrees to purchase real property over a period through installment payments. The seller agrees to deliver title to the property once the purchase price is paid in full. The purchase price is typically paid over a number of years. The buyer is entitled to immediate possession of the property, but the seller retains legal title. *Gibson v. Bostick Roofing & Sheet Metal Co.*, 148 S.W.3d 482, 491 (Tex. App.—El Paso 2004, no pet.); *Graves v. Diehl*, 958 S.W.2d 468, 470 (Tex. App.—Houston [14th Dist.] 1997, no pet.). If the contract is paid in full, the seller delivers a warranty deed to the property, and the purchaser then receives legal title. Until the purchase price is paid in full, the buyer's legal interest is limited to the equitable right to perform under the contract by making the installment payments. *Club Corp. of Am. v. Concerned Prop. Owners for April Sound*, 881 S.W.2d 620, 626 (Tex. App.—Beaumont 1994, writ denied); *In re Waldrom*, 65 B.R. 169, 173 (Bankr. N.D. Tex. 1986).

The defendants are correct that the plaintiffs are not entitled to demand conveyance of legal title until they have performed the payment obligations. Under the contracts for deed, the defendants retained legal title to the properties. The defendants assert that provisions in contracts of deed authorizing the termination of the contracts and retention of payments made are enforceable. *See* TEX. PROP. CODE § 5.064; *see also Grant v. Sherwood Shores, Inc.*, 477 S.W.2d 667, 672 (Tex. Civ. App.—Austin 1972, no

35

writ); *Dixon v. Brooks*, 604 S.W.2d 330, 334 (Tex. Civ. App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.).   This contention assumes, however, that the defendants have fulfilled their obligations by delivering houses that comply with the contracts for deed. Based on the summary judgment record, this court cannot conclude that, as a matter of law, the plaintiffs have forfeited all rights under the contracts for deed.

Moreover, the summary judgment record shows that at least one of the plaintiff groups has fully performed under the contract for deed.   The record shows that in September 2001, the Bishops obtained a mortgage from McAfee Mortgage Company, paying off the contract for deed with the defendants for $43,923.22.   (Docket Entry No. 335, Ex. 6 at 56:9–22).   Ms. Bishop testified that they were current on their payments under the contract for deed up to the time they it paid off.   (*Id.* at 56:23–57:2).   The defendants' records also show that the Bishops do not owe anything under the contract for deed and that the contract has been fully paid.   (*Id.*, Ex. 17).   The Bishops have no obligation to pay the defendants.   Legal and equitable title to the property passed to the Bishops, who then passed equitable title to McAfee under the mortgage.

The right of a seller to terminate a contract for deed if the buyer fails to make the required installment payments, retain the purchase money, and obtain possession, applies "in the absence of any showing that [the seller] was in default under the contracts." *Sherwood Shores, Inc.*, 477 S.W.2d at 672.   A contract for deed is subject to the usual rules applicable to contracts, making reciprocal promises in a contract mutually dependent such that a breach of one will excuse performance of the other.   *See Morgan v.*

*Singley*, 560 S.W.2d 746, 749 (Tex. Civ. App.—Texarkana 1977, no writ) ("It is of course the general rule that the unjustified refusal or failure to pay the agreed installments would constitute a breach of contract.   [But] reciprocal promises in a contract are presumed . . . to be mutually dependent rather than independent . . . .").   "In Texas, the general rule is that reciprocal promises in a contract, absent intentions to the contrary, are presumed to be mutually dependent and the breach of one will excuse the performance of the other."   *D.E.W., Inc. v. Depco Forms, Inc*., 827 S.W.2d 379, 382 (Tex. App.—San Antonio 1992, no writ); *see also Dobbins v. Redden*, 785 S.W.2d 377, 378 (Tex. 1990) ("It is a well established rule that 'a party to a contract who is himself in default cannot maintain a suit for its breach.'" (quoting *Gulf Pipe Line Co. v. Nearen*, 138 S.W.2d 1065, 1068 (Tex. 1940))); *Graco Robotics, Inc*., 914 S.W.2d 633, 641 (Tex. App.—Texarkana 1995, writ dism'd) (noting that a party who fails to perform its obligation may not enforce the remaining terms of the contract).

A contract is breached when a party fails or refuses to perform an act that it expressly promised to do.   *Methodist Hosps. v. Corporate Communicators, Inc*., 806 S.W.2d 879, 882 (Tex. App.—Dallas 1991, writ denied).   Whether a party has breached a contract is a question of law for the court.   *See Willis v. Donnelly*, 118 S.W.3d 10, 25–26 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *Chappell Hill Bank v. Lane Bank Equip. Co.*, 38 S.W.3d 237, 245 (Tex. App.—Texarkana 2001, pet. denied).   Whether a party's breach of contract is material so as to excuse the other party's obligation to perform is a question of fact.   *Hudson v. Wakefield*, 645 S.W.2d 427, 430 (Tex. 1983).   Texas courts

follow the *Restatement (Second) of Contracts* in determining whether a party has materially breached a contract, so as to discharge the other party's obligation to perform his contractual duties. *See Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam).[8] A breach is material if the injured party does not receive the substantial benefit of the bargain. *See Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994); *Lazy M Ranch Ltd. v. TXI Operations*, 978 S.W.2d 678 (Tex. App.—Austin 1998, pet. denied).

If the defendants materially breached the contracts by delivering houses that did not comply with the contracts for deed, the plaintiffs may be entitled to damages. On the present record, the defendants are not entitled to a finding that as a matter of law, the

---

[8] The *Restatement* identifies five circumstances significant to determining whether a party's failure to perform is material:

> (a)   the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b)   the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c)   the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d)   the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances; and
>
> (e)   the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

RESTATEMENT (SECOND) OF CONTRACTS § 241.

plaintiffs can recover no damages under the contracts for deed. The defendants may be entitled, however, to recover the fair-market rental value of the properties for any periods the plaintiffs lived in the houses without any payment at all. *See G.E., Inc. v. Buford*, 105 S.W.3d 667 (Tex. App.—Austin 2003, pet. denied); *Winters v. Arm Refining Co.*, 830 S.W.2d 732 (Tex. App.—Corpus Christi 2003, pet. denied).

### A.    The Enforceability and Effect of the "As Is" Clauses

The plaintiffs' ability to recover for breach of their contracts with the defendants depends on the enforceability of the "as is" clauses in those contracts. For those plaintiffs who have failed to make the monthly payments under the contracts for deed, they may recover for breach of contract if there is a triable fact issue as to whether their nonpayment was excused by the defendants' material prior breach of the contracts. As to those plaintiffs whose payment obligations under the contracts for deed have been fulfilled, their breach of contract actions may nonetheless be barred if the "as is" clauses in their contracts are enforceable. If the clauses are enforceable, the plaintiffs who contracted to accept the property "as is" cannot, as a matter of law, assert a breach of contract claim arising out of the condition of the property.

In *Prudential Insurance Co. of America v. Jefferson Associates, Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995), the Texas Supreme Court approved the enforcement of an "as is" clause that is not the product of the seller's fraudulent representation or concealment. When an agreement to purchase "as is" is executed, a buyer agrees to make his own appraisal and accept the risk that he may be wrong. *Id.* The seller gives no assurances,

express or implied, about the value or condition of the thing sold.  The buyer chooses to rely on his own determination of the condition and value of the purchase.  *Id.*; *see also Cherry v. McCall*, 138 S.W.3d 35 (Tex. App.—San Antonio 2004, pet. denied).

There are exceptions, however, to the rule that an "as is" clause precludes a buyer's recovery.  In *Prudential*, the Texas Supreme Court set out a "totality of the circumstances" test to determine whether an "as is" clause is enforceable.  "Where the 'as is' clause is an important part of the basis of the bargain, not an incidental or 'boiler-plate' provision, and is entered into by parties of relatively equal bargaining position, a buyer's affirmation and agreement that he is not relying on representations by the seller should be given effect."  *Prudential*, 896 S.W.2d at 161 (citations omitted).  If the "as is" agreement is fraudulently induced by misrepresentation or concealment, it will not be binding.  Nor may a seller obstruct the buyer's right to inspect the property and still rely on the "as is" provision.  *Id.* at 162; *see also Bynum v. Prudential Residential Servs., LP*, 129 S.W.3d 781, 788–89 (Tex. App.—Houston [1st Dist.] 2004, no pet.); *Procter III v. RMC Capital Corp.*, 47 S.W.3d 828, 833 (Tex. App.—Beaumont 2001, no pet.); *Smith v. Levine*, 911 S.W.2d 427, 431–32 (Tex. App.—San Antonio 1995, writ denied).

As noted in this court's August 25, 2005 memorandum and order, the "as is" provisions in the contracts for deed in this case are similar to the clauses analyzed in *Prudential*.  The *Prudential* court analyzed the following provision:

> [The buyer] agreed to take the property "with any and all
> latent and patent defects" "under the express understanding
> that there are no express or implied warranties" . . . including
> specifically, "that there is no warranty by Seller that the
> Property is fit for a particular purpose." [The buyer]
> acknowledged that he was not "relying upon any
> representation, statement or other assertion with respect to the
> Property condition" and was instead relying upon his own
> "examination of the Property."   While it should not be
> necessary in every "as is" provision to go into this much
> detail, [the buyer's] contract leaves no doubt exactly what he
> agreed to.  [The] contractual disavowal of reliance upon any
> representation by [the seller] was an important element of
> their arm's-length transaction.

*Prudential*, 896 S.W.2d at 161.

In this case, the "as is" clauses in the earnest money contracts stated that there were no other verbal representations or warranties.[9]  The "as is" clauses in the contracts for deed stated that the purchaser was relying solely on his or her own inspection and that the buyer was not relying on any warranty or representation of any kind made by the seller.[10]  These clauses stated that the plaintiffs accepted the risk as to the present and future condition of the houses.  *See Oat Note, Inc. v. Ampro Equities, Inc.*, 141 S.W.3d 274, 279 (Tex.

---

[9]     The earnest money contracts stated: "PURCHASER has examined all information to his/her satisfaction and either examined the property personally or been given the opportunity to inspect the property and has found it to be suitable to his needs and purposes. . . . It is further understood and agreed that there is herein contained all the terms and conditions of the agreement, and that no verbal statement of any person or persons whomsoever not herein incorporated shall be binding upon either party or upon the SELLER, his agent or representatives, and that no warranties or representation of any kind have been made by either party other than as herein incorporated."  (Docket Entry No. 335, Ex. 21).

[10]     The "as is" clauses in the contracts for deed stated: "PURCHASER acknowledges that no warranty or representations of any kind have been made by any party or individual other than is herein incorporated, and such property is sold 'AS IS' . . . WITH ALL FAULTS.  In purchasing the property, PURCHASER relies only on PURCHASER'S examination and judgment, not on the representation of any other person as to value, future value, condition, size, age, use, or any other matter.  PURCHASER acknowledges that in selling the property SELLER makes no warranties other than title."  (Docket Entry No. 335, Ex. 10).

App.—Austin 2004, no pet.) (noting that the contract at issue specifically stated that home buyer "shall rely on its own inspection and investigation" of the property); *Gym-N-I Playgrounds, Inc. v. Snider*, 158 S.W.3d 78, 85 (Tex. App.—Austin 2005) ("[C]ontractual disavowal of reliance upon any representation is an important element of an arm's length transaction and is binding unless set aside."), *aff'd*, --- S.W.3d ---, No. 05-0197, 2007 WL 1164117 (Tex. Apr. 20, 2007); *cf. Pairett v. Gutierrez*, 969 S.W.2d 512 (Tex. App.—Austin 1998, pet. denied) (home buyer was not bound by an "as is" clause because the contract did not contain clear and unambiguous language demonstrating the buyer's agreement to rely solely on his own inspection).

Each plaintiff signed at least two contracts containing "as is" provisions that described the stage of completion the house would be delivered in. And although the plaintiffs were not represented by counsel, the contracts are not overly complex legal documents, but rather single-page documents that used relatively plain language. In the contracts for deed and the earnest money contracts, the "as is" provisions are conspicuous.[11]

---

[11]    In 2001, the Texas legislature amended the Texas Property Code provisions that apply to contracts for deed. Section 5.072(d) now sets out specific requirements that a waiver of reliance on prior or contemporaneous oral agreements between the parties must have. TEX. PROP. CODE § 5.072(d). That provision states that such a waiver must appear, either in the contract itself or in a separate document, in fourteen-point boldfaced or uppercase typewritten font. *Id.* This statute applies only to contracts for deed entered into on or after September 1, 2001. *Id.* (Historical and Statutory Notes). The contracts for deed in this case were entered into between 1998 and 2000; section 5.072 is inapplicable.

Moreover, the statutes covering contracts for deed that were executed before 2001 are inapplicable to the contracts at issue in this case. Under the 1995 amendments, the statute only applied to those executory contracts of sale involving land in certain economically depressed counties near the Texas-Mexico border. *See* Act of Sept. 1, 1995, 74th Leg., ch. 994, § 3, *amended by* Act of Sept. 1, 2001, 77th Leg., ch. 693, § 1; *see also Henderson v. Love*, 181 S.W.3d 810, 813 (Tex. App.—Texarkana 2005, no pet.).

### 1.    The Alloohs

Mr. Allooh has a college degree in mechanical engineering and technology, works for Continental Airlines, and previously worked for approximately seven months as a carpenter on residential homes and apartment buildings. (Docket Entry No. 335, Ex. 4 at 11:5–15:9). The Alloohs negotiated with the defendants for a five-bedroom "shell" home. (*Id.* at 31:18–21). Mr. Allooh testified that he did not read the earnest money contract before signing, but "just took [the defendants'] word for it." (*Id.* at 24:4–25:7). Mr. Allooh did not testify that he was prevented from reading the earnest money contract. Mr. Allooh did not recall signing the contract for deed, although he admits that his signature is on the document. (*Id.* at 25:18–27:24). Generally, parties to an arm's-length transaction have a duty to read what they sign; failure to do so constitutes negligence. *Salinas v. Beaudrie*, 960 S.W.2d 314, 320 (Tex. App.—Corpus Christi 1997, no pet.). Mr. Allooh's failure to read the contracts he signed is not evidence that the transaction was not at arm's length.

"In the context of a summary judgment, a document containing the buyer's disclaimer of reliance conclusively negates the element of reliance." *Savage v. Doyle*, 153 S.W.3d 231, 236 (Tex. App.—Beaumont 2004, no pet.) (citing *Procter v. RMC Capital Corp.*, 47 S.W.3d 828, 834 (Tex. App.—Beaumont 2001, no pet.)). To avoid summary judgment, the buyer "must present some summary judgment evidence that 'but for' the representations of the seller regarding the condition of the subject of the contract, the buyer would not have assented to the 'as is' clause in the sales' contract." *Id*. The

evidence on the representations regarding the condition of the property must raise a fact issue on: (1) the materiality of the representation; (2) falsity; (3) actual knowledge of the defendant; (4) intent to induce reliance; (5) reliance; and (6) injury.  *See, e.g.*, *Procter*, 47 S.W.3d at 834–35.  Texas courts have recognized that the plaintiff must have "actually and *justifiably* relied on the misrepresentation" to show fraudulent inducement.  *See DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858–59 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("[A] party who enters into a written contract while relying on a contrary oral agreement does so at its peril and is not rewarded with a claim for fraudulent inducement when the other party seeks to invoke its rights under the contract.").  The record does not show evidence of specific misrepresentations about the condition of the house or the terms of the agreements when the Alloohs moved in.

Mr. Allooh stated that when he signed the earnest money contract on April 28, 1998, there was no house on the property to inspect.  (*Id.* at 34:11–23). The Alloohs signed their contract for deed on July 28, 1998 and moved into the home the same day.  Although they had been to the homesite during construction, Mr. Allooh testified that the shell home was not completed until the day they moved in and they did not have an opportunity to inspect the completed house before signing the contract for deed. (*Id.* at 33:1–34:23). Courts have recognized that "as is" sales of improved real estate are generally valid only as applied to a building that could be inspected before the contract was signed, in the state in which the building would be delivered.  *See, e.g.*, *Diamond v. Mecham*, 699 S.W.2d

44

950, 952–53 (Tex. App.—El Paso 1985, writ ref'd n.r.e.) ("It was impossible for the purchasers to know in July, when the contract was signed, the condition which the house would be in in November when it was completed and the sale closed.  We would restrict any 'as is' limitation upon a warranty to goods or buildings which are in the condition in which they are to be delivered on the date of the signing of such a contract. Such a limitation is ineffective as to goods or a building to be completed after the date of the contract since they cannot be inspected for defects prior to the signing of the sales contract.").  Because the Alloohs' home was not completed when they signed the contract for deed, the summary judgment motion as to the Alloohs' breach of contract claim is denied.

### 2. *Joel Bergkvist, IV*

Joel Bergkvist has an engineering degree from Texas A&M University and is employed as a design and drafting manager at an engineering firm.  Bergkvist stated that he did not read the documents he signed.  (Docket Entry No. 335, Ex. 5 at 71:7–9).  Bergkvist had the opportunity to read through the contracts but did not.  That failure does not relieve him from the contractual obligations.  *Salinas*, 960 S.W.2d at 320.

Bergkvist argues that the "as is" clause was not freely negotiated but rather a boilerplate provision that he had no choice but to accept, and that he lacked the sophistication needed to comprehend what he was signing.  (Docket Entry No. 340, ¶ 26).  Bergkvist has an engineering degree and fifteen years of experience in the civil engineering industry.  The law does not require a person to be a lawyer or a sophisticated

negotiator for a contract to be binding.  *See, e.g.*, *Cherry v. McCall*, 138 S.W.3d 35 (Tex.

App.—San Antonio 2004, pet. denied); *Rader v. Danny Darby Real Estate, Inc.*, No.

05-97-01927-CV, 2001 WL 1029355, at *5 (Tex. App.—Dallas Sept. 10, 2001, no pet.)

(not designated for publication).  The present record does not raise a fact issue as to

whether Bergkvist's lack of legal knowledge makes the "as is" clause unenforceable.

Although Ms. Bergkvist's affidavit states that they were told the "as is" clause in

the earnest money contract would not apply to their property because no home had yet

been built on the property, there is no suggestion that a similar statement was made once

the home was built.[12]  The Bergkvists' own argument suggests that they knew that the "as

is" clause in the contract for deed, which they signed after the home was completed, would

apply.[13]  The statement about the nonapplicability of the "subject to flooding" provision in

the earnest money contract does not raise a fact issue as to the enforceability of the "as is"

clause.  Bergkvist has not raised a fact issue as to whether he justifiably relied on this

statement or that his reliance has proximately caused him damage.  *See DRC Parts &*

*Accessories*, 112 S.W.3d at 858–59.  Bergkvist stated that he had ample opportunity to

---

[12]    The defendants object to Ms. Bergkvist's affidavit testimony as hearsay or otherwise inadmissible.
(Docket Entry No. 341 at 4 n.3).  To the extent that the affidavit relates conversations with the defendants'
employees acting within the scope of their employment, these statements are nonhearsay admissions of a
party opponent.  *See* FED. R. EVID. 801(d)(2).  The objection is overruled.

[13]    Bergkvist also contends that the "as is" clause is unconscionable.  To the extent he is arguing
unconscionability based on the earnest money contract clause, on the ground that no home was built when
he signed that contract, his argument is unpersuasive.  The "as is" clause in the earnest money contract did
not apply because the home was not completed when the contract was signed.  *See Diamond v. Mecham*, 699
S.W.2d 950, 952–53 (Tex. App.—El Paso 1985, writ ref'd n.r.e.).  To the extent Bergkvist contends that the
"as is" clause in the contract for deed is unconscionable, Texas law makes that argument unpersuasive.  *See*
*Sw. Bell Tel. v. DeLanney*, 809 S.W.2d 493, 497–99 (Tex. 1991) (Gonzalez, J., concurring) (discussing
related doctrines of unconscionability under common law, DTPA, and UCC).

inspect the home after it was completed and before signing the contract for deed, and that he did, in fact, inspect the home.  (Docket Entry No. 335, Ex. 5 at 83:20–84:5, 85:7–13).  The summary judgment record does not raise a fact issue as to the enforceability of the "as is" clause in Bergkvist's contract for deed.

### 3.    The Bishops

Ms. Bishop has a business and accounting degree and works in the Texas A&M University System's accounting department.  Mr. Bishop works in the oil-field industry.  The Bishops signed an earnest money contract for the purchase of their home in the Peaceful Place subdivision in Grimes County on March 6, 1999.  They also signed two contracts for deed.  The first was signed on March 13, 1999, before the home was constructed; the second was signed on September 12, 1999, almost two weeks after the Bishops moved into their home.  (Docket Entry No. 335, Ex. 6 at 37:18–22, 49:10–50:6).  Ms. Bishop stated that they had been given "ongoing" opportunities to inspect the home before signing the second contract for deed.  They lived in the home for nearly two weeks before signing the second contract for deed.  (*Id.* at 52:5–8).

Before the Bishops signed the second contract for deed, the price of the home had increased $3,450.00 from the price they agreed to in the first contract for deed.  Ms. Bishop stated, "We had quite a discussion on the price.  We didn't understand why it kept going up."  (*Id.* at 51:9–10).  According to Ms. Bishop, the defendants told her to "either sign [the second contract for deed] or walk away from the home."  (*Id.* at 50:20–21).  Because the Bishops had already spent a large amount to install flooring and other

improvements in the home, they felt that they had to sign the second contract for deed. "[W]e didn't have a choice but to sign this so we could move into—be in our home and not lose what we had into it already."  (*Id.* at 51:3–6).  The evidence raises a fact issue as to whether, when the Bishops signed the second contract for deed, they were in an unequal bargaining position.

Ms. Bishop also testified that when they signed the second contract for deed, the defendants told them that the "as is" clause did not apply to their home purchase because they were buying a new home.  "We were told that [the "as is" clause] pertained to existing homes. . . . [W]e said, 'Well, we don't have a home already; so how can we accept it as it is?'  And [the defendants' employee] said, 'No, you're getting a new home.' . . . What we understood was—and what we were told by Mr. Hall [was] that the little things that were still wrong or incorrect would be corrected."  (*Id.* at 52:14–54:14). This specific evidence of a misrepresentation as to the "as is" clause also creates a fact issue as to whether the "as is" clause in the Bishops' second contract for deed is enforceable.  The defendants' summary judgment motion as to the Bishops' breach of contract claim is denied.

### 4.    *The Dotys*

Regina Doty is a homemaker with a high-school education and a nurses' assistant certification.  John Doty is a helicopter pilot for a private company.  Neither has worked in the residential construction industry.  The Dotys contracted for a 90% completed home in the 59 Estates subdivision.  They signed the earnest money contract on September 12,

1998.  Ms. Doty testified that the defendants told them their home would be ready for move-in by October 1, 1998.  According to Ms. Doty, her husband inspected the home that day, but the construction was not completed.  (Docket Entry No. 335, Ex. 7 at 65:20–25). The construction was finished during the first week of October 1998 and the Dotys moved in on October 8, 1998.

The record is not clear as to when the Dotys actually signed the contract for deed. The contract is not dated.  (*Id.*, Ex. 14).  The Dotys' affidavits state that the contract for deed was signed either on September 12 or 18, 1998.  (Docket Entry No. 338, Exs. A & B).  The Dotys cannot be bound by the "as is" clause in their contract for deed if the home was not complete when they signed the contract.  *See Diamond*, 699 S.W.2d at 952–53. The record evidence raises a disputed fact issue material to determining whether construction on the Dotys' home was completed as contracted and they had an opportunity to inspect it before signing the contract for deed.  The defendants' summary judgment motion as to the Dotys' breach of contract claim is denied.

The Dotys have also moved for summary judgment on their breach of contract claim, arguing that the undersized septic system and the foundation problems are *per se* breaches.  (Docket Entry No. 336 at 11).  The Dotys rely on materials from the Texas Natural Resource Conservation Commission that provide guidelines for measuring septic tank capacity.  (*Id.*, Ex. F).  The record shows that the defendants provided the Dotys with two 500-gallon capacity septic tanks.  The Dotys argue that those tanks are undersized for the five-bedroom home built on their property.  The Dotys argue that the guidelines

specify a septic tank with 1,000 gallons of capacity for a three-bedroom home and a septic tank with 1,250 gallons of capacity for a five-bedroom home.

The materials the Dotys rely on consist of one table entitled "Septic Tank Minimum Liquid Capacity" and two tables used to calculate wastewater-usage rate based on the number of bedrooms and the size of the dwelling. (*Id.*). The Dotys contend that the tables use only the number of bedrooms in a home to determine wastewater usage and septic tank capacity. The "Wastewater Usage Rate" table, however, also uses square footage to determine the usage rate and tank capacity requirement. The entry for a three-bedroom home is also listed as one with "less than 2,500 square feet." The entry for a five-bedroom home is also listed as one with "less than 4,500 square feet." (*Id.*). While the Dotys' home has five bedrooms, the record shows that it has only 1,400 square feet. (Docket Entry No. 335, Ex. 25). There are no guidelines for a five-bedroom house that is less than 2,500 square feet. The relationship between the number of bedrooms and the square footage to the septic tank capacity and wastewater usage is unclear. Although Liberty County issued a septic tank permit for the home, the permit application prepared by the defendants misstated the number of bedrooms as three rather than five.

On March 25, 2002, Liberty County "red-tagged" the Dotys' home. The stated reason for this action was the overflowing and malfunctioning sewage and septic system. The reason for the malfunction is not established in the record. On the present record, there are disputed fact issues material to determining whether the defendants breached the Dotys' contract for deed.

50

The Dotys also seek summary judgment on their breach of contract claim based on the problems with the foundation.  They point to the February 22, 2001 inspector's report in support of their motion.  That report stated:

> There were numerous piers which appeared to be unstable under the structure.  There were beams which appeared to be inadequately supported and were sagging.  The stump in the front has decayed causing significant settlement at the abutting pier.  The right rear corner pier was also in need of repair. Numerous sheetrock cracks were observed in the interior wall corners of the structure.   The left rear corner beam had separated above the pier and may fail at any time.  The left rear bedroom closet door was out of square.  It is recommended that a foundation leveling company further evaluate the structure and estimate cost of repairs.

(Docket Entry No. 335, Ex. G).  The Dotys contend that the faulty foundation breached the parties' contract.

"In determining the materiality of a breach, courts will consider, among other things, the extent to which the nonbreaching party will be deprived of the benefit that it could have reasonably anticipated from full performance."  *See Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994) (citing RESTATEMENT (SECOND) OF CONTRACTS § 241(a)).  The record shows that the Dotys lived in the home for nearly four years and moved out because of "unsafe living conditions."  (Docket Entry No. 336, Ex. D).  The Dotys have presented evidence that their home's foundation was so poorly constructed that severe structural damage to the home resulted.  The Dotys' summary judgment motion on their breach of contract claim based on the foundation problems is granted.

> 5.    *The LaVoies*

51

Mr. LaVoie testified that when he signed the contract for deed in July 1998, he had been living in the home since the end of May and had fully inspected it. (Docket Entry No. 335, Ex. 8 at 86:18–23). He had noticed a number of problems with the home during his May 1998 inspection but was assured by the defendants that they would fix those problems. The LaVoies did not identify other problems that the defendants knew about and should have disclosed. *See Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001). The defendants move for summary judgment as to the LaVoies' breach of contract claim.

The earnest money contract and the contract for deed stated that the defendants would provide electrical wiring, plumbing, insulation, one completed bathroom, a kitchen-cabinet-and-sink package, the septic system, replacement windows, and sheetrock the ceiling. (*Id.*, Ex. 15). The defendants did not supply the home with access to a water supply until three months after the LaVoies moved in and it took approximately a year, according to Mr. LaVoie, for the sewage system to be installed. These problems were evident, however, before the LaVoies signed the contract for deed. Mr. LaVoie testified that the defendants did not make the repairs that they verbally promised. (Docket Entry No. 335, Ex. 8 at 69:16). According to Mr. LaVoie, the defendants did not level the roof, replace the ceiling, or fix the floor, as they had verbally promised. (*Id.* at 66:6–11).

Although Mr. LaVoie states that he did not read the contract for deed because he was told that it was "just a standard contract," (*id.* at 80:1–2), he is nonetheless bound by its terms. *See Salinas v. Beaudrie*, 960 S.W.2d 314, 320 (Tex. App.—Corpus Christi 1997, no pet.). The earnest money contract and the contract for deed clearly state, "It is

further understood and agreed that there is herein contained all the terms and conditions of this agreement, and that no verbal statement of any person or persons whomsoever, not herein incorporated, shall be binding upon either party or upon the SELLER, his agent or representatives, and that no warranties or representation of any kind have been made by either party other than as herein incorporated." (Docket Entry No. 335, Exs. 26, 15).

In *Oakwood Mobile Homes, Inc. v. Cabler*, 73 S.W.3d 363 (Tex. App.—El Paso 2002, pet. denied), the court held that a clause disclaiming a seller's liability for any oral representations did not bind a husband and wife who purchased a home, when neither had any education above high school (the husband had only a tenth-grade education) and had never purchased a home before. In that case, the buyers visited the seller's lot to shop for a manufactured home, picked out a particular model, and were told that their home would be exactly like the model. After watching a video explaining the warranties and obligations of the sales, the buyers signed a "huge stack" of papers that were summarized by the sales agent. The contract contained a provision stating that any oral statements or promises about the house would be unenforceable. Before the new home was delivered, the seller called the buyers to inform them that a different, but similar, home was available for immediate delivery. When the buyers inspected the home, it was in two halves and had several defects. The seller assured the buyers that the problems would be fixed and told them to prepare a list of all the repairs needed. The buyers agreed to buy the substitute home and submitted a list of necessary repairs. Oakwood made a few repairs and told the buyers that the remaining work was not covered by the warranty agreement.

53

The buyers sued Oakwood for DTPA violations, common-law fraud, and breach of contract. The trial court found that the evidence supported the DTPA and fraud claims and breach of an oral agreement to make the repairs. The appellate court affirmed. After applying the "totality of the circumstances" test from *Prudential*, the court found that the clause did not preclude recovery because the evidence supported the trial court's conclusion that Oakwood had committed fraud in the inducement and that in agreeing to accept the substitute home, the buyers had relied on the oral promise to make the repairs.

The circumstances in *Oakwood* are significantly different from the LaVoies' purchase. The contract at issue in *Oakwood* did not contain an "as is" provision, unlike the earnest money contract and contract for deed in this case. The buyers in *Oakwood* were required to read and sign a "stack" of documents. In the present case, by contrast, Mr. LaVoie signed a single-page earnest money contract and later signed a single-page contract for deed. Both contracts used relatively clear language. The buyers in *Oakwood* signed the contract before inspecting the substitute house and before the seller orally promised to repair the house. In the present case, by contrast, Mr. LaVoie fully inspected the home before signing the contract for deed and testified that the problems with the home were obvious. Given Mr. LaVoie's experience working in the residential construction industry in general, and in working with Hall in particular, it is not unreasonable to enforce the terms of the "as is" clause in the contract for deed. Mr. LaVoie knew how to negotiate with the defendants to include specific repair obligations in

the contract he signed.  Several repair requests were included in the parties' earnest money contract and contract for deed.

The LaVoies' contract for deed called for the defendants to provide a home with a septic system.  LaVoie asserts that the defendants did not install a septic system until one year after the family moved in.  The LaVoies consequently used five-gallon pails as toilets and borrowed water from neighbors for washing and bathing during that time.  Although LaVoie states that he knew the home did not have a septic system when he signed the contract for deed, he reasonably believed that the system would be installed promptly, based on the language in the contract requiring the defendants to provide one.  An "as is" clause cannot release a party's future obligations under the contract.  As the Texas Supreme Court stated in *Prudential*, "A seller cannot have it both ways: he cannot assure the buyer of the condition of a thing to obtain the buyer's agreement to purchase 'as is' and then disavow the assurance which procured the 'as is' agreement." *Prudential*, 896 S.W.2d at 162.

The contract for deed stated that the defendants would provide the septic system. (Docket Entry No. 335, Ex. 15).  The "as is" clause cannot negate the defendants' explicit obligation under the contract.  *See United Prot. Svcs., Inc. v. W. Village Ltd. P'ship*, 180 S.W.3d 430, 432 (Tex. App.—Dallas 2005, no pet.); *Royal Maccabees Life Ins. Co. v. James*, 146 S.W.3d 340, 345–46 (Tex. App.—Dallas 2004, no pet.).  Although the "as is" clause in the contract for deed releases the defendants from liability for alleged oral or

other promises as to the condition of the constructed home, the clause does not release the defendants from the explicit contractual obligation to install a septic system.

The defendants' summary judgment motion is denied as to the LaVoies' breach of contract claim based on the alleged failure to install a septic system for a year after the LaVoies moved into the home.  The summary judgment motion is granted as to the other breach of contract claims.

6.    *The Mosleys*

When the Mosleys signed the earnest money contract and contract for deed for the purchase of their home in the 59 Estates subdivision, they were operating their own residential remodeling business and working for Darrell Hall.  (Docket Entry No. 335, Ex. 9 at 11:18–13:4).  Ms. Mosley testified that she and her husband inspected the home before signing the earnest money contract.  She read and understood the terms of the earnest money contract.  The Mosleys had moved into the home before signing the contract for deed on June 2, 2000.  (*Id.* at 80:4–16).  After signing the earnest money contract, the defendants agreed to allow the Mosleys to satisfy a portion of the down payment in labor rather than in cash.  The Mosleys state that the defendants promised to provide the materials to finish their home's construction but did not do so.  The Mosleys were contractors who inspected their home before signing the contracts and who negotiated with the defendants for an alternative means of satisfying their payment obligations under the contract.  This record does not raise a fact issue as to whether the "as

56

is" clauses in the Mosleys' contracts are enforceable.  The defendants' summary judgment motion is granted as to the Mosleys' breach of contract claim.

> 7.     *Summary*

The record shows that Bergkvist, the LaVoies, and the Mosleys agreed to buy the houses in the condition in which they were delivered, after being afforded and taking an opportunity to inspect.   These plaintiffs are bound by the "as is" provisions in the contracts.  The defendants are entitled to summary  judgment dismissing the breach of contract claims asserted by these plaintiffs, with the exception of the LaVoies' breach of contract claim based on the failure to install timely the septic system.  The defendants' summary judgment motions as to the breach of contract claims brought by the Alloohs, the Bishops, and the Dotys are denied.  The defendants' summary judgment motion is also denied as to the LaVoies' breach of contract claim based on the failure to install the septic system.  The Dotys' summary judgment motion is denied as to their breach of contract claim based on the inadequate septic system, and granted as to the breach of contract claim based on the faulty foundation.

## IV.    The Negligence and Breach of the Implied Warranty of Workmanlike Construction Claims

Under *Prudential* and *Centex*, the defendants are also entitled to summary judgment dismissing the breach of implied warranty of workmanship and negligence claims brought by Bergkvist, the LaVoies and the Mosleys.[14]  *See Prudential*, 129 S.W.3d at 789; *Centex*

---

[14]    Although this court denied the defendants' summary judgment motion as to the LaVoies' breach of contract claim based on the failure to install a septic system, the "as is" clause in their contract for deed is

*Homes v. Buecher*, 95 S.W.3d 266 (Tex. 2002); *Bynum v. Prudential*, 129 S.W.3d 781, 788–89 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (accepting property "as is" defeats claims for negligence and breach of the implied warranty of workmanlike construction); *see also Gym-N-I Playgrounds, Inc. v. Snider*, --- S.W.3d ---, 2007 WL 1164117, at *6–7 (Tex. Apr. 20, 2007) (citing *Prudential* and holding that an enforceable "as is" clause in the parties' commercial lease agreement negated the causation element in the plaintiff's negligence, gross negligence, DTPA, and fraud claims).  The defendants' only ground for seeking dismissal of the plaintiffs' negligence and breach of implied warranty of workmanlike construction claims is that the "as is" clauses waived those claims.  Because this court found that a fact issue exists as to the enforceability of the "as is" clauses as to the Alloohs, the Bishops, and the Dotys, there is no basis for dismissing the negligence and workmanlike construction claims brought by those plaintiffs.  The motion to dismiss those claims is denied.[15]

The implied warranty of habitability raises distinct issues that are addressed below.

## V.    The Implied Warranty of Habitability

---

nevertheless enforceable as to the other breach of contract claims.  Accordingly, the "as is" clause also negates the LaVoies' reliance under their negligence and breach of the implied warranty of workmanship claims.  *See Bynum*, 129 S.W.3d at 788–89.

[15]    After the Texas Supreme Court's decision in *Centex*, the Texas Legislature created the Texas Residential Construction Commission, which created exclusive statutory warranties of workmanship and habitability for new residential construction.  TEX. PROP. CODE § 408.001(2).  The Commission's new statutory warranties supercede previous implied warranties of workmanship and habitability.  *Id.* § 430.006.  The new warranties prohibit parties from contractually waiving or modifying the statutory warranties.  10 TEX. ADMIN. CODE § 304.3(i).  The new statutory warranties do not apply to in this case, however.  The new warranties only apply to new residential construction or improvements made on or after June 1, 2005.  *Id.* § 304.3(h)(1).

A.      **The Applicable Legal Standards**

In *Centex Homes* the Texas Supreme Court stated that the warranty of habitability is "an essential part of the new home sale." *Centex Homes*, 95 S.W.3d at 272. The court held:

> [T]he warranty of habitability may not be disclaimed generally. This latter implied warranty, however, only extends to defects that render the property so defective that it is unsuitable for its intended use as a home. Further, the implied warranty of habitability extends only to latent defects. It does not include defects, even substantial ones, that are known by or expressly disclosed to the buyer.

*Id.* at 274. The court explained that a disclaimer must be clear and unambiguous. Only "when a purchaser buys a problem house with express and full knowledge of the defects that affect its habitability, should a waiver of this warranty be recognized." *Id.*[16] The "as is" clauses in the earnest money contracts and contracts for deed do not meet this standard.

The implied warranty of habitability focuses on the completed construction of the home and is limited in scope. The implied warranty of habitability requires a builder "to provide a house that is safe, sanitary, and otherwise fit for human habitation." *Id.* at 272 (citations omitted). Substandard construction is generally not actionable. *Id.* The Texas Supreme Court noted that other state courts had observed that the implied warranty of

---

[16]     Whether parties may effectively disclaim or waive the implied warranty of habitability was undetermined until recently. In *Prudential*, the Texas Supreme Court held that an "as is" clause between a buyer and seller indicates that the buyer is not relying on any express or implied warranties. *Prudential*, 896 S.W.2d at 163–64. After *Centex*, at least one court indicated that the court's holding in *Prudential* applies and an "as is" clause may effectively disclaim the implied warranty of habitability. *See Bynum*, 129 S.W.3d at 794 n.6. The Texas Residential Construction Commission's provisions for the exclusive warranties for new residential construction mooted this issue. *See* TEX. PROP. CODE § 430.006. The statute prohibits parties from waiving the habitability warranty. *See* 10 TEX. ADMIN. CODE § 304.3(i).

habitability "is unfortunately named because it does not mean that the house is literally uninhabitable." "In contrast, we have defined a breach of this implied warranty in Texas to be a defect 'of a nature which will render the premises unsafe, or unsanitary, or otherwise unfit for living therein.'" *Id.* (citations omitted). In distinguishing the warranty of workmanlike construction, the court described the warranty of habitability as a protection against defects that create a significant safety risk for residents. Although *Centex* sets a high standard for a breach of the warranty of habitability, a plaintiff does not need to move out of a house to recover.

### B. Analysis

The plaintiffs primarily rely on four categories of defects to support their breach of the implied warranty of habitability claims: poor construction of the houses; defective septic systems; defective roadways; and defective water systems.

#### 1. The Alloohs

The Alloohs allege that the siding was not properly attached to the house, that the floors were "jumpy," that the ceiling rafters were not centered properly, and that nails in the roof had not been fully hammered into the shingles. (Docket Entry No. 335, Ex. 4 at 35:3–36:12). These defects were all fixed by the defendants or by Mr. Allooh. (*Id.* at 38:20–39:15). The Alloohs also allege that the home was built on an inadequate foundation. (*Id.* at 54:11–57:9). Mr. Allooh testified that the defendants used shingles to level the home and failed to remove large tree stumps underneath the home. There is no

60

evidence that these alleged defects made the home unfit or unsafe for residential use.  The Alloohs obtained or made repairs and lived in the home for three years.

The Alloohs also allege that the water supply was contaminated.  In 2001, the Texas Commission on Environmental Quality put the homes in the 59 Estates and Trails End subdivisions into receivership and corrective measures were imposed.  In the August 25, 2005 memorandum and order, this court held that the plaintiffs living in homes under receivership could only maintain claims for breach of the implied warranty of habitability based on the defective water supply from the time they purchased their homes until the water systems were put in receivership and the problems addressed.

The Alloohs lived in their home from July 1998 until December 2001.  They made regular payments on the contract for deed until late 2000 and lived in the home without making payments for another year.  While the damages the Alloohs could receive on their breach of warranty claim might be diminished or completely offset by the damages the defendants might recover on their counterclaim, that is not a basis for dismissing the Alloohs' claim for breach of the implied warranty of habitability based on the defective water system.  The defendants' summary judgment motion on the breach of implied warranty of habitability claim is denied.

### 2.    *Joel Bergkvist, IV*

Bergkvist lived in his home for approximately five years before foreclosure. Bergkvist alleges that his home was built on an improper foundation, has leaky plumbing that caused the floor in the kitchen and in a bathroom to rot and cave in, has poor wiring,

and has inadequate air conditioning.  (Docket Entry No. 335, Ex. 5 at 114–20). Bergkvist testified that his floor rotted due to a plumbing leak and that professional foundation experts discovered the structural problems approximately one year after he moved in.  On July 12, 2001, a foundation repair company quoted Bergkvist a price of $8,450.00 to fix the foundation problems resulting from improperly installed beams, blocks, and bases. (Docket Entry No. 340, Ex. 1).  In 2005, an inspector reported that the home had severe foundation problems; that the electrical wiring was poorly installed; and that there were major plumbing leaks causing severe rot in the floors.  (*Id.*).  This record raises a fact issue as to whether these problems resulted in a home that was unsafe and therefore in breach of the implied warranty of habitability.  *See Holifield v. Coronado Bldg., Inc.*, 594 S.W.2d 214, 216 (Tex. Civ. App.—Houston [14th Dist.] 1980, no writ) (holding that in light of a new home's severe leaks, the builder-vendor breached the implied warranties of habitability and workmanlike construction); *cf. Todd v. Perry Homes*, 156 S.W.3d 919, 921 (Tex. App.—Dallas 2005, no pet.) (affirming summary dismissal of the plaintiff's implied warranty of habitability claim because the plaintiff alleged only a potential risk of mold, rot, or termites due to the drainage problems).  The defendants' summary judgment motion as to Bergkvist's implied warranty of habitability claim based on improper construction is denied.

Bergkvist also alleged that the defendants improperly graded his property, causing water runoff to drain into his septic system, which made it stop working on occasion. Improper grading and related drainage problems are not latent defects for which recovery

under a habitability theory is available.  *See Centex Homes*, 95 S.W.3d at 274.  Moreover, Bergkvist does not present evidence to raise a fact issue as to whether the occasional malfunction of his septic system caused his house to be unsafe or unfit for residential use. The record does not indicate the nature, duration, or frequency of the septic system malfunctions.  Bergkvist cannot maintain a claim for breach of the warranty of habitability based on improper grading.

Although Bergkvist obtained third-party financing on the property shortly after he moved into the home, the record shows that he owes the defendants over $13,000.00 under a lien secured by that property.  He also failed to make payments on the contract for deed covering the second lot after 2001 and owes nearly $19,000.00.  (Docket Entry No. 335, Ex. 17).  During the five years he lived there, the value of Bergkvist's home declined by over half, according to San Jacinto County appraisal records.  Bergkvist seeks damages for the depreciated value of his home.  This court cannot conclude as a matter of law that the defendants' counterclaim precludes Bergkvist's breach of implied warranty of habitability claim based on improper construction.  The defendants' summary judgment motion as to this claim is denied.

### 3.    The Bishops

The Bishops' main complaints center around the defendants' failure to install baseboards, window sills, a truck pad, or covers for plumbing fixtures in their home. (Docket Entry No. 335, Ex. 6 at 60:8–63:21).  They also allege foundation and septic system problems.  They did not allege or identify summary judgment evidence that these

problems made the home unfit for use as a residence.  (*Id.* at 72:7–10).  Many of these problems were obvious and would not give rise to a claim for breach of the implied warranty of habitability.  The Bishops state that they were aware of these problems by the time they moved in.  (*Id.* at 65:5–12).

The Bishops also complained that their water supply had a foul odor and that they did not drink it.  (*Id.* at 62:6–13).  Ms. Bishop stated, "We have to buy drinking water. We've had the well tested.  It doesn't have any bacteria but it's so heavy with sulfur, it stinks like rotten eggs so you just can't drink it."  (*Id.*).  The Peaceful Place subdivision's water system was not put into receivership by the State of Texas.  Ms. Bishop testified that tests showed the water did not have any bacteria.  The summary judgment record does not raise a fact issue as to whether the Bishops' water supply made the home unfit for use as a residence.  The defendants' motion for summary judgment as to the Bishops' claim for breach of the implied warranty of habitability is granted.

### 4.    *The Dotys*

The Dotys alleged that their home was built on a faulty foundation, that the defendants failed to clear construction debris, that the electrical system was substandard, that the home had plumbing leaks, and that plumbing lines were improperly installed. They also alleged that the defendants did not install flooring in the bathroom, ventilation ducts in the attic, or new cabinetry in the kitchen.  The presence of construction debris and the failure to install flooring, ventilation ducts, and cabinetry are not latent defects.  The electrical problems concerned missing electrical outlets and breakers with undersized

wires; there is no evidence that these problems created a home that was uninhabitable.  An inspector stated that a foundation beam near the rear of the house "may fail at any time." (Docket Entry No. 336, Ex. G).  The inspector also stated that the air conditioner's drain line was improperly routed to a sewer vent, which could cause sewer gases to enter the home.  There is no evidence in the record that either of these potential conditions in fact occurred as a result of the construction defects.  A potential risk of foundation failure or that sewer gases might leak does not give rise to a claim for breach of the implied habitability warranty.  *See Todd*, 156 S.W.3d at 921.[17]

The Dotys also allege that the defendants installed an undersized septic system to service their home.  The Dotys allege that they experienced problems with the septic system within one month of moving in.  (Docket Entry No. 335, Ex. 7 at 49:10–14).  They allege that as a result of the septic system problems, sewage backed up into the house, sewer gas entered the house, pipes clogged, and sewage spilled into the ground around the house.  (Docket Entry No. 338, Ex. A).  In March 2002, Liberty County officials deemed the Dotys' home uninhabitable due to the problems with the septic system.  (Docket Entry No. 336, Ex. B).

The defendants argue that because Liberty County oversaw the installation of the septic system by requiring a county-issued permit to install it, the Dotys cannot maintain their claim for breach of the implied warranty of habitability.  As noted above, the State of

---

[17]    The Dotys move for summary judgment on their breach of warranty claim based on the faulty electrical wiring and the unstable foundation.  (Docket Entry No. 336 at 10).  Because the evidence does not raise a fact issue as to whether the electrical or foundation problems resulted in a home that was unfit for use as a residence, the Dotys' summary judgment motion fails, as a matter of law.

Texas uses a combination of the number of bedrooms in a home and the home's square footage to approximate how many gallons of wastewater a residence might consume, which in turn determines the septic system capacity needed for that home.   The defendants' application to obtain a septic system permit for the Dotys' home stated that it had three bedrooms, rather than five.   (Docket Entry No. 336, Ex. E).   The defendants applied for the permit in February 1998, eight months before the home was built.   A fact issue exists as to whether the information on the permit application was knowingly misstated when it was submitted and whether the defendants had a duty to correct it before the permit issued.   Because the Dotys experienced problems with their septic system within one month of moving into their home, because the red-tag notice specified that the home's septic system caused the home to be uninhabitable, and because the effect of county oversight is unclear, the summary judgment record raises fact issues material to the Dotys' claim that the septic system problems resulted in a breach of the implied warranty of habitability.   As a result, the defendants' summary judgment motion as to that claim is denied.[18]

---

[18]      Both sides have moved for summary judgment on the Dotys' claim that the septic system breached the implied warranty of habitability.  Because this court has found a fact issue as to whether a breach of that warranty occurred, the summary judgment motions are denied.  The Dotys also move for summary judgment on the claim that the defendants fraudulently obtained the septic system permit by not disclosing that the Dotys' home had five bedrooms.  The claims based in fraud and fraudulent misrepresentation were dismissed on March 10, 2004, based on the record then before the court.  (Docket Entry No. 73).  Notwithstanding the earlier dismissal, the Dotys have not shown that there are no fact issues material to determining whether the septic system permit was obtained through fraudulent means.  The defendants applied for the permit eight months before the home was completed; it is unclear whether the plans for the home were in place at the time the permit was obtained.  The Dotys' summary judgment motion on the fraud claim is denied.

The Dotys also claim that the defendants failed to maintain the roads in the 59 Estates subdivision. (Docket Entry No. 335, Ex. 7 at 60:10–24). As analyzed in the August 25, 2005 memorandum and order, the evidence in the record showed that the conditions in the roadways were not latent defects and did not make the homes unfit for human habitation. *See Todd*, 156 S.W.3d at 920 (holding that buyers had presented no evidence of a latent defect when the cause of the drainage problems was a visible condition known to the buyers). In *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 438–40 (Tex. 1995), the Texas Supreme Court refused to allow home buyers to recover for post-sale development services under an implied warranty theory. The plaintiffs had purchased a home in a developed community and claimed that as the result of the defendants' drainage work performed several years later, their home flooded. The lower court found that offering homes in a planned community "implies a provision of continued competent development including flood control, drainage management, and maintenance services." The Texas Supreme Court reversed, holding that there was no reasonable basis to conclude that the defendant agreed to perform future development services for the plaintiffs' benefit. *Parkway Co.*, 901 S.W.2d at 440. The defendants' motion for summary judgment as to the Dotys' claim that the failure to maintain adequate roadways breached the implied warranty of habitability is granted.

Finally, the Dotys complain that their water supply was "cloudy," "slick," and operated at a low pressure. (Docket Entry No. 335, Ex. 7 at 48:1–4). The Dotys do not allege that the water made them sick, but do allege that they began purchasing bottled

water out of fear of drinking the well water.  The Dotys are not required to present evidence that they became sick from drinking the water, but must present evidence showing that it was not safe to drink.

The Dotys can maintain a claim based on the contaminated water supply.  The 59 Estates subdivision's water system was put into receivership in 2001.  This court's August 25, 2005 memorandum and order found that those plaintiffs living in subdivisions put under State control in 2000 or 2001 could maintain claims for breach of the implied warranty of habitability for the time they lived in the home before the water systems went into receivership.  The Dotys moved into their home in the 59 Estates subdivision in 1998.  That subdivision was put under the receiver's control in 2001.   In May 2000, the defendants conveyed the Dotys' contract for deed to a third-party financing company, Chaminade Capital Corporation.  (Docket Entry No. 342, Ex. 4).  The record shows that the Dotys were current on their contract for deed payments up to the time of the conveyance to Chaminade.  The record is not clear whether the contract for deed will be reconveyed back to the defendants or when that reconveyance might happen; the parties' contract states that reconveyance will occur after Chaminade received 100 monthly payments.  (*Id.*, Ex. 3).  The Dotys surrendered their interest in the home by letter dated March 27, 2002, after Liberty County "red-tagged" the home.  (*Id.*, Ex. D).  It is unclear what effect the "red-tag" and the Dotys' surrender of interest have on their obligations to Chaminade and any future obligations they may have to the defendants. The Dotys move for summary judgment on the defendants' counterclaim for damages for the Dotys'

68

nonperformance under the contract for deed.   (Docket Entry No. 336 at 6).   There are disputed fact issues material to the defendants' counterclaim.   The Dotys' summary judgment motion is denied.

### 5.   *The LaVoies*

The LaVoies' breach of the implied warranty of habitability claim is based on an allegedly defective ceiling and roof, improper foundation, the defendants' failure to install a septic system until one year after the LaVoies moved in, and contaminated water.   Mr. LaVoie testified that the foundation and roofing problems were evident when he first inspected the home.   (Docket Entry No. 335, Ex. 8 at 86:24–87:8).   The LaVoies moved into their home in 1998 and still live there.   The record contains no evidence that the water system in the Huntsville West subdivision was contaminated, other than LaVoie's contention that the water system in some unspecified fashion may have contributed to his wife's miscarriage.   The State of Texas did not put that water system into receivership. The record contains no evidence of the cause of Ms. LaVoie's miscarriage.   Such conclusory allegations cannot support a claim for breach of the habitability warranty.

The LaVoies knew before they purchased the house that it lacked a septic system and negotiated with the defendants for its installation.   This was not a latent defect.   "[T]he implied warranty of habitability extends only to latent defects.   It does not include defects, even substantial ones, that are known by or expressly disclosed to the buyer."   *Centex Homes*, 95 S.W.3d at 275.   Summary judgment on the LaVoies' claim for breach of the implied warranty of habitability is granted.

6.    *The Mosleys*

The Mosleys complain that the defendants failed to provide them materials with which they could finish the construction of their home.  The need for such materials was obvious and cannot form the basis of a claim for breach of an implied warranty of habitability.  The Mosleys also allege that the home has structural problems.  (Docket Entry No. 335, Ex. 9 at 77:18–78:15).  The Mosleys do not contend that the structural problems have made their home uninhabitable.  Like the Dotys, the Mosleys also complain that the defendants have failed to maintain the roads in the 59 Estates subdivision.  Like the Dotys, the Mosleys cannot maintain a claim for breach of the implied warranty of habitability based on defective road maintenance.

The Mosleys also complain that the defendants improperly installed their septic system too close to their water well.  The record contains no evidence that this made the home uninhabitable.  Ms. Mosley alleged that her family had been sick from the water for a short period before the State of Texas put the water system into receivership.  A claim for breach of the implied warranty of habitability based on the water is limited to the time between June 2000, when they moved into their home, and January 22, 2001, when the water system in the 59 Estates subdivision was put under state control and the problems remedied.

The defendants' summary judgment motion as to the Mosleys' claim for breach of the implied warranty of habitability is denied.  That claim, however, is limited to the period before the State remedied the water problems in the subdivision.

## VI.     The Trespass to Try Title Claims

The defendants assert trespass to try title claims against the LaVoies, the Mosleys, and the Bishops, seeking to recover possession of the houses.  A trespass to try title action determines title or the right of possession.  TEX. PROP. CODE § 22.001.  The moving party must show title to the property.  *Rogers v. Ricane Enters., Inc*., 884 S.W.2d 763, 768 (Tex. 1994) (citations omitted).  Under Texas law, when a purchaser defaults on a contract for deed, the seller may terminate the contract by serving the statutory cancellation notice. *See* TEX. PROP. CODE § 5.064.  The buyer does not obtain legal title until full performance and, on default, risks losing possession and any right to require the seller to convey title in the future, along with forfeiting amounts already paid.  *Graves v. Diehl*, 958 S.W.2d 468, 470 (Tex. App.—Houston [14th Dist.] 1997, no pet.).  If the purchaser fails to make payments when due, the seller is entitled to terminate the contract and regain possession of the property.  *Dixon v. Brooks*, 604 S.W.2d 330, 334 (Tex. Civ. App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.).

The record shows that the Bishops satisfied their payment obligation under the contract for deed.[19]  The Bishops obtained a third-party mortgage in 2001 and did not miss a payment under the contract for deed.  The summary judgment record also shows a fact issue as to whether the defendants materially breached the contract for deed, discharging

---

[19]     The defendants moved for summary judgment as to their counterclaim for trespass to try title to the Bishops' home but did not argue it or present any evidence.  (Docket Entry No. 335 at 34–36).

the Bishops' performance obligation.  The defendants' trespass to try title claim is denied as to the Bishops.

Neither the LaVoies nor the Mosleys made payments under their contracts for deed and have been living in their homes without making payments since they moved in.  The summary judgment record does not raise a fact issue material to determining whether their nonpayment was excused by the defendants' material breach; this court found that the "as is" clauses in their contracts for deed are enforceable.  The record does show that the LaVoies filed for bankruptcy in 2002, although it is unclear whether the bankruptcy court discharged the LaVoies' debt under the contract for deed.  Mr. LaVoie testified that the result of the bankruptcy case was that "[p]retty much we ended up with the house." (Docket Entry No. 335, Ex. 8 at 36:1–3).  There are fact issues material to determining whether the defendants are entitled to regain possession of the LaVoies' home after the bankruptcy.  The defendants' motion for summary judgment on this claim is denied.

The Mosleys have failed to show that their nonperformance was excused; however, a fact issue exists as to whether the defendants' claim to the Mosleys' home exceeds the amount of the Mosleys' breach of habitability claim based on the water problems.  The defendants' summary judgment motion for trespass to try title to the Mosleys' home is denied.

The defendants' counterclaim for trespass to try title is denied as to the Bishops, the LaVoies, and the Mosleys.

## VII.   Conclusion

72

This court concludes as follows:

- The defendants' summary judgment motion as to the Alloohs' claims for breach of contract, negligence, breach of the implied warranty of workmanlike construction, and breach of the implied warranty of habitability based on the water system is denied.

- The defendants' summary judgment motion as to Bergkvist's claims for breach of contract, negligence, and breach of the implied warranty of workmanlike construction is granted.  The summary judgment motion as to Bergkvist's breach of the implied warranty of habitability claim based on construction defects is denied.

- The defendants' summary judgment motion as to the Bishops' claims for breach of contract, negligence, and breach of the implied warranty of workmanlike construction is denied. The summary judgment motion as to the Bishops' claim for breach of the implied warranty of habitability is granted.  The defendants' summary judgment motion as to their counterclaim for trespass to try title to the Bishops' home is denied.

•	The defendants' summary judgment motion as to the Dotys' claims for breach of contract, negligence, and breach of the implied warranty of workmanlike construction is denied. The Dotys' summary judgment motion is denied as to the breach of contract claim based on the septic system installation and granted as to the claim based on the foundation problems. The defendants' summary judgment motion as to the Dotys' breach of the implied warranty of habitability claim based on the septic and water systems is denied. The Dotys' summary judgment motion based on their claims of fraud and breach of the implied habitability warranty, and on the defendants' counterclaim for the fair-market rental value of the home, is also denied.

•	The defendants' summary judgment motion as to the LaVoies' claims for breach of contract based on the failure to install the septic system is denied. The defendants' summary judgment motion as to the claims for breach of contract based on the other alleged defects, negligence, breach of the implied warranty of workmanlike construction, and breach of the implied warranty of habitability is granted. The summary

judgment motion as to the defendants' counterclaim for trespass to try title to the LaVoies' home is denied.

• The defendants' summary judgment motion as to the Mosleys' claims for breach of contract, negligence, and breach of the implied warranty of workmanlike construction is granted; the summary judgment motion as to the claim for breach of the implied warranty of habitability is denied. The summary judgment motion as to the defendants' counterclaim for trespass to try title to the Mosleys' home is denied.

Docket call is set for **September 14, 2007, at 9:00 a.m.** on the remaining claims. The parties must file exhibit lists and witness lists, and exchange exhibits, no later than **September 7, 2007**.

SIGNED on July 3, 2007, at Houston, Texas.

Lee H. Rosenthal
United States District Judge